# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
### Judge John L. Kane

Civil Action No. 09-cv-00938-JLK consolidated with No. 10-cv-00765-JLK

**JAMES P. TENNILLE, ROBERT SMET, ADELAIDA DELEON and YAMILET RODRIGUEZ**, individually and on behalf of all others similarly situated,

       Plaintiffs,

v.

**THE WESTERN UNION COMPANY and WESTERN UNION FINANCIAL SERVICES, INC.,**

       Defendants.

_____

## DECLARATION OF BRIAN T. FITZPATRICK

I.  Background and qualifications

1.      My name is Brian Fitzpatrick and I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Appendix 1.

2.      Like my research at New York University before it, my teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses at Vanderbilt.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the

Journal of Empirical Legal Studies, and the Vanderbilt Law Review.  My work has been cited by numerous courts, scholars, and popular media outlets, such as the New York Times, USA Today, and Wall Street Journal.  I am also frequently invited to speak at symposia and other events about class action litigation, such as the ABA National Institute on Class Actions in 2011 and the ABA Annual Meeting in 2012.  Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.

3.      In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  This article is what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published.  Unlike other studies of class actions, which have been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period, 2006-2007.  *See id*. at 812-13.  As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 23 from the Tenth Circuit alone.  *See id*. at 817.  I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010.  This study has been relied upon by a number of courts, scholars, and testifying experts.  *See, e.g.*, *In re Heartland Payment*

*Systems, Inc. Customer Data Sec. Breach Litigation*, 851 F.Supp.2d 1040, 1081 (S.D. Tex. 2012) (relying on article to set fees in a class action case); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill., Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litigation*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Services Sales Tax Litigation*, 792 F.Supp.2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litigation*, 689 F.Supp.2d 297, 359 (E.D.N.Y. 2010) (same).

4.      I have been asked by Class Counsel to opine on whether the attorneys' fees requested in this litigation are reasonable.  In order to formulate my opinion, I reviewed a number of documents provided to me by Class Counsel; I have attached a list of these documents (and noted how I refer to these documents herein) in Appendix 2.  As I explain, based on my study of settlements across the country and in the Tenth Circuit in particular, I believe the fee requested here is within the range of reason.

II.  Case background

5.      These lawsuits allege that The Western Union Company ("Western Union") and Western Union Financial Services, Inc. ("Western Union Financial Services"), unjustly enriched themselves and violated other state laws through their policy and practice of not notifying customers when their money transfers fail, and, instead, holding the money for their own purposes until it escheats to the state in which the transfer was initiated.  It is only at this time that Western Union attempts to contact customers about their failed transfers.  The lawsuits allege that the Defendants benefited from this practice by collecting millions of dollars in interest and fees on the unreturned money until it escheated to state treasuries.  The *Tennille* suit was filed on April 23, 2009.  The *Smet* suit was filed on April 2, 2010.  The two suits were consolidated on April 10, 2010.  The parties have now settled the lawsuit in a single agreement,

and they have moved the Court to certify a Settlement Class and approve the Settlement.  The Court preliminarily did so on January 3, 2013.  The hearing on Plaintiffs' Motion for Final Approval of the Settlement and an award of Attorneys' Fees is scheduled for June 14, 2013.

6.        The Settlement Class includes, with minor exceptions, "all persons" who initiated any transaction with the Defendants in the United States between January 1, 2001, and the date of preliminary approval that "was not redeemed within 60 calendar days" and whose money has either gone unclaimed since then or was claimed only after notice from the Defendants that it was about to escheat to the government.  Settlement Agreement ¶ 1.C.  Pursuant to the Settlement Agreement, the Settlement Class will release the Defendants from any and all claims pertaining to the subject matter of the litigation that "have been . . . or could have been" alleged in these lawsuits.  *See id.* at ¶ 10.B.  In exchange, the Defendants will provide four types of relief.  First, the Defendants will pay what is estimated to be $180 million into a "common fund" to be distributed *pro rata* (after the deduction of attorneys' fees and administrative expenses) to Class Members based on the amount of their unclaimed monies that the Defendants still possess and the interest that has accrued thereon;[1] none of this money will revert back to the Defendants.[2]  *See id.* at ¶¶ 2.A.3, 2.C.1-2.  Second, the Defendants will directly pay Class Members who file claims *all* of the estimated interest that accrued to Defendants on unclaimed monies that have already escheated to state government entities.  *See id.* at ¶ 2.B.2.  Total amount of interest Class Members could recover from the common fund and directly from Western

---

[1] Class Members who recovered their monies only after the Defendants sent them a pre-escheat notice will also be paid out of this cash fund (based on the estimated amount of interest that accrued before their recoveries).  *See* Settlement Agreement ¶ 2.C.5.

[2] If all Class Members who file claims receive 100% of their principal and interest and there is still cash left in the fund, the remainder will go to state governments in proportion to how much of the fund would have escheated to each state had no claims been made.  *See* Settlement Agreement ¶ 6.A.

Union is some $19 million.  *See* Burke Affidavit ¶ 65.  Third, Class Counsel and the Defendants will use reasonable efforts to assist Class Members in recovering from state governmental entities unclaimed monies that have already escheated by providing data that can be inserted on pre-printed escheat recovery forms for class members.  *See id.* at ¶ 2.B.1; Preliminary Approval Motion 9 n.5.  As much as $83 million could be recovered by Class Members from these efforts. *See* Burke Affidavit ¶ 65.  Fourth, going forward Western Union has agreed to change its practices so that customers will now be notified within 60-90 days when their money transfers fail; the first 7.5 years of this change in business practices will be under court supervision.  *See* Settlement Agreement ¶ 2.D.1.  Based on past revenues earned by the Defendants, it is estimated that this going forward change in practice will cost the Defendants—and save consumers, including many Class Members—approximately $187 million (in present-day dollars) over the next 7.5 years alone.  *See* Johnson Affidavit ¶16.  All told, then, this settlement could provide benefits to Class Members totaling many hundreds of millions of dollars.  *See* Burke Affidavit ¶ 69.

7.      Class counsel are now moving for an award of fees equal to thirty percent (30%) of the cash portion of the settlement, or approximately $54 million.[3]  They are not additionally seeking reimbursement for their expenses; they will pay those out of their own pockets.  In addition, they are not seeking to be compensated by a portion of the value of the non-cash benefits and changed practices they extracted from the Defendants in this litigation.  It should be

---

[3] The settlement agreement provides in ¶ 2.C.3 for an accounting to determine the actual amount of funds to be deposited into the Class Settlement Fund.  The accounting may determine a different amount than the originally estimated $180 million. As of the date of this writing, the accounting has not been conducted and the actual determination of the amount to be deposited into the Class Settlement Fund remains to be determined.  I understand that an interim escheatment may occur and that Defendants have more recently projected the amount to be as low as $149 million.

noted at the outset that, on both of these points, Class Counsel have been much more conservative in their fee request than they could have been (and, in my experience, much more conservative than many other class counsel are). Indeed, if calculated as a percentage of the total potential value of the settlement, the attorneys' fees requested here are a fraction of 30%.

III. Assessment of the reasonableness of the request for attorneys' fees

8.     This is a so-called "common fund" settlement, where the efforts by attorneys for the plaintiffs have created a common fund for the benefit of class members, but, because this is a class action and there is no fee-shifting statute applicable, the attorneys can be compensated only from the fund they have created. At one time, courts that awarded fees in common fund class action cases did so using the familiar "lodestar" approach. *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043, 2051 (2010) (hereinafter "Class Action Lawyers"). Under this approach, courts awarded class counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors. *See id.* Over time, however, the lodestar approach fell out of favor in common fund class action cases because it was difficult to calculate the lodestar (courts had to review voluminous time records and the like). More importantly, it was disfavored because the method did not align the interests of class counsel with the interests of the class (because class counsels' recovery did not depend on how much the class recovered). *See id.* at 2051-52. According to my empirical study, the lodestar method is now used to award fees in only a small percentage of class action cases. *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of settlements).

