**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAY 20 2013

JEFFREY P. COLWELL
CLERK

Paul Dorsey, *Pro Se*
110 Westminster Drive
West Hartford, CT  06107
(860) 521-0081

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
### Judge John L. Kane

Civil Action No. 09-cv-00938-JLK consolidated with No. 10-cv-00765-JLK

**JAMES P. TENNILLE, ROBERT SMET, ADELAIDA DELEON and YAMILET RODRIGUEZ,** individually and on behalf of all others similarly situated,

       Plaintiffs,

v.

**THE WESTERN UNION COMPANY and WESTERN UNION FINANCIAL SERVICES, INC.,**

       Defendants.

## OBJECTION TO PROPOSED SETTLEMENT AND OPPOSITION TO MOTION FOR ATTORNEYS' FEES

# TABLE OF CONTENTS

TABLE OF CONTENTS

INTRODUCTION

I.      THE OBJECTOR IS A MEMBER OF THE CLASS

II.     THE COURT HAS A FIDUCIARY DUTY TO THE UNREPRESENTED MEMBERS OF THIS CLASS

III.    SUNSHINE IS THE BEST DISINFECTANT: RESULTS SHOULD BE MADE PUBLIC

IV.     ARE THE TERMS OF THE SETTLEMENT AGREEMENT BEING FOLLOWED?

V.      TROUBLE WITH THE NOTICE PLAN.

VI.     TROUBLE WITH THE CLASS NOTICE.

VII.    VALUATION OF THE SETTLEMENT IS INACCURATE.

VIII.   THIS COURT SHOULD NOT INFER SETTLEMENT APPROVAL FROM A LOW NUMBER OF OBJECTORS, ESPECIALLY WHEN THE SETTLING PARTIES HAVE ARTIFICIALLY REDUCED THE NUMBER OF OBJECTORS.

IX.     ATTORNEYS' FEES

XI.     UNANSWERED QUESTIONS AS OF THE DATE OF THE FAIRNESS HEARING (JUNE 14, 2013).

## INTRODUCTION

I want to start this objection by stating that overall, my opinion is that Class Counsel has done an excellent job in this lawsuit for the period 2009 – January, 2013.  I have two primary concerns regarding this Settlement:

1) There is no provision for a future public accounting of the funds actually distributed to the class members; and

2) Not enough is being done to get the settlement money back to the Class Members.

My objection raises many other concerns, more detailed and legalistic in nature, but I consider them secondary in importance.

I am aware that Class Counsel has a June 3, 2013 deadline for filing additional material in support of approval of the Settlement.  To a certain extent, this objection may be raising issues that Class Counsel had already planned to address in its June 3 filings.

I am also aware that to a certain extent this objection may be raising issues that have already been addressed by Class Counsel and the Court, since many of the documents in this case have been filed under seal.

This objection adopts the $180 million estimate of the Settlement Fund used by Class Counsel in the Settlement Agreement and subsequent court filings.  Current estimates from Western Union might be as low as $149 million  (see Document 196, page 5 of 29, footnote 2).

This objection adopts all bona fide objections filed by other Class Members in this case and incorporates them by references as if they appeared in full herein.

## I.     THE OBJECTOR IS A MEMBER OF THE CLASS

I, Paul Dorsey, am a member of the class.  I am a natural born citizen of the United States and a life long citizen of Connecticut.  In the period 2009-2010, I initiated approximately ten transactions with Western Union from West Hartford, Connecticut.  These transactions were either phoned-in or "walked-in.".  Some of the transactions involved my Western Union Card (Number xxxxxx128).

A transaction that I initiated on or about October 14, 2010 was never claimed by the intended recipient.  I have not asked for a refund nor have I received a refund on this transaction. According to the receipt that was emailed to me at the time, the transaction was a Western Union Telephone Money Transfer.

Counsel for Western Union and Class Counsel have both confirmed the status of my transaction (see Document 179, page 2).

I am not an employee of Western Union or any of its affiliates, nor have I excluded myself from the class.  I'm not Judge Kane and I'm not a member of his family, immediate or otherwise.

As a member of the class, I have standing to object to the proposed settlement.  My mailing address is 110 Westminster Drive, West Hartford, CT  06107; my phone number is (860) 521-0081.  This brief explains why the settlement is, in my judgement, objectionable and not in the best interest of the class.

I intend to appear *pro se* at the fairness hearing, in the above captioned matter, scheduled for June 14, 2013 at 10:00 am.  I wish to discuss matters raised in this Objection.  I intend to call no witnesses, but reserve the right to make use of all documents entered on to the docket by any

settling party or objector. I also reserve the right to cross-examine any witnesses who testify at the hearing in support of final approval.

## II.   THE COURT HAS A FIDUCIARY DUTY TO THE UNREPRESENTED MEMBERS OF THIS CLASS.

A district court must act as a "fiduciary for the class," "with a 'jealous regard' " for the rights and interests of absent class members. *In re Mercury Interactive Corp.*, 618 F.3d 988, 994-95 (9th Cir. 2010) (quoting *In re Washington Pub. Power Supply Sys Lit.*, 19 F.3d 1291, 1302 (9th Cir 1994)). "Both the US Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litigation*, 360 F. Supp. 2d 166, 192-94 (D. Mass. 2005), citing *inter alia Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair settlements' agreed to by 'fainthearted' or self-interested class representatives.' "); *Reynolds v. Beneficial Nat'l Bank*, 288 F. 3d 277, 279-80 (7th Cir. 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" prior to settlement).

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members….[T]he court can not accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 785 (3d. Cir. 1995) (quoting *Grunin v International House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975)). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interest of the class." Herbert Newberg & Alba Conte, Newberg on Class Actions § 13:20 (4th

ed. 2002). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F. 2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members").

There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness." *True v. American Honda Co.*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010) (citing 4 Newberg on Class Actions § 11:42 (4th ed. 2009)). *Accord* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ("*ALI Principles*").

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties; because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. "While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations. " *In re Bluetooth Headset Prods. Liab Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (quoting *Staton v. Boeing Co.*, 327 F. 3d 938, 960 (9th Cir. 2003).

## III.   SUNSHINE IS THE BEST DISINFECTANT: RESULTS SHOULD BE MADE PUBLIC

As of the date of this objection, neither the Settlement Agreement nor any of the supporting motions and memorandums filed with the Court contains any calculation regarding the expected reach of the Notice Plan.  The calculation of the estimate reach of the Notice Plan

would be the starting point for estimating the "take rates" (let take rate 1 equal the percentage of Class Members who submit valid, timely claims, and let take rate 2 equal the dollar percentage of the claims paid out of the $180 million Settlement Fund). The estimated take rates would be extremely useful in determining whether the proposed Settlement Agreement is fair, reasonable and adequate. In addition to not providing the estimated take rates, the Settlement Agreement does not contain any provision for publicly reporting how much relief actually reached Class Members. That public reporting is essential for any future evaluation of the accuracy and reliability of the estimates of the reach of the Notice Plan and the take rates that Class Counsel and/or the Administrator have – or should have - provided.