9.      Reflecting this trend, the Tenth Circuit has expressed its "preference" for what is known as the percentage-of-the-fund method.  *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994) (holding that district court had abused its discretion by using the lodestar method).  Under this approach, courts select a percentage that they believe is fair to class counsel, multiply the settlement amount by that percentage, and then award class counsel the resulting product.  The percentage-of-the-fund approach has the advantages of being efficient in its process of calculation and, more importantly, of aligning the interests of class counsel with the interests of the class (because the more the class recovers, the more class counsel recovers).  *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052.  In light of the well-recognized disadvantages of the lodestar method and the well-recognized advantages of the percentage-of-the-fund method, it is my opinion, like that of the Tenth Circuit, that courts should generally use the percentage-of-the-fund method in common fund cases, and that it should be used here.

10.      Courts usually examine a number of factors when deciding what percentage to award class counsel under the percentage-of-the-fund approach.  *See* Fitzpatrick, *Empirical Study, supra*, at 832.  In the Tenth Circuit, courts typically consider the twelve factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974): "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee . . .; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-56 (10th Cir. 1988).

11.     Although the Tenth Circuit has not yet explicitly ruled on whether courts should also consider any non-cash relief included in the settlement when analyzing fee awards, many other courts have concluded that they should.  This is for good reason.  If class counsel are not compensated in some way for the work they do in securing non-cash relief, then they will have no incentive to pursue such relief—even if it is more valuable to the class than cash relief (as it very well may be here).  This would obviously be harmful not only from the perspective of class members, but from the perspective of sound public policy as well.  In my experience, courts compensate class counsel for their work on non-cash relief in three principal ways.  First, when the non-cash relief can be reliably valued, some courts include the value of this relief in the common fund and award class counsel a percentage of the total fund.  *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) ("[W]here the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained . . . courts [may] include such relief as part of the value of a common fund for purposes of applying the percentage method . . . ."); *see also* Principles of the Law of Aggregate Litigation, § 3.13(b) (American Law Institute, 2010) ("[A] percentage of the fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and nonmonetary value of the judgment or settlement.").  Second, some courts award class counsel a flat fee for the non-cash relief in addition to a percentage of the cash portion.  *See, e.g., Faught v. American Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2012) (affirming fee award of $1.5 million plus 25% of cash recovery).  Finally, some courts increase the percentage awarded to class counsel from the cash portion of the settlement to account for their efforts toward non-cash relief.  *See, e.g., Staton*, 327 F.3d at 946 ("The fact that counsel obtained injunctive relief in addition to monetary relief for their clients is . . . a relevant circumstance to consider in

determining what percentage of the fund is reasonable as fees."); *Camden I Condominium Ass'n v. Dukle*, 946 F.2d 768, 775 (11th Cir. 1991) (considering "any non-monetary benefits conferred upon the class" when setting fee percentage).  In my opinion, any of these three approaches is reasonable, including the last method, which is the one requested by Class Counsel.

12.     In this case, Class Counsel are seeking an award of fees equal to thirty percent (30%) of the cash portion of the settlement alone, or approximately $54 million.  They are not separately seeking reimbursement of their expenses; they will pay them out of whatever fee the Court awards them.  In my opinion, the fee award requested here is within the range of reason because it is independently supported by all of the factors listed above.  *See also Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849 (10th Cir. 1993) (affirming fee award of 29% of common fund).

13.     Consider first the factors that go to the fee awards in other cases: "(5) the customary fee" and "(12) awards in similar cases."  According to my empirical study, there were 18 class action cases in 2006 and 2007 in which district courts in the Tenth Circuit used the percentage-of-the-fund method to award attorneys' fees.  *See* Fitzpatrick, *Empirical Study, supra*, at 836.  The average fee awarded in these cases was 25.3% and the median fee awarded was 25.5%.  *See id.*  But *one third* of the awards were *30% or greater*.  These numbers are similar to those that I found outside the Tenth Circuit.  According to my empirical study, the most common percentages awarded by federal courts nationwide using the percentage-of-the-fund method were 25%, 30%, and 33%, with nearly two-thirds of awards between 25% and 35%, and with a mean award of 25.4% and a median award of 25%.  *See id.* at 833-34, 838.  All of these numbers are generally consistent with other large-scale empirical studies of fee awards. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action*

*Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 260 (2010) (finding average and median percentages of 24% and 25% nationwide and 22% and 23% in the Tenth Circuit among federal courts from 1993-2008).[4]   These numbers show that the percentage requested here is above average, but still firmly within the mainstream of awards.   As I explain below, in light of the other *Johnson* factors, I think it is reasonable to award Class Counsel an above-average—but still mainstream—fee percentage for their work in these suits.   Moreover, it should be noted that almost all of these numbers are based on fee awards that were *exclusive* of expenses, *see* Fitzpatrick, *Empirical Study, supra*, at 833 ("[F]ee awards are exclusive of awards for expenses . . . 96 percent of the time . . . ."), whereas the award requested here would be *inclusive* of expenses.

14.      It is true the nationwide data in my empirical study (consistent with other large-scale empirical studies, *see* Eisenberg & Miller, *supra*, at 264) showed that settlement size had a statistically significant but inverse relationship with the fee percentages awarded—*i.e.*, that federal courts awarded lower percentages in cases where settlements were larger.[5]   *See* Fitzpatrick, *Empirical Study, supra,* at 838, 842-44.   As I explain below, however, for three reasons, I do not believe these nationwide data detract from my opinion that the award requested here is within the range of reasonable awards.

15.      First, again, my data from large settlements is based mostly on cases that did not involve any non-cash relief; the settlement here, by contrast, involves non-cash relief that is *at least as substantial* as the cash relief (and Class Counsel are *not* seeking a percentage of the

---

[4] The fee-percentage numbers in the Eisenberg-Miller study are often slightly lower than in my study because their methodology led them to oversample larger settlements.   *See* Fitzpatrick, *Empirical Study, supra* at 829.

[5] For example, in the fourteen percentage-of-the-fund settlements in my dataset between $100 and $250 million, the mean and median fee percentages were 17.9% and 16.9%, respectively.   *See id.* at 839.

value of that non-cash relief).  As such, it would not be unreasonable to award a fee percentage in this case that exceeds—even significantly—the awards in other large settlements.

16.     Second, and perhaps most importantly, the practice followed by some courts to lower fee percentages as settlement amounts increase has been criticized by many scholars and other courts, and, in my opinion, it should not be emulated in cases such as these here.  In particular, courts and commentators have worried that lowering percentages as settlement sizes increase will blunt the incentives of class counsel to work for the largest settlement, and, indeed, might incentivize class counsel to settle cases earlier for smaller sums.  *See, e.g.*, *In re Cendant Corp. Litigation*, 264 F.3d at 284 n. 55 ("Th[e] position [that the percentage of a recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply." (alteration in original)); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185, 1213 (S.D.Fla. 2006) ("While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method . . . . .  By not rewarding class counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for class counsel to settle too early for too little.").  Consider the following example: if courts award class counsel 30% of settlements if they are under $100 million, but only 20% of settlements if they are over $100 million, then rational class counsel will prefer to settle cases for $90 million (*i.e.*, a $27 million fee award) than $125 million (*i.e.*, a $25 million fee award).  Such incentives are obviously perverse both from the perspective of class members and from the perspective of sound public policy.  Although it is true that class actions can decrease the per capita cost of

representation, and that there are arguments that these economies of scale should be passed along to class members in the form of lower fee percentages, *see* Fitzpatrick, *Class Action Lawyers*, *supra*, at 2066, the amount of money for which a class action settles does not necessarily reflect the number of people in the action (and, therefore, the per capita cost of the representation). Moreover, even when larger settlements do reflect larger class sizes (and lower per capita costs of representation), it is difficult to justify decreasing fee percentages as settlements increase in cases where, as here, class members have relatively small amounts of money at stake.   As scholars have long recognized, in these so-called "small stakes cases," the most important function of the class action device may not be compensation of class members, but deterrence of wrongdoing.   *See id*. at 2069 (citing David Shapiro, *Class Actions: The Class as Party and Client*, 73 Notre Dame L. Rev. 913 (1998); Myriam Gilles & Gary Friedman, *Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers*, 155 U. Pa. L. Rev. 103 (2006)).   In order to deter wrongdoing, lawyers must be given incentives to invest their own time and money in class actions despite the risk of earning nothing if they are unsuccessful. Yet, these incentives are blunted for the very cases offering the greatest deterrence (*i.e.*, larger cases) when courts award lower fee percentages as settlements become larger.   Although trading away deterrence for other ends may be justifiable in some cases, it is difficult to justify it in small-stakes cases where deterrence is the paramount consideration.   *See id.* at 2069-74.