A vivid and tragic example of what happens without supervision of a settlement administration appears in *Moody v. Sears Roebuck and Co*, 2007 NCBC (Case no. 02 CVS 4892, New Hanover County Court North Carolina, *Order and Opinion*, May 7, 2007). Below is an excerpt from a letter that the North Carolina judge (the Honorable Ben F. Tennille, no known relation to the lead Plaintiff) who uncovered this travesty to the Chicago judge who implemented it (*In re: Lawnmower Engine Horsepower Marketing and Sales Practices Litigation* 2:08-MD-01999 US District Court, Eastern District of Wisconsin, Document 296-6):

> Dear Judge Nowicki:
>
> As a result of the notice plan and settlement in the above captioned action, the citizens of North Carolina will receive $66 in cash and coupons, and the entire nationwide class will receive cash and coupons totaling $2,402. The citizens of New Hanover County, where Mr. Moody brought suit on their behalf, will get nothing from the settlement. You will recall that plaintiffs' counsel were awarded $1,100,000 in cash and coupons for obtaining this result. There were only 997 claims filed during the claim period and only 317 of those claims were valid. There were 189 claims eligible for a $10 cash payment and 128 claims eligible for a $4 coupon, producing the $2,402 total payout. I am writing to bring these numbers to your attention for a number of reasons.

First, Mr. Shipman, lead counsel for the class, challenged me to do so. In a hearing last week on motions to dismiss the North Carolina action in Moody v. Sears, he told me that I should not make any determination of whether the judgment in Wrobel was entitled to full faith and credit without bringing my concerns to your attention first. Yielding to his request, I am taking this opportunity to again express my concerns about this settlement. Mr. Shipman told me that **he believed he had completely fulfilled his fiduciary duty to the class and was not required to notify you of the abysmal results of settlement administration or take any further action on behalf of the class he represents**. As far as he is concerned, this case is over. He is satisfied that he has earned his $1,100,000 fee by generating $2,402 for the class. Under your order, Sears has no obligation to account to you for the results of settlement administration.

Second, Mr. Shipman and Sears have gone to extremes to avoid notifying any court of the failure of the notice plan. **Your order did not require them to file any accounting in Illinois.** In North Carolina, Sears filed motions to dismiss and asked the court to hear them before obtaining any information about the settlement results. Mr. Shipman then went so far as to file a Petition for Writ of Mandamus in the North Carolina Court of Appeals, endorsed by Sears, to prevent me from having a hearing to find out the settlement results. When both attempts failed, Sears put the required information together in the attached affidavit, and Mr. Shipman said he would have given me the information voluntarily if I had only asked for it rather than ordering it be produced. I adjourned the hearing, and the information was then produced voluntarily by Sears. You can see from the affidavit why they fought so hard to keep the information secret.

Third, and most importantly, the result is simply unjust and the type of result Congress alluded to in providing for removal of some state class actions to federal court. The public will rightly be outraged at the result. The citizens of North Carolina where this litigation originated and on whose behalf it was originally filed will undoubtedly feel wronged by the legal system. As I indicated to you in my letter of November 5, 2004, **it is my policy to make the results of all class actions public.** This case is no exception. **Sunshine is the best disinfectant.** As judges, we have to protect the integrity and public perception of the judiciary. Results like this cause the public to lose faith in the bar and the judiciary unless they are corrected (**bolding added** and all footnotes omitted).

## IV.   ARE THE TERMS OF THE SETTLEMENT AGREEMENT BEING FOLLOWED?

The Settlement Agreement (Document 172-2 §3.D.1 on page 18 of 48) provides that:

> The Parties in consultation with the Administrator will endeavor to provide a Notice Plan <u>that complies with all constitutional and Federal Judicial Center notice guidelines</u> and will provide the Notice Plan to the Court together with a Motion for Preliminary Approval [Document 172-1]. In the Notice Plan, Plaintiffs and Defendants will each present competing draft Long Form Notices (Exhibit 2), CAFA Notices (Exhibit 4), and Other Notices (Exhibit 5) to the Court and the Parties will respectfully request the Court to consider their competing draft notices and to select which notices to use (underlining added) [reference added].

The Settlement Agreement, therefore, upgrades the Judicial Center's guidelines into a contractual necessity. Specific and important guidelines from the Federal Judicial Center that were not complied with include the following:

A)   "If the class has been certified only for settlement purposes, that fact should be disclosed." Moore's Federal Practice, Manual For Complex Litigation (4th), Federal Judicial Center 2004, §21.312, page 294, last paragraph *"What must the notice include?"* Per my reviews, I was unable to find this specific language in the Class Notice.

B)   "Even though a settlement is proposed, the notice should outline the original claims, relief sought, and defenses so class members can make an informed decision about whether to opt out." Ibid. Of the original claims made by Class Counsel, the following are of particular significance (and 'un-outlined' in the notice) :

1) ". . . that the principal, interest and transfer fees, without deduction shall be immediately refunded" (See Plaintiff's Second Amended Consolidated Class Action Complaint, Document 45, §97(d) Declaration IV on page 24 of 30). Per my analysis, Western Union gets to keep the initial, up-front transfer fees it charged class members;

2) "That Western Union be required . . . to return to Class members funds that it has escheated to any state or jurisdiction within the United States. <u>Western Union may then pursue reimbursement</u> of escheated funds pursuant to each state's Abandonment Laws which allow the "holder" of said funds to directly return money to the "true owner" and then seek reimbursement from the State." Document 45, §97(e) Declaration V (underlining added). Per my review of the Settlement Agreement, Western Union will "help" class members by providing a pre-printed escheat form, but they won't directly refund the escheated funds to class members;

3) "That Western Union be required to disgorge any fees it has charged class members for possessing, notification, refund, or escheat of uncompleted transfer funds." Document 45, §97(m) Declaration XIII. Per my analysis, the "fees" referred to what would later be called "administrative fees," which equals 50 cents per month per transaction for many, if not most, class members. Under the Settlement Agreement, Western Union keeps these fees.

C)   The notice should "provide information that will enable class members to calculate or at least estimate their individual recoveries, including estimates of the size of the

class and any subclasses." Manual For Complex Litigation (4th) §21.312, page 295, second to

last bullet point.  Per my review of the Class Notice, there was no specific mention of the actual

(low) interest rate, approximately 1%, or the specific administrative fee of 50 cents per month.

In the case of the four class representatives, this administrative fee was highly significant:

| Name | Initial $ Transfer | Admin Fee $ | Admin Fee % | Source |
|---|---|---|---|---|
| Tennille | 180 | 30.00 | 16.7 | Doc 132-7 (pg 2+3) + 132-10 (pg 4) |
| Tennille | 180 | 30.00 | 16.7 | Doc 132-7 (pg 2+3) + 132-10 (pg 4) |
| Smet | 50 | 30.00 | 60.0 | Doc 45 §25 + 132-9 (pg 2+3) |
| Smet | 50 | 30.00 | 60.0 | Doc 45 §25 + 132-9 (pg 2+3) |
| Deleon | 100 | 42.00 | 42.0 | Doc 132-7 (pg 6) + 132-6 (pg 2) |
| Rodriguez | 900 | 18.50 | 2.1 | Doc 132-7 (pg 7) + 132-6 (pg 3) |

In addition, the class notice does not provide an estimate of the size of the class.  The notice

mentions the estimated size of the class fund, $180 million, but not the number of class

members.

     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Per further discussion of the above listed Settlement Agreement (§3.D.1 on page 18 of 48), when

the Parties filed the Settlement Agreement with the Court, none of the six exhibits were

originally published by the clerk's office as part of Document 172-2:

| Old Document 172-2 | Description | Reference | Other Info | New: Doc 175 |
|---|---|---|---|---|
| Exhibit 1 | Claims Form | 1.B | | |
| Exhibit 2 | Long Form Notice | 3.D.1 | Competing | Doc 175-1 |
| Exhibit 3 | Publication Notice | 1.W | | Doc 175-2 |
| Exhibit 4 | CAFA Notices | 3.D.1 | Competing | |
| Exhibit 5 | Other Notices | 3.D.1 | Competing | |
| Exhibit 6 | Talking Points | 12.B | | |

Furthermore, the description for Document 172-1 in Pacer.gov/ is given as "Continuation of

Main Document Memo In Support of Motion for Preliminary Approval" and "35 pages."  Judge

Kane's Order on Motion for Order (Document 174) addresses the gap (see right most column above) with regard to the referenced exhibits, but the original part of the Main Document Memo in Support of Motion for Preliminary Approval is not yet available in Pacer.gov/. As of the date of this objection, May 15, 2013, my attempts to obtain that document – the Notice Plan – have been unsuccessful (see Dorsey Objection Exhibit 1).