17.     Finally, the fact that average and median fee percentages are often lower in larger cases does not mean, of course, that courts do not award higher fee percentages when the facts and circumstances justify it.   Indeed, there are a number of examples from all across the country of fee awards at or above 30% in large settlements.   *See, e.g., Allapattah*, 454 F.Supp.2d at 1218 (31.33% of $1.075 billion); *In re Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330,

1358 (S.D.Fla. 2011) (30% of $410 million); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at \*10 (D.D.C. July 16, 2001) (34% of $365 million); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at \*1 (E.D.Pa., June 2, 2004) (30% of $202 million); *In re Apollo Group Inc. Securities Litigation,* 2012 WL 1378677, at \*9 (D.Ariz., April 20, 2012) (33% of $145 million); *In re Combustion Inc.*, 968 F.Supp. 1116, 1142 (W.D.La. 1997) (36% of $127 million); *Kurzwell v. Philip Morris Companies,* 1999 WL 1076105, at \*1 (S.D.N.Y., Nov. 30, 1999) (30% of $123 million); *In re Ikon Office Solutions, Inc. Securities Litig.,* 194 F.R.D. 166, 197 (E.D.Pa. 2000) (30% of $111 million).

18.     Consider next the *Johnson* factors that go to the results obtained by class counsel in light of the risks the class faced: "(2) the novelty and difficulty of the questions"; "(4) the preclusion of other employment by the attorney due to acceptance of the case"; "(8) the amount involved and the results obtained"; and "(10) the undesirability of the case." All of these factors support the fee requested here. Consider first the results. At trial, I believe the class might have recovered three components of monetary relief: 1) any unescheated principal, 2) the interest that the Defendants had earned on escheated as well as unescheated principal, and 3) administrative fees that the Defendants had deducted from escheated and unescheated principal. According to calculations Class Counsel have received from the Defendant, this relief might have totaled as much $230 million. *See* Burke Affidavit, ¶¶ 64-67. Even ignoring all of the other relief the Defendants will provide to Class Members and considering only the common fund portion—which, again, is $180 million—the recovery here is some 78% of the total possible recovery. This recovery compares very favorably to other class action settlements. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 241 n. 22 (3d Cir. 2001) (citing securities settlements with recoveries between 1.6% and 14% of potential damages).

19.     But the settlement compares even more favorably in light of the risks the class faced.  Not only do the Defendants have numerous defenses under state law to the claims raised in these suits—for example, class members may not have been able to recover the administrative fees deducted by Defendants in light of their contractual agreements and state laws, *see* Preliminary Approval Motion at 27 n. 13—but, even more significantly, there remains a serious question whether these suits can be maintained as a class action at all.  This is the case because Western Union Financial Services contends that the contracts between Class Members and the Defendants include an arbitration provision that contains a bar on class action proceedings.  *See* Motion to Compel Arbitration at 4-7.  If the Defendants had been permitted to enforce this provision, each member of the class here would have been compelled to proceed individually in arbitration, something few would do because 1) the small individual recoveries at issue would make doing so cost prohibitive and 2) it is unlikely that Class Members even knew that Western Union held their funds for, on average, over 5 years.  Indeed, because such provisions effectively insulate Defendants from liability, many courts have held that class action bars are unconscionable under state contract law.  *See, e.g.*, *Discover Bank v. Superior Court*, 113 P.3d 1100, 1110 (Cal. 2005).  In April 2011, the United States Supreme Court held that the Federal Arbitration Act preempted such state laws, thereby rendering enforceable class action bars found in arbitration agreements.  *See AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011).  The Court here found that Western Union's waiver of the benefit of the arbitration provision was imputed to Western Union Financial Services.  *See* Transcript of Hearing on Motion to Compel p. 43.  These questions have now been appealed to the Tenth Circuit, and, if the Tenth Circuit were indeed to decide these questions differently, the settlement value of these suits would fall to

something approaching zero.   In short, there is little doubt in my mind that the results here compare very favorably to the risks the class faced and support an above-average fee award.

20.        Consider next the non-monetary benefits conferred upon the class.  As I noted above, Class Counsel have secured an agreement from the Defendants to change their practices and now notify customers within 60-90 days of when their money transfers fail.  This change may save future customers—many of whom are no doubt members of the class—$187 million (in present-day dollars) in the coming years.  In addition, Class Counsel have secured assistance from the Defendants that will make it easier for class members to recover unclaimed monies that have already escheated to government entities.  This assistance is probably not even a form of relief the class could have obtained had it won at trial.  As I noted, this component of the settlement could be worth as much as $83 million dollars depending on how many Class Members seek escheatment recovery.  Finally, Class Counsel have secured an agreement from the Defendants to pay directly to Class Members all interest it earned by holding unclaimed monies that have already escheated—a benefit worth as much as $19 million more to the class depending on how many Class Members file claim forms.  These benefits to the class may be even more valuable to the class than the cash fund called for by the settlement, yet Class Counsel are not seeking a share of any of these benefits (even though I believe it would have been quite possible to reliably value and include at least some of these benefits in the common fund for purposes of calculating Class Counsel's fee award).  As I noted above, it is therefore important to ensure that Class Counsel are compensated in another way for their work in securing these benefits.  One way to do so, as I also noted above, is to increase Class Counsel's fee percentage from the cash portion of the settlement beyond that which would have been awarded had there been no non-cash relief.  In this regard, it should be noted that the numbers I cited above from

my empirical study were based mostly on cases that did *not* include any non-cash relief. *See* Fitzpatrick, *Empirical Study*, *supra*, at 824 (Table 3). As such, this factor strongly supports awarding a fee percentage here that is above the average and median numbers found in my study.

21. Consider finally the other *Johnson* factors. All of these factors also look favorably on the fee award requested here. One factor goes to the time it took to litigate and settle these cases: "(1) the time and labor required." These lawsuits have transpired for over three years; according to my empirical study, this is longer than the average and median times to settlement in consumer class action cases (963 days and 720 days, respectively). *See id.* at 820. And these suits have not been idle over this time: in addition to an extensive motion practice, the parties engaged in substantial discovery related to arbitration (merits discovery was stayed pending resolution of the arbitration issues), including review of thousands pages of discovery and the depositions of ten witnesses, including six corporate designees. *See* Burke Affidavit ¶¶ 39-48. Perhaps most importantly, however, Class Counsel have an unusual amount of post-settlement work to do in these cases; they will spend substantial time assisting Class Members with the paper work needed to recover their monies that have already escheated to government entities. Another factor considers "(6) any prearranged fee." Class Counsel have shown me their retainer agreements with the plaintiffs, and the agreements call for a fee award of 33% of any recovery. Thus, the fee percentage requested here is *below* that which was prearranged. The remaining factors go to the skills of Class Counsel and their relationship with the plaintiffs: "(3) the skill requisite to perform the legal service properly," "(7) time limitations imposed by the client or the circumstances," "(9) the experience, reputation, and ability of the attorneys," and "(11) the nature and length of the professional relationship with the client." Although I was not privy to the attorney-client relationships here, I can say that Class Counsel count among their

number some of the most exceptional lawyers in the United States.  By any measure, these are "above average" lawyers.