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The Settlement Agreement (Document 172-2 §3.A on page 16 of 48) provides that:

> "Lead Class Counsel will seek bids from class action administrators, and will request the Court's approval of one of those class action administrators to administer the settlement, and serve as the Administrator, subject to the supervision and direction of the Court. . . ."

One of the duties of the class action administrator is to come up with a Notice Plan that constitutes the best notice practicable under the circumstances. However, the Settlement Agreement (Document 172-2 §2.A.2 on page 8 of 48) provides that:

> "No later than ten calendar days after the date of Preliminary Approval (but no earlier than December 11, 2012), Western Union shall deposit $1,300,000 in the Initial Settlement Fund to pay the Administrator's costs, as set forth in Subsection 3.b . . . "

Which raises the question: Is the Notice Plan the best notice practicable under the circumstances? Or is the Notice Plan the best notice practicable under the circumstances of a pre-determined $1,300,000 budget?

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The Settlement Agreement (Document 172-2 §3.D.2 on page 18 of 48) provides that:

> ". . . (a) Western Union shall provide to the Administrator all applicable [1] names and [2] mailing addresses of putative Class members in computer readable format in Western Union's control or possession; and (b) Class Counsel shall provide to the

Administrator all applicable [1] names, [2] mailing addresses, and [3] e-mail addresses of putative Class members in Class Counsel control or possession. . . ." (underlining added) [brackets added].

But Judge Kane's Order Preliminarily Approving Settlement and Providing for Notice (Document 175 §9.b on pages 5-6) provides that:

". . . Western Union and Class Counsel, to the extent they have not already done so, shall within 45 calendar days of entry of this Order, provide to the Claims Administrator a list in computer readable format, of the [1] applicable names, [2] mailing addresses, and [3] e-mail addresses for individual putative Class members within Western Union's and Class Counsel's control and possession . . . " (underlining added) [brackets added].

The Settlement Agreement (Document 172-2 §3.D.4 on page 19 of 48) provides that:

"The Long Form Notices will be e-mailed to Class members for whom the Administrator has an e-mail address on record."

The e-mailing of the Long Form Notice was also specifically mentioned in Richard Burke's Memorandum in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement (Document 172-1, §VII on page 30 of 35, last paragraph):

"The Settlement contemplates a multi-part Notice Plan (see Secs. 3.D and 3.E), which satisfies both the substance and manner of distribution requirements of Rule 23 and Due Process. In the first part, the Administrator will mail to the members of the defined Class – in accordance with the procedures described above in Part IV.D, above – a proposed 'Long Form Notice' . . . In addition, the Administrator will e-mail the Long Form Notice to Class members for whom the Administrator has an e-mail address on record. Sec. 3.D.4. . . . "

Which raises the question:  Why didn't I get a Long Form Notice via e-mail (See Dorsey Declaration attached as Exhibit 2)?  Western Union has my Western Union card number and my

e-mail address – they even sent me a confirmation of the unredeemed money transaction to my e-mail address, just minutes after I phoned in the transfer request (see Dorsey Objection Exhibit 3). This is not a little matter. According to Western Unions' Form 10-K for the fiscal year ending December 31, 2008, as filed with the Securities and Exchange Commission and available on their web-site **http://www.sec.gov**, Section entitled "Consumer relationships", on page 6 (top):

> One of our strengths has been our focus on our consumers and offering them fast, reliable money transfer and payment services. Our global loyalty program is available in a growing number of countries. We launched our Western Union Gold Card, the principle vehicle of the program, in the United States in 2002. As of December 31, 2008, the Gold Card program was available in 72 countries and had approximately 11 million active cards. . . . In the United States, approximately 50% of Western Union branded consumer-to-consumer transactions are initiated using a Gold Card. . . . Consumer databases supplement these efforts by providing insight on consumer preferences so that we can selectively target consumer communications and marketing (underlining added).

Class members may change physical addresses over the course of 12 – 13 years, but they probably don't change their e-mail address every time they move. Accordingly, the e-mail addresses should be used in the Notice Plan, as in fact, the Settlement Agreement calls for.

## V.   TROUBLE WITH THE NOTICE PLAN.

As of the date of this objection, May 15, 2013, I have been unable to obtain the actual Notice Plan, which in and of itself is an unreasonable withholding of an important component of the proposed Settlement Agreement. The Notice Plan should have been available on Pacer.gov with the rest of the documents filed between Documents 172-175. I will be filing a Motion for Discovery in the upcoming week, but quite frankly, I'm disappointed that such a step is needed. In any event, I will discuss my views on the adequacy of the Notice Plan at the Fairness Hearing

on June 14, 2013, by which point I hope I will have been permitted the opportunity to examine the Notice Plan.

In addition to the issue of e-mailing (or not e-mailing) the Long Form Notice to class members (in conjunction with sending via 1st class mail), there is also the issue of what happened to class members who had initiated a small dollar money transfer, whose small balance was, over the years, zeroed out due to the 50 cents a month administrative fee imposed by Western Union. With their balance at zero, the class members' names would not have been turned over to a state via the escheatment process. But under the terms of the Settlement Agreement, these class members are entitled to interest earned on their original balance. Were these class members notified? I can't say without reviewing the Notice Plan, but my guess is: <u>probably not</u>.

Finally, the Publication Notice, which was presented at a page and a half to Judge Kane, (see Document 175-2, pages 1-2) was reduced to a half page display. The typeface can hardly be considered adequate (see Dorsey Objection Exhibit 4).

## VI. TROUBLE WITH THE CLASS NOTICE.

The class notice I receive in the mail on April 1, 2013 was my first introduction to this class action lawsuit. Over lunch I read the entire notice and then went on-line to review the web-site. I happened to notice the discrepancy between the settlement agreement and the class notice regarding where objecting class members could be required to sit for a deposition (the settlement agreement - and Judge Kane's order - called for the county of residence; while the class notice called for the county or state of residence, without specifying who would get to chose the location). I realized that this discrepancy could cause a problem for the settlement, so I made an effort to notify the court of the potential problem and to do so sooner rather than later. On the same day I received the class notice, I faxed to the Court my concerns (See Document 176, filed

April 1, 2013). The next day, Judge Kane ordered Western Union to respond to the issue that I raised (see Document 177). Western Union responded on April 9, 2013 (See Document 179). I wasn't satisfied with Western Union's response, so I filed a reply to their response on April 9, 2013 Document 181:

"I write in response to yesterday's letter from Thomas M. Barba, counsel for Defendants The Western Union Company and Western Union Financial Services, Inc. ("Western Union"). Per Mr. Barba's letter, Class Counsel concurs with its substance and form.

Mr. Barba's letter addressed the issue I raised in my notice to the Court, ". . . namely the discrepancy between the settlement agreement and the class notice regarding where objecting class members may be <u>required</u> to sit for depositions", to quote your minute order of April 2, 2013 (underlining added).

While Mr. Barba's letter acknowledges the discrepancy in the class notice, his conclusion that ". . . the mistake enlarges any objecting putative Class member's due process rights instead of truncating them" is not something I can agree with.

Something that enlarges class members' due process rights sounds like something good to me. And I don't think what happened should be considered good. I'm going to stand by my original assessment – namely, that class members from large states aren't going to object to this proposed settlement, because the perceived financial cost is simply too high.