22.     With all that said, I would be remiss if I did not discuss one last matter pertinent to the fee award requested here.  As I noted above, if there are any monies remaining in the cash fund after all Class Members who submit claims have received 100% of their principal and interest back, the monies will be within the discretion of the Court to distribute upon recommendation that it be sent to state governments in proportion to how much of the principal would have escheated to them had there been no claims on the fund.  This distribution is described in the settlement as a "*cy pres*" (French for "as near as possible") distribution.  I wish to draw attention to this distribution because *cy pres* distributions in other cases have been criticized in recent months, *see, e.g.*, In re *Baby Products Antitrust Litigation*, 708 F.3d 163, 171-80 (3d Cir. 2013), and I believe it is important to note that there is nothing untoward about the distribution here.  In my opinion, in small-stakes cases like this one where, as I noted above, deterrence may be the paramount purpose of the class action, I think there are many reasonable ways to deal with residual settlement funds; most any option short of returning the funds to defendant will serve the goal of deterrence equally well.  *See* Fitzpatrick, *Class Action Lawyers, supra*, at 2081-82.  As such, I think it is perfectly reasonable to send the money to state governments.[6]  In *Baby Products*, the Third Circuit criticized the *cy pres* distribution because the settlement sent residual monies to third parties before compensating class members who did file claims for 100% of their damages.  *See* In re *Baby Products*, 708 F.3d at 175-76.  Whatever the merit of this criticism, it is largely inapplicable here because any residual monies will exist only

---

[6] Some commentators believe this is not only a reasonable way to deal with residual funds, but that this is the best of all alternatives.  *See generally* Goutam U. Jois, *The Cy Pres Problem and the Role of Damages in Tort Law*, 16 Va. J. Soc. Pol'y & L. 258 (2008).

after all Class Members who file claims receive 100% of their principal and interest; it is true Class Members will not recover the administrative fees the Defendants deducted, but, as I noted above, it was speculative whether these were legally recoverable to begin with.  Moreover, Class Members will receive hundreds of millions of dollars in additional relief through the changes in Defendants' disclosure policies.

23.     A question was also raised in *Baby Products* over whether class counsel should be compensated at the same percentage from the portion of a common fund that ultimately goes to a *cy pres* distribution as they are from the portions that went directly to the class.   The Third Circuit rejected a rule that they should not, *see id.* at 178 ("We think it unwise to impose . . . a rule requiring district courts to discount attorneys' fees when a portion of an award will be distributed *cy pres.*"), and, in my opinion, this is the correct approach.  If class counsel are not compensated for extracting money from the defendants to pay *cy pres* distributions, then class counsel will have little incentive to undertake the burden of arranging such distributions rather than simply permitting the residual monies to revert to those defendants.  This would undermine the goals of class action litigation in small-stakes class actions like this one where, again, deterrence and not compensation is of paramount importance.  In class actions like this one, it is—frankly—most important that the defendants pay someone for the harm they caused; it is less important *whom* they pay.  *See id.* ("Nor do we want to discourage counsel from filing class actions in cases where few claims are likely to be made but the deterrent effect of the class action is equally valuable.").

24.     For all these reasons, I believe fee award requested here is within the range of reason.

25.     My compensation in this matter is $495 per hour plus expenses.

Nashville, TN

April 29, 2013


Brian T. Fitzpatrick

# Appendix 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Professor*, August 2012 to present
- *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Federal Courts, Complex Litigation
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## ACADEMIC ARTICLES

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

## BOOK CHAPTERS

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, forthcoming 2012)

## ACADEMIC PRESENTATIONS

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Corporate Law Center, Fordham Law School (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law (Apr. 3, 2007) (panelist)


**OTHER PUBLICATIONS**

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club of Nashville (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

# Appendix 2

Documents Reviewed:

- Docket entries in *Tennille v. Western Union Company*, No. 09-cv-00938-JLK-MKT (D.Colo.)

- Order Granting Western Union's Motion to Dismiss Complaint for Failure to State a Claim on which Relief Can be Granted in *Tennille* (document 12, filed 9/21/2009)

- Order Denying Western Union's Motion to Dismiss Plaintiffs' Complaints for Failure to State a Claim on which Relief Can be Granted in Part and for Scheduling Conference in *Tennille* (document 28, filed 11/8/2010)

- Western Union's Answer and Affirmative Defenses to Plaintiff's First Amended Class Action Complaint in *Tennille* (document 35, filed 11/30/10)

- Western Union's Answer and Affirmative Defenses to Plaintiff's Class Action Complaint in *Smet v. The Western Union Company*, No. 10-cv-765-JLK (document 36, filed 11/30/10)

- Second Amended Consolidated Class Action Complaint in *Tennille* (document 45, filed 3/11/11)

- Defendants' Motion to Dismiss Count IV and Count V of Plaintiff's Second Amended Consolidated Class Action Complaint for Failure to State a Claim Upon Which Relief Can Be Granted in *Tennille* (document 52, filed 4/25/11)

- Western Union Financial Services' Motion to Compel Arbitration and Stay Proceedings Pending Arbitration in *Tennille* (document 56, filed 6/7/11) ("Motion to Compel Arbitration")

- Plaintiffs' Response to Opposition to Defendants' Motion to Dismiss Count IV and Count V of Plaintiffs' Second Amended Consolidated Class Action Complaint in *Tennille* (document 61, filed 6/8/11)

- Defendants' Reply in Support of Motion to Dismiss Count IV and Count V of Plaintiffs' Second Amended Consolidated Class Action Complaint in *Tennille* (document 80, filed 7/8/11)

- Plaintiffs' Response in Opposition to Western Union Financial Services' Motion to Compel Arbitration and Stay Proceedings Pending Arbitration in *Tennille* (document 112, filed 8/19/11)

- Western Union Financial Services' Reply Brief in Support of its Motion to Compel Arbitration and Stay Proceedings Pending Arbitration in *Tennille* (document 131, filed 9/28/11)

- Western Union Financial Services' Notice of Supplemental Authority re: Western Union Financial Services' Motion to Compel Arbitration and Stay Proceedings Pending Arbitration in *Tennille* (document 138, filed 11/18/11)

- Transcript of Oral Argument on Western Union Financial Services' Motion to Compel Arbitration and Stay Proceedings Pending Arbitration in *Tennille* (11/21/11) ("Transcript of Hearing on Motion to Compel")

- Plaintiffs' Motion to Certify Western Union Financial Services' Appeal as Frivolous in *Tennille* (document 153, filed 1/5/12)

- Order Denying Plaintiffs' Motion to Certify Western Union Financial Services' Appeal as Frivolous in *Tennille* (document 154, filed 1/13/12)

- Plaintiffs' Memorandum in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement in *Tennille* (document 172-1, filed 12/21/12)

- Stipulation and Agreement of Compromise and Settlement in *Tennille* (document 172-2, filed 12/21/12) ("Settlement Agreement")

- Affidavit of R. Larry Johnson (filed herewith) ("Johnson Affidavit")

- Affidavit of Richard Burke in Support of Final Approval of the Class Action Settlement and Class Counsels' Application for Attorneys' Fees (filed herewith) ("Burke Affidavit")

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**
**Judge John L. Kane**

Civil Action No. 09-cv-00938-JLK consolidated with No. 10-cv-00765-JLK

**JAMES P. TENNILLE, ROBERT SMET, ADELAIDA DELEON and YAMILET
RODRIGUEZ**, individually and on behalf of all others similarly situated,

        Plaintiffs,

v.

**THE WESTERN UNION COMPANY and WESTERN UNION FINANCIAL SERVICES,
INC.,**

        Defendants.