The fact that Western Union and the Plaintiffs have now agreed to hold the deposition in the objector's county or state of residence (with the option to the objector), is of no help to the class member who might have initially wanted to object, but was scared away from the entire matter by the threatened expense and inconvenience of travelling to some far corner of his (large) state.

Let's not forget that many of the class members are immigrants, a large percentage, no doubt, from urban areas. Accordingly, they may not own a car, relying instead on public transportation. They may not even have a credit card, which would make renting a car highly problematic. Under these circumstances, a potential objector could very easily and rationally fear that a one or two night hotel bill could await him if he decided to exercise his due process rights.

Class members probably don't have the income level of the average American, so such long range travel costs would impose a significant burden, especially in relation to any presumed recovery.

Mr. Barba's letter mentions the "reasonable notice requirements" of Rule 30(B)(1) of the Federal Rules of Civil Procedure. I don't know what Rule 30(B)(1) states, but I know it wasn't referenced – or quoted – in the class notice. So that rule would be of no help to a worried class member who wanted to object to the proposed settlement, but couldn't justify the perceived cost.

While not mentioned in Mr. Barba's letter, the Federal Rules of Civil Procedure might also require travel expense reimbursement to the objector who is required sit for a deposition. That rule also wasn't referenced – or quoted – in the class notice.

I confirm that Class Counsel explained to me that it is an infrequent event ("rare" is the word I remember him using) to hold an actual deposition of an objector. Of course, that fact wasn't in the class notice (or the web-site, for that matter), so it too would be of no help to that worried class member.

Mr. Barba states that the Administrator for the settlement will update the web-site. When? As of 5:15 p.m. EDT today, April 9, the web-site has not been corrected. Counsels have known about this issue since April 2, mid-morning.

What is happening with the traffic to the web-site? I'm not the web-master, but it seems reasonable to assume that the traffic count has already peaked, and is declining rapidly.

I note that the original class notice, with the error, was mailed to over a million class members.

I also note that while Mr. Barba and Class Counsel have admitted an error, they have not apologized for making it. Not to the District Court, whose name was prominently printed at the top of the class notice ("UNITED STATES DISTRICT COURT DISTRICT OF COLORADO"); not to you, the presiding judge ("U.S. District Judge John L. Kane is in charge of this class action.") and not to Western Union or the million plus putative class members.

Instead, against all the logic presented in this letter, Mr. Barba and Class Counsel have claimed that " . . . no prejudice can be shown as a result of the discrepancy noted . . . "

I disagree and suggest that the Court consider more appropriate remedies, with any costs being borne by the appropriate Counsel, and not Western

Union or class members."

Despite my asking (in my April 9th court filing) about when the web-site would be corrected to incorporate the clarifying language, which all parties agreed was needed and had agreed to make, no updating was made. I checked ever day, many, many times a day. Finally, on April 15, 2013, concerned that the promised change would never be made, I notified the court about the failure of the Administrator (Epiq Class Action & Claims Solutions, Inc. – hereinafter "Epiq") to update the web-site (see Document 193). The next day, the change was finally made, some 15 days after the initial incorrect Long Form Notice was mailed to approximately 1.2 million putative class members.

Or at least I thought the change had been made. But, as it turns out, Epiq made the change to the English version of the web-site, and neglected to update the Spanish version. As of the date of this objection, May 15, 2013, the web-site is still incorrect (see Dorsey Objection Exhibit 5). I note that Supreme Court Justice Sonia Sotomayor, the court's sole member of Hispanic background, is assigned circuit responsible for the 10th Circuit Court of Appeals. Coincidentally, Justice Sotomayor was in Denver earlier this month to help dedicate the new Justice Center.

The Class Notice also differs – significantly – from the Settlement Agreement and Judge Kane's Order Preliminarily Approving Settlement and Providing for Notice with regard to who is a Class Member. Specifically, the Class Notice defines a "Western Union Transaction" as "consumer-to-consumer, consumer-to-business, or business-to-consumer money transfer

transaction initiated using Western Union's services . . ." Long Form Notice, page 2 Block 5 "What do "Western Union Transaction" and "Escheat" mean?" (underlining added).

Then, in the next block, the Notice repeats the definition when defining who is a member of the class. Long Form Notice, page 3 Block 6:

> ". . . Judge Kane decided that everyone who fits this description is a Class member:
> All persons (a) who initiated any Western Union Transaction in the United States on or after January 1, 2001 and on or before the date of Preliminary Approval, whose Western Union Transaction was not redeemed within 60 calendar days. . . Again, a 'Western Union Transaction' means a consumer-to-consumer, consumer-to-business, or business-to-consumer money transfer transaction initiated using Western Union's services . . ." (underlining added).

Both the Settlement Agreement and Judge Kane's order specifically describe a "Western Union Transaction" as " . . . a consumer-to-consumer or consumer-to-business money transfer transaction initiated using Western Union's services . . ." Settlement Agreement §1.Y on page 8 of 48; Judge Kane's Order §4 on page 3 of 11.

Which raises the question: Did the class notice get sent to more entities than was authorized? Without a review of the entities that make up the $180 million unclaimed fund at Western Union, there is no way to know.

## VII.   VALUATION OF THE SETTLEMENT IS INACCURATE

According to Class Counsel, ". . . The total value of the settlement is approximately $470 million, which is comprised of the common fund ($180 million), plus the injunctive relief ($187 million)[rounds to $188], plus the escheated funds and facilitating their recovery ($83 million) plus interest to be obtained by the Class ($19 million)." Declaration of Richard J. Burke In

Support of Motion For Final Approval of the Class Action Settlement and Class Counsels' Application For Attorneys' Fees, Document 198 §69.  Arranged in chart form, highest to lowest:

| | | |
|---|---|---|
| Injunctive Relief | 188 | = Present Value |
| Common Fund | 180 | |
| Escheated Funds | 83 | |
| Interest | 19 | |
| Total | 470 | |

**Injunctive Relief:** Larry Johnson of Veris Consulting calculated the valuation of the injunctive relief.  See Document 200.  His calculation incorrectly used the mean growth rate of 12.2% (see Document 200 §20) when the compounded growth rate of 9.6% should have been used (2005's unclaimed funds of $20,137,240 - at a 9.6% annual growth – compounds very closely to 2009's unclaimed funds of $31,867,496).

Also, since the goal is to capture the value of the injunctive relief, the calculations should be predicated on a starting balance of zero, with growth rates at 9.6%, not 12.2%. This means that the starting balance used in the interest earned calculation should be zero, not $180.0 million, with future year balances being adjusted accordingly.

Also, in §31, the "Escheated funds" row (51.6 / 15.9 / 19.0 / 22.4 . . . etc) that is used is essentially a double count of the $180 common fund.  That money is already being returned to the class (and is valued separately).  The appropriate row of data to use is found in §28: "Inflows – unclaimed funds (at annual growth rate of 12.2%)" (50.6 / 56.8 / 63.7 / 71.6 . . . etc).  But here again, the appropriate growth rate should be 9.6%, not 12.2%.  And the 50.6 starting figure for 2013 is from §21.  I calculate the starting value should be 46.0, not 50.6 million.  With Western Union changing its notification policy, the working theory is that these inflows won't happen. The money will be returned to the customers or claimed by the intended recipient (no doubt after some good-natured prodding by the customer).