_____

## DECLARATION OF BRIAN T. FITZPATRICK

I.  Background and qualifications

1.      My name is Brian Fitzpatrick and I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Appendix 1.

2.      Like my research at New York University before it, my teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses at Vanderbilt.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the

Journal of Empirical Legal Studies, and the Vanderbilt Law Review.  My work has been cited by

numerous courts, scholars, and popular media outlets, such as the New York Times, USA Today,

and Wall Street Journal.  I am also frequently invited to speak at symposia and other events

about class action litigation, such as the ABA National Institute on Class Actions in 2011 and the

ABA Annual Meeting in 2012.  Since 2010, I have also served on the Executive Committee of

the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.

3.      In December 2010, I published an article in the Journal of Empirical Legal

Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J.

Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  This article is what I believe to

be the most comprehensive examination of federal class action settlements and attorneys' fees

that has ever been published.  Unlike other studies of class actions, which have been confined to

securities cases or have been based on samples of cases that were not intended to be

representative of the whole (such as settlements approved in published opinions), my study

attempted to examine *every* class action settlement approved by a federal court over a two-year

period, 2006-2007.  *See id.* at 812-13.  As such, not only is my study an unbiased sample of

settlements, but the number of settlements included in my study is several times the number of

settlements per year that has been identified in any other empirical study of class action

settlements: over this two-year period, I found 688 settlements, including 23 from the Tenth

Circuit alone.  *See id.* at 817.  I presented the findings of my study at the Conference on

Empirical Legal Studies at the University of Southern California School of Law in 2009, the

Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in

2009, and before the faculties of many law schools in 2009 and 2010.  This study has been relied

upon by a number of courts, scholars, and testifying experts.  *See, e.g.*, *In re Heartland Payment*

*Systems, Inc. Customer Data Sec. Breach Litigation*, 851 F.Supp.2d 1040, 1081 (S.D. Tex. 2012) (relying on article to set fees in a class action case); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill., Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litigation*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Services Sales Tax Litigation*, 792 F.Supp.2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litigation*, 689 F.Supp.2d 297, 359 (E.D.N.Y. 2010) (same).

4.    I have been asked by Class Counsel to opine on whether the attorneys' fees requested in this litigation are reasonable.  In order to formulate my opinion, I reviewed a number of documents provided to me by Class Counsel; I have attached a list of these documents (and noted how I refer to these documents herein) in Appendix 2.  As I explain, based on my study of settlements across the country and in the Tenth Circuit in particular, I believe the fee requested here is within the range of reason.

II.  Case background

5.    These lawsuits allege that The Western Union Company ("Western Union") and Western Union Financial Services, Inc. ("Western Union Financial Services"), unjustly enriched themselves and violated other state laws through their policy and practice of not notifying customers when their money transfers fail, and, instead, holding the money for their own purposes until it escheats to the state in which the transfer was initiated.  It is only at this time that Western Union attempts to contact customers about their failed transfers.  The lawsuits allege that the Defendants benefited from this practice by collecting millions of dollars in interest and fees on the unreturned money until it escheated to state treasuries.  The *Tennille* suit was filed on April 23, 2009.  The *Smet* suit was filed on April 2, 2010.  The two suits were consolidated on April 10, 2010.  The parties have now settled the lawsuit in a single agreement,

3

and they have moved the Court to certify a Settlement Class and approve the Settlement.  The Court preliminarily did so on January 3, 2013.  The hearing on Plaintiffs' Motion for Final Approval of the Settlement and an award of Attorneys' Fees is scheduled for June 8, 2013.

      6.        The Settlement Class includes, with minor exceptions, "all persons" who initiated any transaction with the Defendants in the United States between January 1, 2001, and the date of preliminary approval that "was not redeemed within 60 calendar days" and whose money has either gone unclaimed since then or was claimed only after notice from the Defendants that it was about to escheat to the government.  Settlement Agreement ¶ 1.C.  Pursuant to the Settlement Agreement, the Settlement Class will release the Defendants from any and all claims pertaining to the subject matter of the litigation that "have been . . . or could have been" alleged in these lawsuits.  *See id*. at ¶ 10.B.  In exchange, the Defendants will provide four types of relief.  First, the Defendants will pay what is estimated to be $180 million into a "common fund" to be distributed *pro rata* (after the deduction of attorneys' fees and administrative expenses) to Class Members based on the amount of their unclaimed monies that the Defendants still possess and the interest that has accrued thereon;[1] none of this money will revert back to the Defendants.[2]  *See id.* at ¶¶ 2.A.3, 2.C.1-2.  Second, the Defendants will directly pay Class Members who file claims *all* of the estimated interest that accrued to Defendants on unclaimed monies that have already escheated to state government entities.  *See id.* at ¶ 2.B.2.  Total amount of interest Class Members could recover from the common fund and directly from Western

---

[1] Class Members who recovered their monies only after the Defendants sent them a pre-escheat notice will also be paid out of this cash fund (based on the estimated amount of interest that accrued before their recoveries).  *See* Settlement Agreement ¶ 2.C.5.

[2] If all Class Members who file claims receive 100% of their principal and interest and there is still cash left in the fund, the remainder will go to state governments in proportion to how much of the fund would have escheated to each state had no claims been made.  *See* Settlement Agreement ¶ 6.A.

Union is some $19 million.  *See* Burke Affidavit ¶ 67.  Third, Class Counsel and the Defendants will use reasonable efforts to assist Class Members in recovering from state governmental entities unclaimed monies that have already escheated by providing data that can be inserted on pre-printed escheat recovery forms for class members.  *See id.* at ¶ 2.B.1; Preliminary Approval Motion 9 n.5.  As much as $83 million could be recovered by Class Members from these efforts.  *See* Burke Affidavit ¶ 67.  Fourth, going forward Western Union has agreed to change its practices so that customers will now be notified within 60-90 days when their money transfers fail; the first 7.5 years of this change in business practices will be under court supervision.  *See* Settlement Agreement ¶ 2.D.1.  Based on past revenues earned by the Defendants, it is estimated that this going forward change in practice will cost the Defendants—and save consumers, including many Class Members—approximately $187 million (in present-day dollars) over the next 7.5 years alone.  *See* Johnson Affidavit ¶16.  All told, then, this settlement could provide benefits to Class Members totaling many hundreds of millions of dollars.  *See* Burke Affidavit ¶ 70.

    7.    Class counsel are now moving for an award of fees equal to thirty percent (30%) of the cash portion of the settlement, or approximately $54 million.[3]  They are not additionally seeking reimbursement for their expenses; they will pay those out of their own pockets.  In addition, they are not seeking to be compensated by a portion of the value of the non-cash benefits and changed practices they extracted from the Defendants in this litigation.  It should be

---

[3] The settlement agreement provides in ¶ 2.C.3 for an accounting to determine the actual amount of funds to be deposited into the Class Settlement Fund.  The accounting may determine a different amount than the originally estimated $180 million. As of the date of this writing, the accounting has not been conducted and the actual determination of the amount to be deposited into the Class Settlement Fund remains to be determined.  I understand that an interim escheatment may occur and that Defendants have more recently projected the amount to be as low as $149 million.

noted at the outset that, on both of these points, Class Counsel have been much more conservative in their fee request than they could have been (and, in my experience, much more conservative than many other class counsel are). Indeed, if calculated as a percentage of the total potential value of the settlement, the attorneys' fees requested here are a fraction of 30%.