**Common Fund:** "The valuation of the common fund is relatively straightforward: it is the amount to be deposited into the Class Settlement Fund . . . " Declaration of Richard J. Burke In Support of Motion For Final Approval of the Class Action Settlement and Class Counsels' Application For Attorneys' Fees, Document 198 §62. Ahhh, if only that were true. The valuation of the common fund at $180 million does not take into account the amount of the settlement fund that will actually flow thru to the class members. That amount is surely much smaller, given the known dynamics of the class members and given the shortcomings in the notice plan. A proper valuation should consider how much is actually going to benefit the class members. An alternative valuation methodology, based on what the common fund will cost the Defendants, is also somewhat problematic, given the novel specifics of this case. Western Union is disgorging not only $180 million in cash, but also $180 million in liabilities. The net number to Western Union's balance sheet is zero! And, in fact, their annual report for the fiscal year ending December 31, 2012, filed with the Securities and Exchange Commission, states:

> "The settlement agreement, which is subject to the Court's final approval, would result in a substantial amount of the settlement proceeds to be paid from the Company's existing related unclaimed property liabilities. If a settlement agreement is not approved, the Company and Western Union Financial Services, Inc. intend to vigorously defend themselves against both lawsuits." See Notes to Consolidated Financial Statements, "Litigation and Related Contingencies"

In assessing the credibility of Western Union's stunning admission, I note that Brian T. Fitzpatrick, who Class Counsel has entrusted to opine on whether the attorneys' fees requested in this litigation are reasonable (see Document 197, §4), made a declaration on this very subject matter in a different litigation. *Wolfgeher v. Commerce Bank, N.A.* Case No. 1:09-MD-02036:

> "Not only did the information for this valuation come directly from [Defendant], but it came in large part from a filing [Defendant]

was required to make with the United States Securities and Exchange Commission – a filing that could subject [Defendant] to suit by shareholders if it were misleading". Document 3214-1 §21 on page 15 of 31.

**Escheated Funds:** According to Class Counsel:

> "The Settlement provides for Class members whose funds have escheated to be provided an Escheatment Recovery form and instructions for recoverying of escheated funds. It is anticipated that a substantial number of Class members will seek recovery of their escheated funds." Declaration of Richard J. Burke In Support of Motion For Final Approval of the Class Action Settlement and Class Counsels' Application For Attorneys' Fees, Document 198 §70.

What is the basis for predicting that a substantial number of Class members will seek recovery?

It doesn't seem realistic to me. Accordingly, the $83 million should be discounted accordingly.

**Interest:** According to Class Counsel:

> "The Settlement further provides for the recovery of the interest on unclaimed funds held by Defendants in the amount of $19,056,000. Some of this interest is to be paid from the Class Settlement Fund for those Class members whose unclaimed funds have not escheated, but the majority of interest is to be paid directly by Defendants from escrow funds administered by the Claims administrator". Declaration of Richard J. Burke In Support of Motion For Final Approval of the Class Action Settlement and Class Counsels' Application For Attorneys' Fees, Document 198 §67.

To the extent that the interest is being paid out of the Class Settlement Fund, then that amount is a double count of the Settlement Fund.

## VIII.   THIS COURT SHOULD NOT INFER SETTLEMENT APPROVAL FROM A LOW NUMBER OF OBJECTORS, ESPECIALLY WHEN THE SETTLING PARTIES HAVE ARTIFICIALLY REDUCED THE NUMBER OF OBJECTORS.

A low number of objections does not demonstrate that the settlement is fair, reasonable, and adequate. Any given class action settlement, no matter how much it betrays the interests of

the class, will produce only a small percentage of objectors. The predominating response will always be apathy, because objectors – unless they can obtain pro bono counsel – must expend significant resources on an enterprise that will create little direct for themselves. See Vought v. Bank of Am., No. 10-cv-2052, 2012 U.S. Dist. LEXIS 143595, at *60 (C.D. Ill. Oct. 4, 2012) (citing, inter alia, a 1996 Federal Judicial Center survey that found between 42% and 64% of settlements engendered no filings by objectors). Another common response from non-lawyers will be the affirmative avoidance, whenever possible, of anything involving a courtroom. Class counsel may argue that this understandable tendency to ignore notices or free-ride on the work of other objectors is best understood as acquiescence in or evidence of support for the settlement. This is wrong. Silence is simply *not* consent. Grove v. Principal Mut. Life Ins. Co., 200 F.R.D. 434, 447 (S.D. Iowa 2001) (citing In re GMC Pick-Up, 55 F.3d at 789). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amout of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails cost, and the stakes for individual class members are often low." Christopher R. Leslie, The Significance of Silence: Collective Action Problems and Class Action Settlements, 59 Fla. L. Rev. 71, 73 (2007).

Silence of absent class members will be all the more pronounced in cases like the one at hand, in which the settling parties have artificially reduced the number of objectors. See the discussion in Section VI "Trouble with the Class Notice" which details the "county or state" brouhaha.

**IX    ATTORNEYS FEES**

Assuming my objections are addressed, Class Counsel should be paid for the considerable amount of hard work already done. However, Class Counsel should not be paid 100% of their fee when sizable amount of work still needs to be performed. Accordingly, I recommend that two to three million dollars be withheld from Class Counsel's fees until the final accounting is rendered to the Court.

## XI. UNANSWERED QUESTIONS AS OF THE DATE OF THE FAIRNESS HEARING (JUNE 14, 2013).

Depending on the information provided by Class Counsel in their upcoming June 3, 2013 filings, I may have further questions regarding the Proposed Settlement.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I am willing to sit for a deposition within Hartford County, Connecticut within 14 calendar days after serving of this Objection.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Summary of evidence to be submitted:

See Dorsey Objection Exhibit 1 attached for list of 10 items
Western Union / First Data Form 10-Ks for years ending December 31, 2003 - 2012
Western Union receipts from walk-up agent, circa Sept – Oct 2010
All documents entered on to the docket by any settling party or objector.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Identity of any witness to be called at the Fairness Hearing:

None, but I reserve the right to cross-examine any witnesses who testify at the hearing in support of final approval.

A Notice of Intent to Appear is being filed separately

5.15.13
---
May 15, 2013

Paul M Dorsey
---
Paul M. Dorsey

Dorsey Objection

# EXHIBIT 1

# XFINITY Connect

# RE: Request for Documents / Tennille v Western Union

**From :** Stephen. A Weiss <sweiss@seegerweiss.com>

**Subject :** RE: Request for Documents / Tennille v Western Union

**To :** 'p.dorsey@comcast.net' <p.dorsey@comcast.net>

**Cc :** jamie@complexlitgroup.com, paul@complexlitgroup.com, rich@complexlitgroup.com, Jonathan Shub <jshub@seegerweiss.com>

Fri, May 10, 2013 05:33 PM

Dear Paul:

Thank you for your call on Wednesday and your continued interest in the proposed settlement. Consistent with your prior representations to me that you are not currently being represented by separate counsel, I write to you now in response to your email below to Richard Burke on May 7 on which I was copied. If that status quo has changed and you are now represented by separate counsel, please inform me of that counsel's identity and kindly direct this communication to such counsel.

As I discussed with you on Wednesday, we've reviewed your request for various discovery relating to the settlement and concluded that production of such materials and information is inconsistent with our duties as Class Counsel, would be unduly burdensome under the circumstances and are otherwise not required under the procedural rules, the common law interpreting those rules and customs of practice under Rule 23. We therefore respectfully decline your request and will not produce such materials to you. However, in our role as Class Counsel, we will be submitting papers to the Court so that the Court may evaluate whether the settlement is fair, reasonable and adequate, which as I've previously explained to you is the Court's responsibility under Rule 23 as a fiduciary of the class. We believe that all of the information that is reasonably required to evaluate the fairness, reasonableness and adequacy of the settlement will be contained in those papers and it would be premature to provide such information to you prior to filing. To the extent that the information that you seek now is not contained in those papers, please be assured that we did not consider that information relevant to the Court's task of evaluating the fairness of the settlement.