III. Assessment of the reasonableness of the request for attorneys' fees

8.      This is a so-called "common fund" settlement, where the efforts by attorneys for the plaintiffs have created a common fund for the benefit of class members, but, because this is a class action and there is no fee-shifting statute applicable, the attorneys can be compensated only from the fund they have created. At one time, courts that awarded fees in common fund class action cases did so using the familiar "lodestar" approach. *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043, 2051 (2010) (hereinafter "Class Action Lawyers"). Under this approach, courts awarded class counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors. *See id.* Over time, however, the lodestar approach fell out of favor in common fund class action cases because it was difficult to calculate the lodestar (courts had to review voluminous time records and the like). More importantly, it was disfavored because the method did not align the interests of class counsel with the interests of the class (because class counsels' recovery did not depend on how much the class recovered). *See id.* at 2051-52. According to my empirical study, the lodestar method is now used to award fees in only a small percentage of class action cases. *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of settlements).

9.      Reflecting this trend, the Tenth Circuit has expressed its "preference" for what is known as the percentage-of-the-fund method. *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994) (holding that district court had abused its discretion by using the lodestar method). Under this approach, courts select a percentage that they believe is fair to class counsel, multiply the settlement amount by that percentage, and then award class counsel the resulting product. The percentage-of-the-fund approach has the advantages of being efficient in its process of calculation and, more importantly, of aligning the interests of class counsel with the interests of the class (because the more the class recovers, the more class counsel recovers). *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052. In light of the well-recognized disadvantages of the lodestar method and the well-recognized advantages of the percentage-of-the-fund method, it is my opinion, like that of the Tenth Circuit, that courts should generally use the percentage-of-the-fund method in common fund cases, and that it should be used here.

10.      Courts usually examine a number of factors when deciding what percentage to award class counsel under the percentage-of-the-fund approach. *See* Fitzpatrick, *Empirical Study, supra*, at 832. In the Tenth Circuit, courts typically consider the twelve factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974): "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee . . .; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-56 (10th Cir. 1988).

7

11.     Although the Tenth Circuit has not yet explicitly ruled on whether courts should also consider any non-cash relief included in the settlement when analyzing fee awards, many other courts have concluded that they should.  This is for good reason.  If class counsel are not compensated in some way for the work they do in securing non-cash relief, then they will have no incentive to pursue such relief—even if it is more valuable to the class than cash relief (as it very well may be here).  This would obviously be harmful not only from the perspective of class members, but from the perspective of sound public policy as well.  In my experience, courts compensate class counsel for their work on non-cash relief in three principal ways.  First, when the non-cash relief can be reliably valued, some courts include the value of this relief in the common fund and award class counsel a percentage of the total fund.  *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) ("[W]here the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained . . . courts [may] include such relief as part of the value of a common fund for purposes of applying the percentage method . . . ."); *see also* Principles of the Law of Aggregate Litigation, § 3.13(b) (American Law Institute, 2010) ("[A] percentage of the fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and nonmonetary value of the judgment or settlement.").  Second, some courts award class counsel a flat fee for the non-cash relief in addition to a percentage of the cash portion.  *See, e.g., Faught v. American Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2012) (affirming fee award of $1.5 million plus 25% of cash recovery).  Finally, some courts increase the percentage awarded to class counsel from the cash portion of the settlement to account for their efforts toward non-cash relief.  *See, e.g., Staton*, 327 F.3d at 946 ("The fact that counsel obtained injunctive relief in addition to monetary relief for their clients is . . . a relevant circumstance to consider in

determining what percentage of the fund is reasonable as fees."); *Camden I Condominium Ass'n v. Dukle*, 946 F.2d 768, 775 (11th Cir. 1991) (considering "any non-monetary benefits conferred upon the class" when setting fee percentage).  In my opinion, any of these three approaches is reasonable, including the last method, which is the one requested by Class Counsel.

12.     In this case, Class Counsel are seeking an award of fees equal to thirty percent (30%) of the cash portion of the settlement alone, or approximately $54 million.  They are not separately seeking reimbursement of their expenses; they will pay them out of whatever fee the Court awards them.  In my opinion, the fee award requested here is within the range of reason because it is independently supported by all of the factors listed above.  *See also Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849 (10th Cir. 1993) (affirming fee award of 29% of common fund).

13.     Consider first the factors that go to the fee awards in other cases: "(5) the customary fee" and "(12) awards in similar cases."  According to my empirical study, there were 18 class action cases in 2006 and 2007 in which district courts in the Tenth Circuit used the percentage-of-the-fund method to award attorneys' fees.  *See* Fitzpatrick, *Empirical Study, supra*, at 836.  The average fee awarded in these cases was 25.3% and the median fee awarded was 25.5%.  *See id.*  But *one third* of the awards were *30% or greater*.  These numbers are similar to those that I found outside the Tenth Circuit.  According to my empirical study, the most common percentages awarded by federal courts nationwide using the percentage-of-the-fund method were 25%, 30%, and 33%, with nearly two-thirds of awards between 25% and 35%, and with a mean award of 25.4% and a median award of 25%.  *See id.* at 833-34, 838.  All of these numbers are generally consistent with other large-scale empirical studies of fee awards. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action*

*Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 260 (2010) (finding average and median percentages of 24% and 25% nationwide and 22% and 23% in the Tenth Circuit among federal courts from 1993-2008).[4]   These numbers show that the percentage requested here is above average, but still firmly within the mainstream of awards.   As I explain below, in light of the other *Johnson* factors, I think it is reasonable to award Class Counsel an above-average—but still mainstream—fee percentage for their work in these suits.   Moreover, it should be noted that almost all of these numbers are based on fee awards that were *exclusive* of expenses, *see* Fitzpatrick, *Empirical Study, supra*, at 833 ("[F]ee awards are exclusive of awards for expenses . . . 96 percent of the time . . . ."), whereas the award requested here would be *inclusive* of expenses.

14.     It is true the nationwide data in my empirical study (consistent with other large-scale empirical studies, *see* Eisenberg & Miller, *supra*, at 264) showed that settlement size had a statistically significant but inverse relationship with the fee percentages awarded—*i.e.*, that federal courts awarded lower percentages in cases where settlements were larger.[5]   *See* Fitzpatrick, *Empirical Study, supra,* at 838, 842-44.   As I explain below, however, for three reasons, I do not believe these nationwide data detract from my opinion that the award requested here is within the range of reasonable awards.

15.     First, again, my data from large settlements is based mostly on cases that did not involve any non-cash relief; the settlement here, by contrast, involves non-cash relief that is *at least as substantial* as the cash relief (and Class Counsel are *not* seeking a percentage of the

---

[4] The fee-percentage numbers in the Eisenberg-Miller study are often slightly lower than in my study because their methodology led them to oversample larger settlements.   *See* Fitzpatrick, *Empirical Study, supra* at 829.

[5] For example, in the fourteen percentage-of-the-fund settlements in my dataset between $100 and $250 million, the mean and median fee percentages were 17.9% and 16.9%, respectively.   *See id.* at 839.

value of that non-cash relief).  As such, it would not be unreasonable to award a fee percentage in this case that exceeds—even significantly—the awards in other large settlements.