As always, I welcome you to call me at any time should you have continued questions or concerns regarding the proposed settlement. I thank you again for your interest and attention.

Very truly yours,
Stephen A. Weiss

**From:** p.dorsey@comcast.net [mailto:p.dorsey@comcast.net]
**Sent:** Tuesday, May 07, 2013 4:41 PM
**To:** rich@complexlitgroup.com; Weiss, Stephen. A; Shub, Jonathan
**Cc:** jamie@complexlitgroup.com; paul@complexlitgroup.com
**Subject:** Request for Documents / Tennille v Western Union

Rich:

Thank you for affording me the opportunity to meet with your co-class counsels from Seeger Weiss. While I had offered to meet with you at your office in the midwest (Chicagoland), I very much appreciated the shorter trip into New York City. My meeting took place on April 17, 2013.

At my meeting with Mr. Jonathan Shub and Mr. Steve Weiss, I made it clear to them that I didn't want to object to the proposed settlement. But I also made it clear that I was looking for 1) more information about the Notice Plan, and 2) an estimate on how much of the $180 million would be claimed by class members.

I had hoped to get some, if not all, of what I was looking for from your filings regarding your attorneys fees. That turned out to be a false hope.

Accordingly, I want to let you know that it is my intention to file a formal objection to the proposed settlement, along with a related "Notice of Intention to Appear."

In good faith, I am requesting from you the following ten documents (the information contained in the documents will either be incorporated into my objection or my questioning of witnesses at the Fairness Hearing):

1. A list of all class action administrators who were solicited by Lead Class Counsel (per Stipulation and Agreement of Compromise and Settlement [Document 172-2, hereinafter "Settlement Agreement"] at Section 3.A: "Lead Class Counsel will seek bids from class action administrators . . . ").

2. The Request for Proposal (a/k/a "Bid Package") that was used by Lead Class Counsel to solicit bids from claims administrators.

3. Proposals returned by all class action administrators, including (but not limited to) Epiq Class Action & Claims Solutions, Inc (hereinafter "Epiq").

4. The signed contract with Epiq, the court approved Settlement Administrator.

5. The three or four monthly invoices that Epiq has submitted to Western Union and Class Counsel (per the Settlement Agreement at Section 3.C: "From one month after the date of Preliminary Approval [Jan 3, 2013] until the Settlement Effective Date, the Administrator shall submit to Western Union and Class Counsel monthly invoices of all expenses. . . ").

6. The Notice Plan (per the Settlement Agreement at Section 3.D.1: "The Parties in consultation with the Administrator will endeavor to provide a Notice Plan that complies with all constitutional and Federal Judicial Center notice guidelines and will provide the Notice Plan to the Court together with a Motion for Preliminary Approval").

7. Any certification by Epiq regarding the Notice Plan.

8. Exhibits to the Settlement Agreement: 1 [Claim Form]; 4 [CAFA Notice]; 5 [Other Notice]; and 6 [Talking Points]. These are not available on Pacer.gov/.

9. Sensitivity analysis of Notice Plan (ie – spending $1.3 million will yield an expected "reach" of x%; spending $2.0 million will yield an expected reach of y%; spending $5.0 will yield an expected reach of z%).

10. Any analysis/projection on the actual dollars to be returned to the class members (ie – out of the estimated $180 million, given the Notice Plan and claims process, an estimated $10 million will be successfully returned to class members).

Please let me know promptly if you will make these items available to me and when I can expect to receive them from you.

Thank you.

Paul Dorsey
Putative Class Member
Tennille v. Western Union

110 Westminster Drive
West Hartford, CT 06107
860 521-0081

Dorsey Objection

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
### Judge John L. Kane

Civil Action No. 09-cv-00938-JLK consolidated with No. 10-cv-00765-JLK

**JAMES P. TENNILLE, ROBERT SMET, ADELAIDA DELEON and YAMILET RODRIGUEZ,** individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

**THE WESTERN UNION COMPANY and WESTERN UNION FINANCIAL SERVICES, INC.,**

      **Defendants.**

---

## DECLARATION OF PAUL M DORSEY

---

Paul M Dorsey hereby declares the following to the best of his information, knowledge, and belief:

1) I reside at 110 Westminster Drive, West Hartford, CT 06107-3355. My phone number is 860 / 521-0081. I have resided at this address for a least several years.

2) On April 1, 2013, I received in the mail, at the above address, an 8 page notice (a/k/a "Long Form Notice") from the Western Union Settlement Administrator. The return address was from: Tennille v. Western Union Settlement Administrator, PO Box 3058, Portland, OR 97208-3058.

3) I never received any e-mail notification from the Western Union Settlement Administrator, either on, before or after April 1, 2013 that advised me about the above described class action lawsuit, Tennille v Western Union.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct

Date: __5.15.13__

                                  Paul M Dorsey
                                  Paul M Dorsey

Dorsey Objection

# EXHIBIT 3

**From:** westernunionresponse@westernunion.com (westernunionresponse@westernunion.com)
**To:** P.DORSEY@SNET.NET;
**Date:** Thu, October 14, 2010 6:56:03 PM
**Cc:**
**Subject:** TMT Western Union Receipt

Western Union Telephone Money Transfer
13022 Hollenberg Drive
Bridgeton MO 63044

PAUL M DORSEY
110 WESTMINSTER DR
W HARTFORD, CT

---

**This is not a bill**
**Este documento no es una factura**

**Customer Receipt / Recibo del Cliente**

---

Money Transfer Send / Envio de Transferencia de Dinero
MTCN : 7976600981
Operator ID / ID de Operador : 183
Date / Fecha : 10/14/2010
Time / Hora : 18:39:47

Sender / Remitente : PAUL M DORSEY
Card Number / Número de Tarjeta de Crédito : **** **** **** 9052
Receiver / Destinatario : MICHAEL GILLESPIE

Available In / Disponible en : IRELAND EUR

Western Union Card Number/Numero de tarjeta: 209800128

Payout Amount / Monte de Pago : 30.00
Exchange Rate / Tipo de Cambio : 0.6677084

Transaction Exchange Rate / Transaccion Tipo de Cambio:
The currency and exchange rate for your transaction was determined at the time of send (EXCEPT WHERE PROHIBITED BY LAW) and is listed above /
El tipo de cambio y moneda para su transacción fue determinado al momento del envío (EXCEPTO DONDE LO PROHIBE LA LEY) y está indicado en la parte de arriba.

| | |
|---|---|
| Amount / Cantidad : | $ 44.93 |
| Service Charge(s) / Servicio Cargos : | $ 15.00 |
| Additional Charge(s) / Cargos Adicionales : | $ 0.00 |
| Total / Total : | $ 59.93 |

Transfers to certain destinations may take longer or be subject to additional restrictions.

Las transferencias enviadas hacia algunos destinos, pueden tardar más tiempo en estar disponibles o estar sujetas a restricciones adicionales.

Thank you for calling 1-800-CALL-CASH and using the *Western Union*® *Money Transfer*SM service. If you have any questions about your transaction, please contact us at 1-800-525-3403.

Gracias por llamar 1-800-CALL-CASH y utilizar el servicio *Western Union*® *Money Transfer*SM. Si tiene cualquier pregunta acerca de su transacción, le rogamos que nos llame por teléfono al número 1-800-325-4045.

> We value your opinion! Go to westernunionsurvey.com, text WU to 70626 (std txt fees apply) or call 1-888-SURVEYWU. Get $1 off one qualifying transfer from US thru 12/10; no $ value; 1 discount/transfer. Code J6691-195439013.