16.     Second, and perhaps most importantly, the practice followed by some courts to lower fee percentages as settlement amounts increase has been criticized by many scholars and other courts, and, in my opinion, it should not be emulated in cases such as these here.  In particular, courts and commentators have worried that lowering percentages as settlement sizes increase will blunt the incentives of class counsel to work for the largest settlement, and, indeed, might incentivize class counsel to settle cases earlier for smaller sums.  *See, e.g.*, *In re Cendant Corp. Litigation*, 264 F.3d at 284 n. 55 ("Th[e] position [that the percentage of a recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply." (alteration in original)); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185, 1213 (S.D.Fla. 2006) ("While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method . . . . .  By not rewarding class counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for class counsel to settle too early for too little.").  Consider the following example: if courts award class counsel 30% of settlements if they are under $100 million, but only 20% of settlements if they are over $100 million, then rational class counsel will prefer to settle cases for $90 million (*i.e.*, a $27 million fee award) than $125 million (*i.e.*, a $25 million fee award).  Such incentives are obviously perverse both from the perspective of class members and from the perspective of sound public policy.  Although it is true that class actions can decrease the per capita cost of

representation, and that there are arguments that these economies of scale should be passed along to class members in the form of lower fee percentages, *see* Fitzpatrick, *Class Action Lawyers*, *supra*, at 2066, the amount of money for which a class action settles does not necessarily reflect the number of people in the action (and, therefore, the per capita cost of the representation). Moreover, even when larger settlements do reflect larger class sizes (and lower per capita costs of representation), it is difficult to justify decreasing fee percentages as settlements increase in cases where, as here, class members have relatively small amounts of money at stake.  As scholars have long recognized, in these so-called "small stakes cases," the most important function of the class action device may not be compensation of class members, but deterrence of wrongdoing.  *See id*. at 2069 (citing David Shapiro, *Class Actions: The Class as Party and Client*, 73 Notre Dame L. Rev. 913 (1998); Myriam Gilles & Gary Friedman, *Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers*, 155 U. Pa. L. Rev. 103 (2006)).  In order to deter wrongdoing, lawyers must be given incentives to invest their own time and money in class actions despite the risk of earning nothing if they are unsuccessful. Yet, these incentives are blunted for the very cases offering the greatest deterrence (*i.e.*, larger cases) when courts award lower fee percentages as settlements become larger.  Although trading away deterrence for other ends may be justifiable in some cases, it is difficult to justify it in small-stakes cases where deterrence is the paramount consideration.  *See id.* at 2069-74.

17.     Finally, the fact that average and median fee percentages are often lower in larger cases does not mean, of course, that courts do not award higher fee percentages when the facts and circumstances justify it.  Indeed, there are a number of examples from all across the country of fee awards at or above 30% in large settlements.  *See, e.g., Allapattah*, 454 F.Supp.2d at 1218 (31.33% of $1.075 billion); *In re Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330,

1358 (S.D.Fla. 2011) (30% of $410 million); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (34% of $365 million); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *1 (E.D.Pa., June 2, 2004) (30% of $202 million); *In re Apollo Group Inc. Securities Litigation,* 2012 WL 1378677, at *9 (D.Ariz., April 20, 2012) (33% of $145 million); *In re Combustion Inc.*, 968 F.Supp. 1116, 1142 (W.D.La. 1997) (36% of $127 million); *Kurzwell v. Philip Morris Companies,* 1999 WL 1076105, at *1 (S.D.N.Y., Nov. 30, 1999) (30% of $123 million); *In re Ikon Office Solutions, Inc. Securities Litig.,* 194 F.R.D. 166, 197 (E.D.Pa. 2000) (30% of $111 million).

18.      Consider next the *Johnson* factors that go to the results obtained by class counsel in light of the risks the class faced: "(2) the novelty and difficulty of the questions"; "(4) the preclusion of other employment by the attorney due to acceptance of the case"; "(8) the amount involved and the results obtained"; and "(10) the undesirability of the case."  All of these factors support the fee requested here.  Consider first the results.  At trial, I believe the class might have recovered three components of monetary relief: 1) any unescheated principal, 2) the interest that the Defendants had earned on escheated as well as unescheated principal, and 3) administrative fees that the Defendants had deducted from escheated and unescheated principal.  According to calculations Class Counsel have received from the Defendant, this relief might have totaled as much $230 million.  *See* Burke Affidavit, ¶¶ 64, 67.  Even ignoring all of the other relief the Defendants will provide to Class Members and considering only the common fund portion— which, again, is $180 million—the recovery here is some 78% of the total possible recovery. This recovery compares very favorably to other class action settlements.  *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 241 n. 22 (3d Cir. 2001) (citing securities settlements with recoveries between 1.6% and 14% of potential damages).

19.      But the settlement compares even more favorably in light of the risks the class

faced.  Not only do the Defendants have numerous defenses under state law to the claims raised

in these suits—for example, class members may not have been able to recover the administrative

fees deducted by Defendants in light of their contractual agreements and state laws, *see*

Preliminary Approval Motion at 27 n. 13—but, even more significantly, there remains a serious

question whether these suits can be maintained as a class action at all.  This is the case because

Western Union Financial Services contends that the contracts between Class Members and the

Defendants include an arbitration provision that contains a bar on class action proceedings.  *See*

Motion to Compel Arbitration at 4-7.  If the Defendants had been permitted to enforce this

provision, each member of the class here would have been compelled to proceed individually in

arbitration, something few would do because 1) the small individual recoveries at issue would

make doing so cost prohibitive and 2) it is unlikely that Class Members even knew that Western

Union held their funds for, on average, over 5 years.  Indeed, because such provisions effectively

insulate Defendants from liability, many courts have held that class action bars are

unconscionable under state contract law.  *See, e.g.*, *Discover Bank v. Superior Court*, 113 P.3d

1100, 1110 (Cal. 2005).  In April 2011, the United States Supreme Court held that the Federal

Arbitration Act preempted such state laws, thereby rendering enforceable class action bars found

in arbitration agreements.  *See AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011).  The

Court here found that Western Union's waiver of the benefit of the arbitration provision was

imputed to Western Union Financial Services.  *See* Transcript of Hearing on Motion to Compel

p. 43.  These questions have now been appealed to the Tenth Circuit, and, if the Tenth Circuit

were indeed to decide these questions differently, the settlement value of these suits would fall to

14

something approaching zero.  In short, there is little doubt in my mind that the results here compare very favorably to the risks the class faced and support an above-average fee award.

20.      Consider next the non-monetary benefits conferred upon the class.  As I noted above, Class Counsel have secured an agreement from the Defendants to change their practices and now notify customers within 60-90 days of when their money transfers fail.  This change may save future customers—many of whom are no doubt members of the class—$187 million (in present-day dollars) in the coming years.  In addition, Class Counsel have secured assistance from the Defendants that will make it easier for class members to recover unclaimed monies that have already escheated to government entities.  This assistance is probably not even a form of relief the class could have obtained had it won at trial.  As I noted, this component of the settlement could be worth as much as $83 million dollars depending on how many Class Members seek escheatment recovery.  Finally, Class Counsel have secured an agreement from the Defendants to pay directly to Class Members all interest it earned by holding unclaimed monies that have already escheated—a benefit worth as much as $19 million more to the class depending on how many Class Members file claim forms.  These benefits to the class may be even more valuable to the class than the cash fund called for by the settlement, yet Class Counsel are not seeking a share of any of these benefits (even though I believe it would have been quite possible to reliably value and include at least some of these benefits in the common fund for purposes of calculating Class Counsel's fee award).  As I noted above, it is therefore important to ensure that Class Counsel are compensated in another way for their work in securing these benefits.  One way to do so, as I also noted above, is to increase Class Counsel's fee percentage from the cash portion of the settlement beyond that which would have been awarded had there been no non-cash relief.  In this regard, it should be noted that the numbers I cited above from

my empirical study were based mostly on cases that did *not* include any non-cash relief.  *See* Fitzpatrick, *Empirical Study*, *supra*, at 824 (Table 3).  As such, this factor strongly supports awarding a fee percentage here that is above the average and median numbers found in my study.

21.     Consider finally the other *Johnson* factors.  All of these factors also look favorably on the fee award requested here.  One factor goes to the time it took to litigate and settle these cases: "(1) the time and labor required."  These lawsuits have transpired for over three years; according to my empirical study, this is longer than the average and median times to settlement in consumer class action cases (963 days and 720 days, respectively).  *See id.* at 820. And these suits have not been idle over this time: in addition to an extensive motion practice, the parties engaged in substantial discovery related to arbitration (merits discovery was stayed pending resolution of the arbitration issues), including review of thousands pages of discovery and the depositions of ten witnesses, including six corporate designees.  *See* Burke Affidavit ¶¶ 42-50.  Perhaps most importantly, however, Class Counsel have an unusual amount of post-settlement work to do in these cases; they will spend substantial time assisting Class Members with the paper work needed to recover their monies that have already escheated to government entities.  Another factor considers "(6) any prearranged fee."  Class Counsel have shown me their retainer agreements with the plaintiffs, and the agreements call for a fee award of 33% of any recovery.  Thus, the fee percentage requested here is *below* that which was prearranged.  The remaining factors go to the skills of Class Counsel and their relationship with the plaintiffs: "(3) the skill requisite to perform the legal service properly," "(7) time limitations imposed by the client or the circumstances," "(9) the experience, reputation, and ability of the attorneys," and "(11) the nature and length of the professional relationship with the client."  Although I was not privy to the attorney-client relationships here, I can say that Class Counsel count among their

number some of the most exceptional lawyers in the United States.  By any measure, these are "above average" lawyers.