IN ADDITION TO THE TRANSFER FEE, WESTERN UNION ALSO MAKES MONEY WHEN IT CHANGES YOUR DOLLARS INTO FOREIGN CURRENCY. PLEASE SEE BELOW FOR MORE INFORMATION REGARDING CURRENCY EXCHANGE. ADEMÁS DE LOS CARGOS POR EL SERVICIO DE TRANSFERENCIA, WESTERN UNION TAMBIÉN GANA DINERO CUANDO CAMBIA SUS DÓLARES A MONEDA EXTRANJERA. POR FAVOR LEA EN LA PARTE INFERIOR MÁS INFORMACIÓN SOBRE EL CAMBIO DE MONEDA.

FOR A COMPLETE COPY OF THE TERMS AND CONDITIONS GOVERNING THIS TRANSACTION AND THE SERVICES YOU HAVE SELECTED PLEASE REVIEW AND PRINT THE TERMS AND CONDITIONS. PARA RECIBIR UNA COPIA COMPLETA DE LOS TÉRMINOS Y CONDICIONES QUE RIGEN ESTA TRANSACCIÓN Y LOS SERVICIOS QUE UD. SELECCIONÓ, FAVOR DE REVISAR Y IMPRIMIR LOS TERMINOS Y CONDICIONES.

WESTERN UNION PRIVACY POLICIES: Western Union may disclose your personal information to third parties as explained in Western Union's Privacy Statement ("Statement"). To obtain a copy of the Statement, click here, visit Western Union's website at westernunion.com, or call 1-800-562-2598. Information disclosed may include financial background; identification, such as name and address; transaction information; and other information relating to financial matters. Recipients may include financial institutions; retailers; companies that process transactions or provide other services for us; government agencies; and direct marketers. You may opt out of (direct us not to make) certain disclosures. If you do not opt out, we will assume that you agree that your information may be used as the Statement describes. To opt out, call 1-800-562-2598.

Condiciones de privacidad de Western Union: Western Union, puede revelar su información personal a terceros, como se explica en la declaración de Privacidad de Western Union. Para obtener una copia de esta declaración, haga click aquí, visite la página web de Western Union en westernunion.com o llámenos al teléfono 1-800-562-2598. La información revelada, puede incluir antecedentes financieros, detalles de su identificación, tales como nombre completo y dirección; información sobre transacciones y otro tipo de información referente a situaciones financieras. Esta información puede ser enviada a instituciones financieras, minoristas, compañías que procesen transacciones o nos provean de otro servicio; agencias gubernamentales; y vendedores directos. Usted podría optar por (señalarnos no revelar) alguna información. Si usted no especifica dicha opción, asumiremos que acepta que su información pueda ser usada como lo describe esta declaración. Si decide optar por no revelar alguna información, llame al 1-800-562-2598.

# XFINITY Connect

p.dorsey@comcast.ne

± Font Size –

# Western Union: Confirmed Quick Collect transfer

**From :** westernunionresponse@westernunion.com

**Subject :** Western Union: Confirmed Quick Collect transfer

**To :** P DORSEY <P.DORSEY@SNET.NET>

Thu, May 02, 2013 10:49 PM

Dear PAUL DORSEY,

Thank you for using the Western Union Quick Collect® service.

Your payment has been processed and sent to your biller or facility.

QUICK COLLECT TRANSACTION DETAILS:

**Your Money Transfer Control Number [MTCN] is : 2479450990**

| | |
|---|---|
| Date of Order: | 05/02/2013 |
| Amount Sent: | $65.00 |
| Quick Collect Fee : | $6.95 |
| Total Amount: | $71.95 |
| Transaction Type: | credit |
| AUTH CODE: | 0386917 |

The total charges will appear on your credit or debit card statement.

**Receiver Information**

| | |
|---|---|
| Biller or Facility Name: | CONNECTICUT DOC |
| Attention: | NIANTIC ANNEX |
| Code City/State: | CTDOC CT, |

**Sender Information**
PAUL DORSEY
110 WESTMINSTER DRIVE
WEST HARTFORD, CT 06107
UNITED STATES
8605210081
P.DORSEY@SNET.NET

---

We believe there is one gift perfect for any occasion: money! From weddings and graduations to Mother's and Father's Day, send money to show honor and support with Western Union. Transfer fees within the U.S. start at $5.

---

If you have any questions, visit us at www.westernunion.com.

Thank you for using Western Union!

DO NOT REPLY TO THIS EMAIL. IF YOU HAVE QUESTIONS PLEASE CONTACT US

Dorsey Objection

# EXHIBIT 4

# If You Purchased and/or Paid for Flonase or Generic Flonase

## A Class Action Settlement Could Affect You

A proposed Settlement has been reached in a class action lawsuit regarding the prescription nasal spray Flonase. The lawsuit claims that the seller of Flonase violated state laws by delaying the availability of generic versions of Flonase. The seller is SmithKline Beecham Corporation doing business as GlaxoSmithKline ("GSK"). GSK denies it has done anything wrong but agreed to the Settlement to resolve the controversy and to avoid the cost and expense of further litigation.

*No one is claiming that Flonase or its generic equivalent is unsafe or ineffective.*

### Who is included?

You are a Consumer Class Member if you:
• Purchased and/or paid for Flonase and/or its generic equivalents,
• Anywhere in the United States and its territories,
• For personal, family or household use,
• Between May 19, 2004, and March 31, 2009.

You "purchased and/or paid for" Flonase or generic Flonase (fluticasone propionate nasal spray) if you were:
(a) An uninsured consumer who paid the entire cost of the prescription, or
(b) An insured consumer who made a co-payment or other partial out-of-pocket payment, or paid the entire cost because you had not met a deductible amount under your health plan.

### What does the Settlement Provide?

GSK will pay $35 million into a Settlement Fund to settle all claims in the lawsuit brought on behalf of consumers and health insurers known as Third-Party Payors or "TPPs". A group of TPPs called Settling Health Plans ("SHPs") also settled with GSK under a separate agreement for $11 million. To make sure their payments were approximately proportionate to those of Class Members, SHPs may receive payments from or contribute payments to the Class Settlement Fund.

Class Counsel will ask the Court to award attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest, litigation expenses and incentive payments to the Class Representatives. After these deductions and any SHP payments, the remainder of the Class Settlement Fund will be distributed *pro rata* to Class Members.

### What can I get from the Settlement?

The amount of money you are eligible to receive will depend on how much you paid for Flonase and generic Flonase and on how much other Class Members and SHPs paid and/or reimbursed.

### How do I get a payment?

Submit a Claim Form by August 15, 2013. See below.

### What are my other rights?

If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement. The exclusion deadline is May 3, 2013. If you stay in the Settlement you will not be able to sue GSK for any claims relating to the Settlement. You will be bound by all the Court's orders. However, if you stay in the Settlement, you may object to it by May 3, 2013.

The Court will hold a hearing on June 3, 2013 at 10:30 a.m. to consider whether to approve the Settlement and a request for attorneys' fees, expenses and incentive awards. The Court has appointed attorneys to represent the Class. You or your own lawyer may ask to appear and speak at the hearing at your own expense.

**Call Toll-Free: 1-800-549-1836**
**Visit: www.FlonaseSettlement.com**

---

**If you initiated a money transfer in the United States using Western Union between January 1, 2001 and January 3, 2013 and your money transfer was not redeemed within 60 days, you may be eligible to receive a cash payment from a class action settlement.**

*Para una notificación en español, llámenos o visite nuestro página web.*

This settlement involves a lawsuit over whether Western Union Financial Services, Inc. and Western Union Company (collectively, "Western Union") timely notified its customers of unredeemed Western Union Transactions in the United States using Western Union's money transfer services.