22.     With all that said, I would be remiss if I did not discuss one last matter pertinent to the fee award requested here.  As I noted above, if there are any monies remaining in the cash fund after all Class Members who submit claims have received 100% of their principal and interest back, the monies will be within the discretion of the Court to distribute upon recommendation that it be sent to state governments in proportion to how much of the principal would have escheated to them had there been no claims on the fund.  This distribution is described in the settlement as a "*cy pres*" (French for "as near as possible") distribution.  I wish to draw attention to this distribution because *cy pres* distributions in other cases have been criticized in recent months, *see, e.g.*, In re *Baby Products Antitrust Litigation*, 708 F.3d 163, 171-80 (3d Cir. 2013), and I believe it is important to note that there is nothing untoward about the distribution here.  In my opinion, in small-stakes cases like this one where, as I noted above, deterrence may be the paramount purpose of the class action, I think there are many reasonable ways to deal with residual settlement funds; most any option short of returning the funds to defendant will serve the goal of deterrence equally well.  *See* Fitzpatrick, *Class Action Lawyers, supra*, at 2081-82.  As such, I think it is perfectly reasonable to send the money to state governments.[6]  In *Baby Products*, the Third Circuit criticized the *cy pres* distribution because the settlement sent residual monies to third parties before compensating class members who did file claims for 100% of their damages.  *See* In re *Baby Products*, 708 F.3d at 175-76.  Whatever the merit of this criticism, it is largely inapplicable here because any residual monies will exist only

---

[6] Some commentators believe this is not only a reasonable way to deal with residual funds, but that this is the best of all alternatives.  *See generally* Goutam U. Jois, *The Cy Pres Problem and the Role of Damages in Tort Law*, 16 Va. J. Soc. Pol'y & L. 258 (2008).

after all Class Members who file claims receive 100% of their principal and interest; it is true Class Members will not recover the administrative fees the Defendants deducted, but, as I noted above, it was speculative whether these were legally recoverable to begin with.  Moreover, Class Members will receive hundreds of millions of dollars in additional relief through the changes in Defendants' disclosure policies.

23.      A question was also raised in *Baby Products* over whether class counsel should be compensated at the same percentage from the portion of a common fund that ultimately goes to a *cy pres* distribution as they are from the portions that went directly to the class.  The Third Circuit rejected a rule that they should not, *see id.* at 178 ("We think it unwise to impose . . . a rule requiring district courts to discount attorneys' fees when a portion of an award will be distributed *cy pres.*"), and, in my opinion, this is the correct approach.  If class counsel are not compensated for extracting money from the defendants to pay *cy pres* distributions, then class counsel will have little incentive to undertake the burden of arranging such distributions rather than simply permitting the residual monies to revert to those defendants.  This would undermine the goals of class action litigation in small-stakes class actions like this one where, again, deterrence and not compensation is of paramount importance.  In class actions like this one, it is—frankly—most important that the defendants pay someone for the harm they caused; it is less important *whom* they pay.  *See id.* ("Nor do we want to discourage counsel from filing class actions in cases where few claims are likely to be made but the deterrent effect of the class action is equally valuable.").

24.      For all these reasons, I believe fee award requested here is within the range of reason.

25.      My compensation in this matter is $495 per hour plus expenses.

18

Nashville, TN

April 29, 2013

Brian T. Fitzpatrick

# Appendix 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Professor*, August 2012 to present
- *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Federal Courts, Complex Litigation
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## ACADEMIC ARTICLES

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

## BOOK CHAPTERS

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, forthcoming 2012)

## ACADEMIC PRESENTATIONS

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Corporate Law Center, Fordham Law School (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law (Apr. 3, 2007) (panelist)

## OTHER PUBLICATIONS

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits*, SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club of Nashville (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

# Appendix 2

<u>Documents Reviewed:</u>

- Docket entries in *Tennille v. Western Union Company*, No. 09-cv-00938-JLK-MKT (D.Colo.)

- Order Granting Western Union's Motion to Dismiss Complaint for Failure to State a Claim on which Relief Can be Granted in *Tennille* (document 12, filed 9/21/2009)

- Order Denying Western Union's Motion to Dismiss Plaintiffs' Complaints for Failure to State a Claim on which Relief Can be Granted in Part and for Scheduling Conference in *Tennille* (document 28, filed 11/8/2010)

- Western Union's Answer and Affirmative Defenses to Plaintiff's First Amended Class Action Complaint in *Tennille* (document 35, filed 11/30/10)

- Western Union's Answer and Affirmative Defenses to Plaintiff's Class Action Complaint in *Smet v. The Western Union Company*, No. 10-cv-765-JLK (document 36, filed 11/30/10)

- Second Amended Consolidated Class Action Complaint in *Tennille* (document 45, filed 3/11/11)

- Defendants' Motion to Dismiss Count IV and Count V of Plaintiff's Second Amended Consolidated Class Action Complaint for Failure to State a Claim Upon Which Relief Can Be Granted in *Tennille* (document 52, filed 4/25/11)

- Western Union Financial Services' Motion to Compel Arbitration and Stay Proceedings Pending Arbitration in *Tennille* (document 56, filed 6/7/11) ("Motion to Compel Arbitration")

- Plaintiffs' Response to Opposition to Defendants' Motion to Dismiss Count IV and Count V of Plaintiffs' Second Amended Consolidated Class Action Complaint in *Tennille* (document 61, filed 6/8/11)

- Defendants' Reply in Support of Motion to Dismiss Count IV and Count V of Plaintiffs' Second Amended Consolidated Class Action Complaint in *Tennille* (document 80, filed 7/8/11)

- Plaintiffs' Response in Opposition to Western Union Financial Services' Motion to Compel Arbitration and Stay Proceedings Pending Arbitration in *Tennille* (document 112, filed 8/19/11)

- Western Union Financial Services' Reply Brief in Support of its Motion to Compel Arbitration and Stay Proceedings Pending Arbitration in *Tennille* (document 131, filed 9/28/11)

- Western Union Financial Services' Notice of Supplemental Authority re: Western Union Financial Services' Motion to Compel Arbitration and Stay Proceedings Pending Arbitration in *Tennille* (document 138, filed 11/18/11)

- Transcript of Oral Argument on Western Union Financial Services' Motion to Compel Arbitration and Stay Proceedings Pending Arbitration in *Tennille* (11/21/11) ("Transcript of Hearing on Motion to Compel")

- Plaintiffs' Motion to Certify Western Union Financial Services' Appeal as Frivolous in *Tennille* (document 153, filed 1/5/12)

- Order Denying Plaintiffs' Motion to Certify Western Union Financial Services' Appeal as Frivolous in *Tennille* (document 154, filed 1/13/12)

- Plaintiffs' Memorandum in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement in *Tennille* (document 172-1, filed 12/21/12)

- Stipulation and Agreement of Compromise and Settlement in *Tennille* (document 172-2, filed 12/21/12) ("Settlement Agreement")

- Affidavit of R. Larry Johnson (filed herewith) ("Johnson Affidavit")

- Affidavit of Richard Burke in Support of Final Approval of the Class Action Settlement and Class Counsels' Application for Attorneys' Fees (filed herewith) ("Burke Affidavit")