The United States District Court for the District of Colorado will hold a hearing to decide whether to give final approval to the settlement, so that the benefits can be distributed. Those included in the settlement have legal rights and options, such as submitting a claim for benefits or excluding themselves from or objecting to the settlement. More information is in the Detailed Notice which is available at www.MoneyTransferSettlement.com.

**What is this About?** The lawsuit claims that Western Union did not timely notify its customers that their Western Union Transactions were not redeemed by the receivers to whom the Western Union Transactions were sent, and as a result caused harm to their customers. Western Union denies it did anything wrong, and the Court has not ruled on whether Western Union violated any laws.

**Who is Included?** All persons (a) who initiated any Western Union Transaction in the United States on or after January 1, 2001 and on or before January 3, 2013, whose Western Union Transaction was not redeemed within 60 calendar days; and (b) who either (i) have not claimed their money transfer funds (or had that money claimed on their behalf) from Western Union; or (ii) were informed by written communication that their money was about to escheat to the state, district, territory, or U.S. jurisdiction in which their money transfers were initiated, and who sought and received a refund of their money but did not receive a payment for interest Western Union earned on that money.

A "Western Union Transaction" is one initiated using Western Union's services, including Dinero en Minutos, Envio Plus, Equity Accelerator, Mexico Giro Paisano, Money in Minutes, Money Transfer, Next Day, Quick Collect, Quick Pay, Speedpay, and Swiftpay. "Escheat" means the process where unclaimed or abandoned property reverts to the state under certain statutes.

**What Does the Settlement Provide?** If the settlement is approved by the Court, Western Union will establish a Class Settlement Fund estimated to be approximately $180 million and claim forms will be sent to known Class members and made available via the toll-free number and website below. Eligible Class members who file a claim will be reimbursed for their money transfer funds, less administrative fees, plus interest. Class members whose funds have escheated will be provided forms and instructions on how to recover their escheated money, and can also recover interest from Western Union. Western Union will also change certain policies and practices with respect to notifications to customers using its money transfer services.

**Your Options.** If you do not want to be legally bound by the settlement, you must exclude yourself from the Class by May 15, 2013 or you will not be able to sue, or continue to sue, Western Union about the legal claims this settlement resolves, ever again. If you exclude yourself, you cannot get any benefits from the settlement. If you stay in the Class, you may object to it by May 15, 2013. The Detailed Notice explains how to exclude yourself or object. If you remain in the settlement, you may be eligible to submit a claim form after the settlement is approved and any appeals are complete. The claim form will become available after the Court approves the settlement and appeals, if any, are final.

The law firm of Complex Litigation Group LLC has been appointed Lead Class Counsel. The Court will hold a hearing in the case, known as *Tennille v. Western Union Co.*, Case No. 1:09-cv-00938, on June 14, 2013, at the United States District Court for the District of Colorado located at Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, CO 80294, in Courtroom A802 to consider whether to approve the settlement, and a request by Class Counsel for attorney's fees, costs and expenses of up to 30% of the value of the Class Settlement Fund. Class Counsel will also request payments of $7,500 each as an incentive award for the Plaintiffs who helped the lawyers on behalf of the whole Class. You or your own lawyer may ask to appear and speak at the hearing at your own cost, but you do not have to. For more information, call or go to the website shown below.

**www.MoneyTransferSettlement.com**
**1-877-316-3151**

Dorsey Objection

# EXHIBIT 5

## OBJECTING TO THE SETTLEMENT

23. How do I tell the Court if I do not like the Settlement?

Only Class members who do not exclude themselves can object to the settlement or request for reimbursement of attorneys' fees and expenses. If you do not exclude yourself, you may object to the settlement if you believe that some part, or all of the settlement is unreasonable, unfair, or inadequate. To object, send a letter explaining your objection in *Tennille v. The Western Union Co.* Your objection letter must include:

1. Your first and last name, a valid mailing address, and a functioning telephone number;
2. Your signature;
3. The reasons you object to the settlement;
4. The identity of any witness to be called at the Fairness Hearing;
5. A summary of any evidence to be submitted; and
6. The identity of any documents to be submitted.

Objections must be sent to each of the following addresses postmarked by **May 15, 2013**. Objections submitted after this date may not be considered.

**COURT**
Clerk's Office
United States District Court
District of Colorado
Alfred A. Arraj U.S. Courthouse
Room A105
901 19th Street
Denver, CO 80294

**LEAD CLASS COUNSEL**
Richard J. Burke
Jamie E. Weiss
Complex Litigation Group LLC
513 Central Ave., Suite 300
Highland Park, IL 60035

**DEFENSE COUNSEL**
Jason A. Yurasek
Perkins Coie LLP
Four Embarcadero Center
Suite 2400
San Francisco, CA 94111

Thomas M. Barba
Steptoe & Johnson LLP
1330 Connecticut Ave. NW
Washington, DC 20036

If you file an objection, you must be willing to agree to sit for a deposition, within the county or state in which you reside, within 14 calendar days after serving the objection. The Class notice initially stated that you must be willing to sit for a deposition within the county or state in which you reside. After consultation with the Court, the parties have agreed that Class members must be willing to sit for a deposition at any reasonable location within the state where the objector resides, at the objectors choice. An objecting Class member whose objection is limited to the proposed award of attorneys' fees and expenses is not required to sit for a deposition.

Back To Top

CÓMO OBJETAR EL ACUERDO

23. ¿Cómo le hago saber al Tribunal que no me agrada el Acuerdo?

Sólo los miembros del Grupo de Demandantes que no se excluyan pueden objetar el acuerdo o solicitar un reembolso de los gastos y honorarios de los abogados. Si no se excluye, puede objetar el acuerdo si considera que una parte o todo el acuerdo es poco razonable, injusto o inadecuado. Para hacerlo, envíe una carta que explique su objeción a *Tennille v. The Western Union Co.* Su carta de objeción debe incluir:

1. Su nombre y apellido, una dirección postal válida y un número de teléfono en uso;
2. Su firma;
3. Los motivos por los cuales objeta el acuerdo;
4. La identidad de algún testigo para ser convocado en la Audiencia de imparcialidad;
5. Un resumen de cualquier evidencia que se presente; y
6. La identidad de cualquier documento que se presente.

Las objeciones deben enviarse a cada una de las siguientes direcciones con sello postal no más tarde del **15 de mayo de 2013**. Es posible que las objeciones presentadas después de esta fecha no se tengan en cuenta.

| TRIBUNAL | ABOGADOS PRINCIPALES DEL GRUPO DE DEMANDANTES | ABOGADOS DE LA DEFENSA |
|---|---|---|
| Clerk's Office<br>United States District Court<br>District of Colorado<br>Alfred A. Arraj U.S.<br>Courthouse<br>Room A105<br>901 19th Street<br>Denver, CO 80294 | Richard J. Burke<br>Jamie E. Weiss<br>Complex Litigation Group LLC<br>513 Central Ave., Suite 300<br>Highland Park, IL 60035 | Jason A. Yurasek<br>Perkins Coie LLP<br>Four Embarcadero<br>Center<br>Suite 2400<br>San Francisco, CA<br>94111<br><br>Thomas M. Barba<br>Steptoe & Johnson LLP<br>1330 Connecticut Ave.<br>NW<br>Washington, DC 20036 |

Si presenta una objeción, debe estar dispuesto a presentarse para una declaración jurada dentro del país o estado en el que reside, dentro de los 14 días calendario posteriores a la presentación de la objeción. Los miembros del Grupo de Demandantes que presenten objeciones y cuyas objeciones estén limitadas a la recompensa propuesta de honorarios y gastos de los abogados no tienen la obligación de presentarse para una declaración jurada.

Volver al principio