**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane**

Civil Action No. 09-cv-00938-JLK, consolidated with No. 10-cv-00765-JLK

**JAMES P. TENNILLE, ROBERT SMET, ADELAIDA DELEON, and YAMILET
RODRIGUEZ**, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

**THE WESTERN UNION COMPANY and WESTERN UNION FINANCIAL SERVICES,
INC.,**

      Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT**

---

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. CASE BACKGROUND AND HISTORY ...................................................................... 2

   *A.* *The Claims Asserted by Plaintiffs on Behalf of the Class* ...................................... 2

   *B.* *Procedural History and Rule 12 Motion Practice* ................................................ 6

   *C.* *Discovery* ............................................................................................................... 8

   *D.* *The Motion to Compel Arbitration and Related Discovery* .................................. 9

III. THE PARTIES' SETTLEMENT NEGOTIATIONS ..................................................... 10

IV. THE TERMS OF THE SETTLEMENT ....................................................................... 10

   *A.* *The Common Fund Will Compensate Class Members' Whose Unredeemed Money Transfers Did Not Yet Escheat to the States.* .............................................................. 12

   *B.* *Direct Payment of Lost Interest from Western Union and Assistance with Recovering Unclaimed Property From the States Will Be Provided to Class Members' Whose Unclaimed Money Transfers Escheated to the States.* .............................................................. 14

   *C.* *Western Union Agrees to Change Its Business Practices to Provide Prompt Notice of Unclaimed Money Transfers.* ...................................................................................... 14

   *D.* *The Settlement Provides Extensive Efforts to Locate Class Members, Which Is Itself a Significant Benefit of the Settlement.* .......................................................................... 15

V. THE COURT SHOULD CERTIFY THE CLASS. ...................................................... 17

   *A.* *The Class Satisfies the Requirements of Rule 23(a).* ........................................... 19

      1. The Numerosity Requirement Is Satisfied. ...................................................... 19

      2. The Commonality Requirement Is Satisfied. ................................................... 19

      3. The Typicality Requirement Is Satisfied. ......................................................... 21

      4. The Adequate Representation Requirement Is Satisfied. ................................ 22

   *B.* *The Class Satisfies the Requirements of Rule 23(b)(3).* ....................................... 24

      1. Common Questions of Law and Fact Predominate. ........................................ 24

      2. A Class Action Is the Superior Method of Resolving This Dispute. .............. 25

VI. THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND THEREFORE WARRANTS FINAL APPROVAL. ........................................................ 27

   *A.* *There Is an Overriding Federal Policy Favoring Settlements of Class Actions.* ............... 27

   *B.* *Criteria Governing Consideration of Final Settlement Approval* ....................... 29

   *C.* *The Settlement Was Fairly and Honestly Negotiated.* .......................................... 31

   *D.* *The Settlement Came Out Only After Spirited Litigation.* ................................... 33

   *E.* *Serious Questions of Law and Fact Existed That Put the Ultimate Outcome of a Trial in Doubt.* .......................................................................................................................... 35

*F. The Value of the Settlement Far Outweighs the Possibilities of Future Relief After Protracted and Expensive Litigation.* ............................................................................ *36*

*G. Class Counsel Believe the Settlement Is Fair, Reasonable, and Adequate.* ....................... *39*

*H. Positive Response of Class Members* ............................................................................ *40*
   1.   The Paucity of Objections in General ............................................................... 40
   2.   The Few Objections Lodged Are Meritless ...................................................... 42
       a.   Bacharach Objection ................................................................................. 42
       b.   Dorsey Objection ...................................................................................... 44
       c.   Giancaterino Objection ............................................................................. 50
       d.   Jeremiah Nelson Objection ....................................................................... 51
       e.   Sikora Nelson Objection ........................................................................... 51
       f.   Severini Objection .................................................................................... 52
       g.   Other Responses ....................................................................................... 53
       h.   Objections of State Attorneys General ...................................................... 54

## TABLE OF AUTHORITIES

**Cases**

*Airline Stewards & Stewardesses Ass'n v. Trans World Airlines, Inc.*, 630 F.2d 1164 (7th Cir. 1980) ........................................................................................................ 28

*Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) .......................... 44

*Alvarado Partners v. Mehta*, 723 F. Supp. 540 (D. Colo. 1989), *appeal dismissed*, 936 F.2d 582 (table), 1991 WL 109139 (10th Cir. June 17, 1991) (unpublished) ......................... 31

*Am. Family Mut. Ins. Co. v. Orlowski*, No. 08-CV-00763DMEKMT, 2009 WL 1698504 (D. Colo. June 15, 2009) ................................................................................................... 28

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................ passim

*Ashley v. Reg'l Transp Dist. & Amalgamated Transit Union Div. 1001 Pension Fund Trust*, No. 05-CV-01567-WYD-BNB, 2008 WL 384579 (D. Colo. Feb. 11, 2008) .......... 30, 45

*AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) ......................................................... 9

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ........................................................................ 48

*Brent v. Midland Funding, LLC*, No. 3:11 CV 1332, 2011 WL 3862363 (N.D. Ohio Sept. 1, 2011) ............................................................................................................................. 29

*Brotherson v. Prof'l Basketball Club, L.L.C.*, 262 F.R.D. 564 (W.D. Wash. 2009) ................... 26

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ............................................... 26

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) .......................................... 40

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ................................................. 52

*City P'ship Co. v. IR-TCI Partners V, L.P.*, 252 F. Supp. 2d 1114 (D. Colo. 2003) ................... 28

*City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576 (D. Colo. 2002) .......................... 18, 22

*Clark v. State Farm Mut. Auto. Ins. Co.*, 245 F.R.D. 478 (D. Colo. 2007), *aff'd*, 590 F.3d 1134 (10th Cir. 2009) .............................................................................................. 21, 26

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ............................................. 31

*Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D. Colo. 1993) ............................... 19, 21, 24, 25

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ................................................................. 28, 39

*Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008) ............................................ 22

*DeJulius v. New Eng. Health Care Employees Pension Fund*, 429 F.3d 935 (10th Cir. 2005) ................................................................................................................ 46

*Diaz v. Romer*, 801 F. Supp. 405 (D. Colo. 1992), *aff'd*, 9 F.3d 116 (table), 1993 WL 425143 (10th Cir. Oct. 21, 1993) (unpublished).......................................... 29

*Duffield v. First Interstate Bank of Denver, N.A.*, 13 F.3d 1403 (10th Cir. 1993) ...... 53

*Emig v. Am. Tobacco Co.*, 184 F.R.D. 379 (D. Kan. 1998)........................................ 22

*Erickson v. Credit Bureau Servs., Inc.*, No. 8:11CV215, 2013 WL 672313 (D. Neb. Feb. 22, 2013) .......................................................................................................... 32

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ................................................ 49

*Garcia v. Gordon Trucking, Inc.*, No. 1:10-CV-0324 AWI SKO, 2012 WL 5364575 (E.D. Cal. Oct. 31, 2012) ...................................................................................... 23

*Gautreaux v. Pierce*, 690 F.2d 616 (7th Cir. 1982) .................................................... 40

*GET, LLC v. City of Blackwell*, 407 F. App'x 307 (10th Cir. 2011) ........................... 28

*Giles v. The Inflatable Store, Inc.*, No. 07CV00401PABKLM, 2009 WL 801729 (D. Colo. Mar. 24, 2009)............................................................................................ 28

*Gottlieb v. Wiles*, 11 F.3d 1004 (10th Cir. 1993)............................................... 30, 46

*Halstead Hosp., Inc. v. N. Bank Note Co.*, 680 F.2d 1307 (10th Cir. 1982).............. 53

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ......................................... 29

*Henderson v. Volvo Cars of N. Am., LLC*, No. 09-4146 CCC, 2013 WL 1192479 (D.N.J. Mar. 22, 2013) .......................................................................................... 34

*Hershey v. ExxonMobil Oil Corp.*, No. 07-1300-JTM, 2012 WL 5306260 (D. Kan. Oct. 26, 2012) .......................................................................................................... 29

*Hochschuler v. G.D. Searles & Co.*, 82 F.R.D. 339 (N.D. Ill. 1978) ......................... 26

*In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113 (2d Cir. 2011)...................... 46

*In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04 Civ. 8141 (DAB), 2010 WL 5060697 (S.D.N.Y. Dec. 2, 2010), *aff'd*, 452 F. App'x 75 (2d Cir. 2012)........................... 42

*In re AOL Time Warner, Inc. Sec.*, No. 02 Civ. 5575 (SWK), 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) ..................................................................................... 41

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003) ..................... 41

*In re Checking Account Overdraft Litig.*, No. MDL 2036, 2012 WL 456691 (S.D. Fla. Feb. 14, 2012) ............................................................................................................ 43

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003) ............................................................................................................................ 23

*In re Corrugated Container Antitrust Litig.*, 611 F.2d 86 (5th Cir. 1980) ........................ 46

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, No. MDL 1203, 2002 WL 32154197 (E.D. Pa. Oct. 3, 2002) ............................................ 43

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ....... 44

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) .................................................................................................................... 28

*In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166 (S.D. Cal. 2007) ...................... 45

*In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92 (D.N.J. 2012) ................................. 42

*In re Ins. Mgmt. Solutions Group, Inc. Sec. Litig.*, 206 F.R.D. 514 (M.D. Fla. 2002) ............. 23

*In re Integra Realty Res., Inc.*, 262 F.3d 1089 (10th Cir. 2001) ............................. 22, 46

*In re Intelcom Grp., Inc. Sec. Litig.*, 169 F.R.D. 142 (D. Colo. 1996) .......................... 18

*In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) ................ 41

*In re Lucent Techs., Inc., Secs. Litig.*, 307 F. Supp. 2d 633 (D.N.J. 2004) ..................... 41

*In re Metro. Life Derivative Litig.*, 935 F. Supp. 286 (S.D.N.Y. 1996) ......................... 36

*In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379 (D. Md. 1983) ....................... 47

*In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329 (N.D. Ga. 2000) .............. 34

*In re N.M. Natural Gas Antitrust Litig.*, 607 F. Supp. 1491 (D. Colo. 1984) .................... 40

*In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) .................................... 31

*In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 278 (E.D. Pa. 2012) ................... 36

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1133 (D. Colo. 2009) ........... 30

*In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-0085 FSH, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) .................................................................................................. 44

*In re Revco Sec. Litig.*, 142 F.R.D. 659 (N.D. Ohio 1992) ....................................... 26

*In re Storage Tech. Corp. Sec. Litig.*, 113 F.R.D. 113 (D. Colo. 1986) ...................................... 23

*In re Sumitomo Copper Litig.*, 189 F.R.D. 274 (S.D.N.Y. 1999)................................................ 41

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) ........................................................ 43

*In re U.S. Oil and Gas Litig.*, 967 F.2d 489 (11th Cir. 1992)...................................................... 28

*In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, 631 F. Supp. 2d 1151 (D. Minn. 2009) .................................................................................................................................... 32

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247 ADM/JJK, 2012 WL 3984542 (D. Minn. Sept. 11, 2012) ...................................................... 43

*In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ............. 42

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379 (D. Ariz. 1989).................. 31

*Int'l Bhd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*, No. 3:09-CV-00419-MMD, 2012 WL 5199742 (D. Nev. Oct. 19, 2012)................................................ 32

*Int'l Union of Elec. Workers v. Unisys Corp.*, 858 F. Supp. 1243 (E.D.N.Y. 1994)................... 39

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996)................................................................................ 28

*J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280 (10th Cir. 1999)................................................. 18, 19

*Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322 (10th Cir. 1984) .............................................. 30

*Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635 (D. Colo. 1986) ...................................... 21, 22, 24

*Kerner v. City & Cnty. of Denver*, No. 11-CV-00256-MSK-KMT, 2012 WL 7802744 (D. Colo. Nov. 30, 2012) ...................................................................................................... 19, 26

*Kohn v. Am. Hous. Found., Inc.*, 178 F.R.D. 536 (D. Colo. 1998)............................................. 18

*Lake v. First Nationwide Bank*, 900 F. Supp. 726 (E.D. Pa. 1995) ............................................ 39

*Lane v. Page*, 862 F. Supp. 2d 1182 (D.N.M. 2012) ................................................................. 33

*Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766 (N.D. Ohio 2010) .................................. 41

*Lucas v. Kmart Corp.*, 234 F.R.D. 688 (D. Colo. 2006)........................................................ 34, 39

*Marcus v. State of Kan., Dep't of Revenue*, 209 F. Supp. 2d 1179 (D. Kan. 2002) .................... 31

*McNeely v. Nat'l Mobile Health Care, LLC*, No. 07-933-M, 2008 WL 4816510 (W.D. Okla. Oct. 27, 2008)........................................................................................................... 36

*Meyenburg v. Exxon Mobil Corp.*, 3:05-CV-15-DGW, 2006 WL 5062697 (S.D. Ill. June 5, 2006) ................................................................................................................ 43

*Millsap v. McDonnell Douglas Corp.*, No. 94-CV-633-H(M), 2003 WL 21277124 (N.D. Okla. May 28, 2003) ............................................................................................ 44

*Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483 (11th Cir. 1994) ................................. 28

*Neiberger v. Hawkins*, 208 F.R.D. 301 (D. Colo. 2002) ................................................. 22

*Olden v. Gardner*, 294 F. App'x 210 (6th Cir. 2008) .................................................... 42

*Pan Am. World Airways, Inc. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 523 F.2d 1073 (9th Cir. 1975) .................................................................................................... 47

*Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181 (10th Cir. 1975) ....................................... 21

*Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978) ................................... 41

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ................................................. 25

*Queen Uno Ltd. Pshp. v. Coeur D'Alene Mines Corp.*, 183 F.R.D. 687 (D. Colo. 1998)............ 19

*Reap v. Cont'l Cas. Co.*, 199 F.R.D. 536 (D.N.J. 2001).................................................. 26

*Riker v. Gibbons*, No. 3:08-CV-00115-LRH, 2010 WL 4366012 (D. Nev. Oct. 28, 2010)......... 45

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009)............................................ 52

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180 (10th Cir. 2002)....................... 22, 30

*Ryskamp v. Looney*, No. 10-CV-00842-WJM-KLM, 2012 WL 3397362 (D. Colo. Aug. 14, 2012) ............................................................................................................. 40

*Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545 (D. Colo. 1998)....................... 19, 21, 22

*Sebo v. Rubenstein*, 188 F.R.D. 310 (N.D. Ill. 1999) ................................................... 23

*Shlensky v. Dorsey*, 574 F.2d 131 (3d Cir. 1978) ........................................................ 40

*Shook v. El Paso Cnty.*, 386 F.3d 963 (10th Cir. 2004)................................................. 17

*Shuford v. Ala. State Bd. of Ed.*, 897 F. Supp. 1535 (M.D. Ala. 1995) ............................ 42

*Skier's Edge Co. v. Ladapa Die & Tool, Inc.*, 99 F. App'x 848 (10th Cir. 2004) (unpublished) ........................................................................................................ 53

*Snapp v. Topps Co.*, No. 93-CV-0347 JG, 1997 WL 1068687 (E.D.N.Y. Feb. 12, 1997).......... 41

*State of N.Y. ex rel. Vacco v. Reebok Int'l Ltd.*, 903 F. Supp. 532 (S.D.N.Y. 1995) ................... 41

*Steiner v. Ideal Basic Indus., Inc.*, 127 F.R.D. 192 (D. Colo. 1987) ............................................ 21

*Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115 (3d Cir. 1990) .......................................................... 42

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010) ............................................ 26

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254 (S.D.N.Y. 2003) ...................................................................................................................................... 41

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1876 (2012) ............................................................................................................................ 52

*Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, No. 3:08-CV-00271-JFA, 2012 WL 4061537 (D.S.C. Sept. 14, 2012) ...................................................................................................... 18

*Thieriot v. Celtic Ins. Co.*, No. C-10-04462-LB, 2011 WL 1522385 (N.D. Cal. Apr. 21, 2011) ...................................................................................................................................... 32

*Trevizo v. Adams*, 455 F.3d 1155 (10th Cir. 2006) ................................................................ 17, 19

*U S W., Inc. v. MacAllister*, No. 92-B-1254, 1992 WL 427772 (D. Colo. Dec. 18, 1992) ......... 40

*United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641 (W.D. Okla. 2012) ......................................................................................................... 24

*Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976) ................................................... 29

*Vernon Gries v. Standard Ready Mix Concrete, L.L.C.*, No. C07-4013-MWB, 2009 WL 427281 (N.D. Iowa Feb. 20, 2009) ...................................................................................... 18

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ........................................................ 19, 20

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) .......................... 31, 40, 42

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) ................................................................... 28

*Wess v. Storey*, No. 2:08-CV-623, 2011 WL 1463609 (S.D. Ohio Apr. 14, 2011) ..................... 38

*Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273 (D. Colo. 1997) ............................... passim

*Williams v. Costco Wholesale Corp.*, No.02CV2003 IEG(AJB), 2010 WL 2721452 (S.D. Cal. July 7, 2010) ............................................................................................................... 39

*Williams v. First Nat'l Bank of Pauls Valley*, 216 U.S. 582 (1910) ............................................ 27

*Williams v. Sprint/United Mgmt. Co.*, No. 03-2200-JWL, 2007 WL 2694029 (D. Kan. Sept. 11, 2007) ................................................................................................................... 35

*Willix v. Healthfirst, Inc.*, No. 07CV1143ENVRER, 2009 WL 6490087 (E.D.N.Y. Dec. 3, 2009) ................................................................................................................ 23

Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982) ............................................ 28

**Statutes**

28 U.S.C. § 1712(a) ...................................................................................................... 49

Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 3(a), 119 Stat. 4 (Feb. 18, 2005) ........ 49

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................................... 17

Fed. R. Civ. P. 23(b) ......................................................................................... 17, 24, 25

Fed. R. Civ. P. 23(c) ................................................................................................... 46

## I.    INTRODUCTION

Plaintiffs James P. Tennille, Robert Smet, Adelaida DeLeon, and Yamilet Rodriguez (collectively, "Plaintiffs") respectfully move this Court for final approval of a class action settlement ("Settlement") to which it granted preliminary approval on January 3, 2013. The Settlement creates a common fund of approximately $133 million[1] to resolve the claims of the provisionally-certified class, and under which Western Union agrees to pay interest to class members whose funds have already escheated directly and not out of the fund, to promptly notify owners of unredeemed[2] money transfers in the future, and to assist in the provision of account information for the recovery of already escheated funds.[3] This is a fair, reasonable, and adequate result in a lawsuit in which a litigation class had not yet been certified and the proceedings had been stayed pending the Tenth Circuit's consideration of whether non-class arbitration was required here. The class-wide Settlement meets all the requirements for and merits the Court's final approval.

On January 3, 2013, the Court provisionally certified a settlement class and approved the dissemination of notice of the Settlement to its members.[4] The deadline for the filing of objections to the Settlement or, in the alternative, requests for exclusion from the settlement class expired on May 15, 2013, and 12 potential objections were submitted. Given that over one

---

[1] The common fund amount was initially estimated to be approximately $180 million. Class counsel only recently received Western Union's accounting, establishing $133 million as the proper amount to be deposited into the Class Settlement Fund, which Class Counsel is in the process of vetting and substantiating. (D.E.# 219-1.)

[2] Sometimes, also referred to as "unclaimed", or "uncompleted" funds.

[3] "Western Union" refers collectively to Defendants The Western Union Company ("TWUC") and Western Union Financial Services, Inc. ("WUFSI").

[4] Order Preliminarily Approving Settlement and Providing for Notice (D.E. #175).

million first-class notices were mailed to putative class members, the dearth of opposition to the Settlement is a weighty barometer of its fairness, reasonableness, and adequacy.

In order to consummate the Settlement, Plaintiffs now seek a final Order and Judgment: (1) certifying the settlement class ("Class"), which is defined in Section IV below, under Rule 23(b)(3)[5]; (2) granting final approval to the Settlement as fair, reasonable, and adequate; (3) reaffirming the appointment of the named Plaintiffs in these consolidated actions as the Class Representatives; and (4) reaffirming the appointment of Complex Litigation Group LLC; Seeger Weiss LLP; Burg, Simpson, Eldredge, Hersh & Jardine, P.C.; Calton Legal Services; Mitchell Baker; and Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., and Mitchell Baker, as Class Counsel; and Complex Litigation Group LLC as Lead Class Counsel.

## II.   CASE BACKGROUND AND HISTORY

### A.   The Claims Asserted by Plaintiffs on Behalf of the Class

This class action litigation consists of two consolidated cases, the *Tennille* action, No. 09-cv-00938-JLK, and the *Smet* action, No. 10-cv-00765-JLK.[6]  In the operative Second Amended Consolidated Class Action Complaint (D.E. #45) ("Complaint"), Plaintiffs challenged, on behalf of themselves and the Class (defined in Section IV below) of Western Union money transfer customers, Western Union's business practices concerning its customers who sent money that went "unredeemed"—*i.e.*, money transfers that were not claimed by the intended recipient.

Specifically, this litigation is about how Western Union treats funds that it fails to transfer to the intended recipient.  Consumers transfer funds through Western Union using a Money Transfer Form.  This form includes the consumer's (sender's) name and address, the

---

[5] Unless otherwise noted, all rule references herein are to the Federal Rules of Civil Procedure.

[6] The cases were consolidated on April 12, 2010.  (D.E. # 20.)

intended recipient's name and address, and the amount to be transferred.  The consumer pays

Western Union a fee for this service and at the time of transfer Western Union ascribes a Money

Transfer Number to the account so that its information systems can track every aspect of the

transaction.   Some monies, however, are not transferred to intended recipients for a number of

reasons—the wire information is incorrect, the recipient does not show up, or the recipient lacks

adequate identification to claim the consumer's money transfer.

Because consumers give their money to Western Union to transfer, and not hold it, the

reasonable expectation is that Western Union has transferred the funds as it has been paid to do.

When these expectations have failed, one would expect Western Union to promptly inform the

consumer (sender) that the money was not transferred and that Western Union continues to hold

the funds.  But Western Union does not do this.  Rather, Western Union holds the money for, on

average, five years[7] before informing the sender that the transfer has failed.  This "Notice" is sent

as preparatory to escheatment of those funds to various state unclaimed and abandoned property

departments, and it informs senders that if they do not contact Western Union for a "Refund"

within a short period, often 30 days, their property will be escheated.  This notice of escheatment

letter, the only notice that Western Union provides, is sent to the address provided by the

consumer on the money transfer form 5 years earlier when the transaction was initiated.  Western

Union makes no attempt to update the address, conduct a skip trace, telephone those consumers

that provided phone numbers, nor take any other step to ensure the accuracy of the dated address

and ensure reasonable and adequate notice.  As a consequence of this delay, the vast majority of

consumers do not know that Western Union failed to transfer their money as contracted, that it

---

[7] Abandoned property laws of the states vary on length of time in which property will be deemed abandoned, some as early as 3 years, and some as late as 7 years.  Plaintiffs have computed the weighted average of the states durational periods to be 5.32  years.

has been holding their money for 5 years, and consumers now must respond within thirty days of receiving the notice or their funds will be escheated. This delayed notice has had severe consequences. Fewer than 15% of consumers receive a refund, with the remainder lost to escheatment. There is no evidence that any significant number of consumers have ever recovered their funds from the unclaimed property departments of their respective states. At any given time, Western Union holds approximately $133 million to $180 million of consumers' unclaimed money transfer funds prior to escheatment. D.E. #225 is an exquisite example. Mr. Steven Blackwell, a pro se responder states:

> Due to lack of knowledge about the money transfer on 6/12/07 in the amount of 50.00 I would like my refund. It seems very deceptive that Western Union would hold and bank roll customer's non received transactions. The company is even more s[i]nister and diabolical in sending out notices on and after the response date. My notice was received on the 5/08/13 the exact date I had to respond. However I had spoken with Elizabeth Employee #1152 settlement administrator on 5/28/13 that very same evening.
>
> This situation presented to me is deeply troublesome in which Western Union chooses to operate in such a manner. Until on or before I received this letter I've been a loyal and frequent customer of the company. I am terminating services at this time with Western Union because of their conduct. It seems to be common practices of businesses these days. I am a disabled veteran and I abide honestly and lawfully. Finally due to the circumstances and behavior of Western Union at this time I am requesting a transaction refund plus interest. It would be the company's d[ue] diligence after acting and operating without transparency.[8]

Plaintiffs allege, and the record supports, that Western Union financially benefited from this practice. It transferred unclaimed money transfers into investment accounts from which it earned over $19 million in interest. In addition, Western Union charged what it calls an "administrative fee" of $0.50 per month — up to a maximum of $42 per account. During the class period (January 1, 2001 to January 3, 2013), Western Union collected over $29 million in

---

[8] While Mr. Blackwell's "response" is apparently untimely, it does not in fact appear to be an objection, and it is offered here as an unsolicited example of the wrongfulness of Western Union's conduct and the impact that delay has upon customers.

such administrative fees.  Finally, the states financially benefited as well.  During the class period, the states have received over $83 million in "abandoned" property, the vast majority of which they have routinely placed into general revenue as state law allows, with only a fraction of these funds ever being returned to Western Union's customers, and only after additional service charges were deducted.

Plaintiffs allege that the practice of failing to inform consumers for five years—especially when Western Union had contact information, and knew that transfers had failed, sometimes almost immediately (in the case of Plaintiff James Tennille)—was an inequitable and unlawful practice.  It is this practice of unconscionable delay that is the essence of the litigation. The demographic makeup of the affected consumers is predominantly immigrants whose addresses are very likely to change within the 5 years of Western Union's delay, and who are unlikely to have any idea, after five years, as how to get their money back either from Western Union or the states to whom those funds have escheated.

As a result, Plaintiffs commenced this litigation with the goals of:

- securing prompt and effective notice to consumers whose money transfers have failed that they may recover those funds now, and need not wait five years, and not have to pay administrative fees to Western Union for the "privilege" of Western Union's keeping their money;

- securing a handover of unclaimed money transfer funds currently held by Western Union to Court supervision for distribution to affected consumers;

- recovering all the interest that Western Union earned on those unclaimed funds;

- implementing a robust notice plan to reach as many affected consumers as possible to effect the distribution of class-wide recovery;

- recovering interest for those consumers whose money has already escheated to the states;

- assisting affected consumers in recovering escheated funds; and

- ending Western Union's practice of failing to inform consumers that their transfers have failed, and retaining the interest earned on consumers' money and imposing administrative fees on consumers, and requiring Western Union to inform those consumers within 60 days and provide the failed transfer and right of refund.

For its part, Western Union denies that its practice was improper, unjust, or inequitable in any way. It represents that it complied with the abandoned property laws of the fifty states, and insists that its only obligation was to inform consumers of pending escheatment. Western Union maintains that it was always willing to refund unclaimed money transfer funds, and so provided that right in their form money transfer contracts. In addition, Western Union has asserted as a defense that the money transfer contracts contained an arbitration clause that precluded class claims or consolidated actions, as well as recourse to the courts for the resolution of disputes.

At the time of the Court's January 3, 2013 preliminary approval of the Settlement, Plaintiffs' pending claims against Western Union were common law claims for unjust enrichment, conversion, and breach of fiduciary duty. (D.E. #45.) Plaintiffs, on behalf of themselves and the Class, sought compensatory damages, restitution, and other fees and costs for Western Union's alleged improper retention and use of the uncompleted money transfers and the ineffective and tardy notice. They also sought declaratory relief. (*Id.*)

### B. Procedural History and Rule 12 Motion Practice

Plaintiff James Tennille ("Plaintiff Tennille") initiated this litigation by filing a class action complaint against TWUC on April 23, 2009. (D.E. #1.) TWUC filed a motion to dismiss on June 15, 2009 (D.E. #7), which was granted without prejudice on September 21, 2009. (D.E. #12.) Plaintiff Tennille filed an amended complaint on October 21, 2009 (D.E. #13), which TWUC moved to dismiss on November 20, 2009. (D.E. #16.)

On April 2, 2010, Plaintiff Robert Smet ("Plaintiff Smet") filed a second, related

complaint against TWUC.  The Court consolidated the *Tennille* action with the *Smet* action on April 12, 2010.  (D.E. #20.)

Plaintiffs alleged that Western Union engaged in fraudulent and inequitable conduct by failing to  reasonably and adequately inform Class members that their transfers had failed and that Western Union was in possession of their funds; failing to return the unclaimed money transfer funds to the Class within a reasonable time after those funds went unclaimed; and making use of the unredeemed money transfer funds to earn interest and administrative fees when Western Union knew the sender did not know the transfers had gone unclaimed and was in Western Union's possession.  Plaintiffs further alleged that Western Union had benefitted from use of the funds until they were escheated.

TWUC filed an omnibus motion to dismiss the *Tennille* and *Smet* actions on May 28, 2010.  (D.E. #25.)  After the parties engaged in substantial briefing and argument, the Court ruled on the motion, granting it in part, dismissing the consumer protection act claims, and denying it in part, sustaining unjust enrichment and conversion claims, on November 8, 2010 and February 4, 2011, respectively.  (D.E. #28 and 37.)  The Court also made a choice of law determination, holding that Colorado law applied to the claims of the proposed class.  (D.E. #37.) TWUC answered the *Tennille* and *Smet* complaints on November 30, 2010.  (D.E. #35-36.)

The Court articulated the claims succinctly as follows:

Plaintiffs' allegations center on Western Union's practice of failing to notify customers when their attempted wire transfers fail or go unclaimed, and holding those funds in interest-bearing accounts, sometimes for years, until individual state unclaimed property laws trigger a notification obligation. Western Union then attempts to return customers' unclaimed deposit, but keeps the accrued interest for itself. Plaintiffs contend the failure to notify customers that their deposits are unclaimed is fraudulent, and the retention of interest that is properly customers', not Western Union's, is wrongful and subjects Western Union to equitable or quasi-equitable claims for conversion and unjust enrichment.

(Dkt. #28.)

Plaintiffs then filed the Second Amended Consolidated Class Action Complaint ("Complaint") on March 11, 2011, which added two new plaintiffs, Adelaida DeLeon ("Plaintiff DeLeon") and Yamilet Rodriguez ("Plaintiff Rodriguez"); a new defendant, WUFSI; and a new claim, for breach of fiduciary duty.  (D.E. #45.)  TWUC and WUFSI moved to dismiss the breach of fiduciary duty and declaratory judgment counts on April 25, 2011 (the "April 25 Rule 12 Motion").  (D.E. #52.)

### C.   Discovery

The Parties engaged in extensive discovery during the litigation.   Discovery consisted of information culled from Western Union's information systems and detailed its money transfer account information, the amount of unclaimed money transfer funds, how the account information on unclaimed funds was stored and retained, earned interest on those funds, administrative fees calculated and charged, the accounting, use and retention of all unclaimed money transfer funds, the content and formation of all money transfer contracts, their terms and the relationship between the contracts and data retained in the information systems, Western Union's abandoned property and escheatment processes, and the amounts and methods by which Western Union escheated unclaimed money transfers by year and by state for the class period. In addition, the parties exchanged Rule 26(a) initial disclosures; propounded interrogatories and requests for production of documents and examined thousands of documents; served notices for Rule 30(b)(6) depositions and deposed all key Western Union personnel on topics related to corporate organization, document retention, records management, information systems functionality, the escheatment notice process, the escheatment process, and the money transfer process; provided responses to Defendants' interrogatories and document requests;  and produced documents in response to Defendants' document production requests.  Plaintiffs also

reviewed and analyzed the documents and discovery responses provided by Defendants, and engaged in "meet-and-confers" regarding the same.

### D.   The Motion to Compel Arbitration and Related Discovery

Before the Defendants' Rule 12 Motion to Dismiss the Complaint could be fully briefed and adjudicated, Defendants filed a Motion to Compel Arbitration in reliance upon *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), seeking to compel individual arbitration of Plaintiffs' claims and to stay the litigation pending arbitration (the "Arbitration Motion").  (D.E. #56.)

In connection with the Arbitration Motion, Plaintiffs propounded and served Western Union with arbitration and business structure-related discovery requests, include Fed. R. Civ. P. 30(b)(6).   In response, Western Union produced deposition designees, documents and information relating to its internal accounting; internal corporate structure; business practices and business structure, including the relationship between TWUC and WUFSI; policies and procedures related to handling of unclaimed money transfers; creation of the notice that Western Union sends to consumers prior to the money escheating to the states; all arbitrations that have been conducted; and the escheatment process itself.

Defendants likewise took arbitration-related discovery of Plaintiffs, which principally consisted of discovery from, and the individual depositions of, all four Plaintiffs.

The Court denied the Arbitration Motion on November 21, 2011.  (D.E. #139.)  Two days later, on November 23, 2011, Western Union filed a notice of appeal from the order denying the Arbitration Motion.  (D.E. #141.)

After seeking and being denied a stay of proceedings from this Court, Western Union moved the Tenth Circuit for a stay.  The Tenth Circuit granted that request on January 24, 2012, and entered an order staying the litigation pending WUFSI's appeal of the order denying the

Arbitration Motion.  The matter was referred to the Chief Circuit Mediator, David Aemmer, whose successful efforts resulted in this Settlement.  At the Parties' request, the Tenth Circuit remanded the matter to this Court for the limited purpose of considering the Settlement.  (D.E. #169.)

## III.   THE PARTIES' SETTLEMENT NEGOTIATIONS

During the pendency of the appeal of the Arbitration Motion's denial, the Parties participated in an initial telephonic mediation conference with the Tenth Circuit's mediation office on March 6, 2012.  At that time, the Parties began substantively discussing settlement, including the contours of a possible class-wide resolution.

These initial disclosures led to extensive, adversarial settlement negotiations, both directly between counsel for Plaintiffs and Western Union but primarily under the direction and with the assistance of Chief Circuit Mediator Aemmer.  The Parties engaged in extensive back-and-forth discussions for a period of months, including in-person mediation on May 2 and 3, 2012, in Denver, Colorado.  After the in-person sessions, the Parties engaged in almost weekly telephonic mediation conferences with Chief Circuit Mediator Aemmer.

During those months, the Parties worked to reach a final, comprehensive agreement on a class-wide settlement, which occurred November 16, 2012.  As described below, the Settlement fully resolves Plaintiffs' claims on behalf of the Class that are the subject of this litigation and provides a fair, reasonable, and adequate benefit to the Class.

## IV.   THE TERMS OF THE SETTLEMENT

The Settlement is an outstanding result for the Class, and provides the following benefits: (1) the resolution of claims against Western Union for prompt notice to all Class members whose unclaimed money transfer funds are currently in the possession of Western Union; (2) the recovery of  the principal and loss of use of unredeemed money transfers; (3) the recovery of all

interest to class members who had unclaimed money transfers in the past and provides for their recovery of all interest; and (4) importantly, on a going forward basis, the remediation of the objectionable practice which gave rise to the lawsuit--the failure of prompt notice to consumers when a money transfer has failed and extends the right of refund without additional administrative charge and risk of escheatment.   The Class of persons whose claims are being resolved is defined in the Parties' Settlement Agreement as:

> All persons (a) who initiated any Western Union Transaction in the United States on or after January 1, 2001 and on or before the date of Preliminary Approval, [*i.e.*, January 3, 2013] whose Western Union Transaction was not redeemed within 60 calendar days; and (b) who either (i) have not claimed their money transfer funds (nor had that money claimed on their behalf) from Western Union; or (ii) were informed by written communication that their money was about to escheat to the state, district, territory, of U.S. jurisdiction in which of their money transfers were initiated, and who sought and received a refund of their money but did not receive a payment for interest Western Union earned on that money.

Sec. 1.C.   Excluded from the Class are (1) Western Union and its affiliates, and officers, and employees of Western Union and its affiliates; (2) persons who timely and validly excluded themselves from the Class; (3) state and federal governmental entities; and (4) the judge to whom this case is assigned and any member of the judge's immediate family.   Secs. 1.C.1-4.

The consideration being made available to the Class includes several cash and non-cash components.   These categories of class benefits include (1) the creation of a non-reverting cash fund, currently estimated at approximately $133 million (*see* D.E. #219, 219-1), consisting of all unclaimed money transfers, currently not subject to escheatment, that Western Union now holds, which will be used to provide refunds to Class members whose principal has not escheated, plus interest; (2) Class members whose funds have already escheated to the states will be entitled a direct payment from Western Union (*i.e.*, the funds will be in addition to those in the Class Settlement Fund) to cover the interest that accrued during Western Union's retention of the

11

unredeemed funds, (3) the Settlement creates a process for Class Counsel providing assistance to those Class members to obtain a refund of their money from the state to which their funds have escheated; (4) injunctive relief, whereby on a going-forward basis for at least the next seven and one-half years, Western Union will, subject to this Court's supervision, affirmatively notify its customers *within 60 days* if a money transfer goes unredeemed; and (5) a multi-faceted, robust notice plan that takes numerous steps to ensure the most accurate, up-to-date, addresses are being used to contact Class members despite the stale nature of many addresses in Western Union's databases.

### A. The Common Fund Will Compensate Class Members' Whose Unredeemed Money Transfers Did Not Yet Escheat to the States.

Section 2.C of the Settlement Agreement requires Western Union to transfer into a Class Settlement Fund (described in Section 2.A, at 8-10) approximately $133 million[9] to resolve Class members' claims for unclaimed money transfers and interest earned thereon, which was not escheated to a state, and thus not deemed abandoned property, from January 1, 2001 to January 3, 2013 (the date that the Court granted preliminary approval of the Settlement).  The Settlement Fund was funded by Western Union with $1.3 million to cover the anticipated costs of notice. Sec. 2.A.2.  Then, not later than ten days after the Settlement Effective Date (Sec. 1.V), Western Union will deposit into the Settlement Fund "the Class members' unclaimed money transfer funds, less administrative fees and charges as specified in the Class members' contracts and/or permitted by state statutes, held by Western Union on the date of Final Approval[.]."  Sec. 2.A.3. Excluded from the Class Settlement Fund are "any funds deemed abandoned or unclaimed under

---

[9] While the common fund amount was initially estimated to be approximately $180 million, Class counsel recently received Western Union's letter to the Court and attached spreadsheet (D.E. #219 & 219-1), stating that $132.9 million is the proper amount to be deposited into the Class Settlement Fund.  Class Counsel is in the process of vetting and substantiating that revised amount.

the abandoned or unclaimed property laws of any state, district, territory, or U.S. jurisdiction." *Id*. As such, the Class Settlement Fund contains no unclaimed money transfer subject to escheatment to any state.[10]

The Settlement Agreement provides that the Class Settlement Fund will be used to pay the costs of Notice and Claims Administration (Secs. 2.A. and 3); Class Counsels' attorneys' fees and litigation expenses, as approved by the Court (Sec. 5); and the Class Representatives' incentive awards, also as approved by the Court (Sec. 4). The balance of the Class Settlement Fund will be allocated and paid to the Class upon submission of a simplified Claim Form (Sec. 1.B). Class members who have not received a return of their unclaimed money transfers will be entitled to receive from the Class Settlement Fund a lump sum cash refund in an amount equal to their unclaimed money transfer, less administrative fees, plus interest (under a specified formula), for the period of time while the funds were in Western Union's possession. Secs. 2.B.2 & 2.C.1-2. Class members who received a return of their unclaimed money transfers from Western Union (but not the interest earned) will be entitled to receive a cash payment in an amount equal to the interest earned by Western Union while in Western Union's possession. Sec. 2.C.5.

If there are funds left over in the Class Settlement Fund after payment of all fees, costs, and claims, the remaining monies and any accumulated interest will be placed into a *cy pres* fund, for the Court to distribute at its discretion, which the Parties suggest should be paid directly

---

[10] Since the date of Preliminary Approval some unclaimed money transfers reached the durational maturity dates for "abandonment" under the escheatment laws of various states. For these funds, notice of escheatment, together with the Notice of the Settlement was mailed. This circumstance is covered by 2.C.4 & 5. Section 2.C.4 provides benefits for those Class members whose unclaimed funds became abandoned after Preliminary Approval, and who did not seek a refund. Section 2.C.5 provides benefits for those Class members whose unclaimed funds became abandoned after Preliminary Approval, and who did seek a refund.

to the states, each in proportion to the amount that would have escheated to that state in the absence of payments to the Settlement Fund.  Sec. 6.  Of course, the Court may also designate *cy pres* recipients of any remaining funds.

**B.      Direct Payment of Lost Interest from Western Union and Assistance with Recovering Unclaimed Property From the States Will Be Provided to Class Members' Whose Unclaimed Money Transfers Escheated to the States.**

Section 2.B of the Settlement Agreement provides benefits to Class members whose unclaimed money transfers have already escheated to a state.  Such Class members will receive an Escheatment Recovery Form to assist them in recovering the uncompleted money transfer from the state to which the funds were escheated.[11]  These Class members also will be entitled to receive a lump sum cash payment representing the interest earned by Western Union while the funds were in Western Union's possession.  These will be direct payments from Western Union, separate from the Class Settlement Fund.  Sec. 2.B.

**C.      Western Union Agrees to Change Its Business Practices to Provide Prompt Notice of Unclaimed Money Transfers.**

As stated above the business practiced that is at the heart of the litigation was Western Union's failure to inform consumers that their money transfers had failed.  There was never, nor could there have been, a dispute that unclaimed money transfers were the property of the Sender, nor was there a dispute that a right to refund of those funds existed, at least in theory.  The gravamen of Plaintiffs' case was, given there was no dispute over ownership of the money nor

---

[11]      In conjunction with the Administrator, Class Counsel will prepare an Escheatment Recovery Form pre-populated with information from Western Union's information systems regarding the name and address of the class member, the amount escheated by Western Union on behalf of that Class member, the date of the escheatment, and the State to which the money was escheated.  The Escheatment Recovery Form will likewise provide Instructions for submission to the state for recovery of the escheated funds.  See Sections 1.H and 3.F. In addition all Class members will be provided with Claim forms Section 3.F.3. Class Counsel will also be available to answer questions and otherwise assist in this effort.

14

over whether it *should* be refunded, but rather Western Union *secretly* keeping those funds on average for five years before making a half-hearted effort to return it.  Because of the importance of the issue, Western Union has also agreed to change its policies and practices going forward.  Pursuant to the Settlement Agreement, Western Union will, in the future, notify its customers if money transfers have not been redeemed within 60 days.  Sec. 2.D.  The agreed-upon changes in business practices represent a substantially more favorable method of notice to the members of the Class than Western Union's existing practice.  This prompt notice will substantially increase the likelihood that a customer receives notice that a money transfer is incomplete, that a refund is available and will likely be exercised.  Thus, the notice will decrease substantially the likelihood that funds will go abandoned, putting them at risk for escheatment.

This benefit is also important because many Western Union customers are repeat users of Western Union's money transfer services.  As such, many Class members will benefit from this forward-looking relief.  By claiming their funds only a few months after they go unredeemed— instead of years (or not at all)—customers, whose needs for the funds are immediate, will become promptly aware of a failed transfer, will be able to receive a prompt refund, will avoid losing the time value of the money, will not incur the administrative fees that Western Union charges for holding their unclaimed money transfers, and are far less likely to have their money escheated to the state as abandoned property.

**D.    The Settlement Provides Extensive Efforts to Locate Class Members, Which Is Itself a Significant Benefit of the Settlement.**

The nature of the Settlement's class notice program confers another important benefit on the Class.  Presently, when Western Union attempts to notify Class members that their money is about to escheat, Western Union only uses the address the Class member provided five to nine years earlier.  The notice provided by the Settlement was far more robust than the direct mail to

the potentially stale addresses that Western Union collected when the transaction was initiated years prior.  Class Counsel worked with professional class action notice administrator Epiq Class Action & Claims Solutions, Inc. and its legal notice unit Hilsoft Notifications (collectively, "Epiq") to develop a notice plan that attempts to account for a potentially unusually high number of stale addresses.  Prior to initiating notice, Epiq checked all addresses against the National Change of Address ("NCOA") database maintained by the U.S. Postal Service ("USPS").[12]  If the NCOA indicated that an address was no longer valid, the address was updated through third-party address search services that tied the name and address associated with the record with personally-identifiable information available for the individual.  Then, the most recent address for that individual was returned.  To ensure the most accurate mailings possible, addresses were then certified using the Coding Accuracy Support System ("CASS") and verified through Delivery Point Validation ("DPV").  All of this occurred before notices were even mailed to the Class.[13]

        After mailing, the notice plan provided that notices returned as undeliverable would be re-mailed to any new address available through USPS information, such as the address provided by the USPS on returned pieces for which the automatic forwarding order had expired, but which was still during the period in which the USPS returns the piece with the address indicated, or to better addresses that could be found after reasonable, additional third-party source lookups.

---

[12] The NCOA database contains records of all permanent changes of address submissions received by the USPS for the last four years. The USPS makes this data available to mailing firms and lists submitted to it are automatically updated with any reported move based on a comparison with the person's name and known address.

[13] CASS is a certification system that the USPS uses to ensure the quality of ZIP + 4 coding systems.  Records that are ZIP + 4 coded are then sent through DPV to verify the address and identify Commercial Mail Receiving Agencies.  DPV verifies the accuracy of addresses, and reveals what is wrong with incorrect addresses.

Upon successfully locating better addresses, notices were promptly re-mailed.  Notice was also published in various publications, including *People* magazine.  The notice and its reach to Class members, along with the various facts that underpin these conclusions, are set forth in the accompanying Declaration of Cameron R. Azari on Implementation and Adequacy of Settlement Notices and Notice Plan.

It is clear that notice by these means provided the best chance that Class members would learn of their unclaimed money transfers and take steps to seek compensation in accordance with the terms of the Settlement Agreement.

## V.     THE COURT SHOULD CERTIFY THE CLASS.

In granting preliminary approval of the Settlement, the Court determined that the requirements for certification of a settlement class were provisionally satisfied.  (D.E. #175, ¶ 5.) Final certification of the Class for settlement purposes is now warranted.

Certification of a class is proper when the plaintiff demonstrates that the proposed class and proposed class representative meet the four threshold prerequisites of Rule 23(a) commonly known as the "numerosity," "commonality," "typicality," and "adequacy of representation" (or simply "adequacy") elements.  Fed. R. Civ. P. 23(a); *Trevizo v. Adams*, 455 F.3d 1155, 1161-62 (10th Cir. 2006); *Shook v. El Paso Cnty.*, 386 F.3d 963, 968 (10th Cir. 2004).

In addition to meeting the four elements of Rule 23(a), a plaintiff seeking class certification must also satisfy at least one of the three provisions of Rule 23(b).  Fed. R. Civ. P. 23(b); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997).  Where, as here, plaintiffs seek certification under Rule 23(b)(3), they must demonstrate that common questions of law or fact predominate over individual issues and that maintaining the suit as a class action is superior to other methods of adjudication.  Fed. R. Civ. P. 23(b)(3); *Amchem Prods.*, 521 U.S. at 615-16. These two components of Rule 23(b)(3) are commonly known as the "predominance" and

"superiority" tests.  *E.g.*, *Kohn v. Am. Hous. Found., Inc.*, 178 F.R.D. 536, 542 (D. Colo. 1998).

A court making its determination as to the suitability of claims for class adjudication should accept the allegations of a plaintiff's complaint as true, although it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements [and] may . . . consider the legal and factual issues presented by [a] plaintiff's complaint[]." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999) (citing authorities; internal quotation marks omitted).  It is inappropriate, though, for a court to consider the underlying merits of the plaintiff's claims.  *City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 581 (D. Colo. 2002); *In re Intelcom Grp., Inc. Sec. Litig.*, 169 F.R.D. 142, 145 (D. Colo. 1996).

Although a class must meet all of the requirements of Rule 23, "[s]ettlement is relevant to a class certification" and is "a factor in the calculus."  *Amchem Prods.*, 521 U.S. at 619, 622; *accord Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, No. 3:08-CV-00271-JFA, 2012 WL 4061537, at *1 (D.S.C. Sept. 14, 2012) ("certainly settlement should be a factor, and an important factor" in determining settlement class certification) (citation and internal quotation marks omitted); *Vernon Gries v. Standard Ready Mix Concrete, L.L.C.*, No. C07-4013-MWB, 2009 WL 427281, at *3 (N.D. Iowa Feb. 20, 2009) (while settlement class may not be certified merely because settlement is fair, "the terms of a settlement may play a factor in the court's Rule 23(a) calculus").

As demonstrated below, each of the requirements for certification of a Rule 23(b)(3) settlement class is satisfied in this litigation.[14]

---

[14] Western Union does not contest class certification for settlement purposes.  In the event however, that the Settlement Agreement is terminated for any reason, including because the Settlement is not finally approved, Western Union has reserved all defenses to and the right to contest class certification.

### A.   The Class Satisfies the Requirements of Rule 23(a).

#### 1.   The Numerosity Requirement Is Satisfied.

Rule 23(a) requires that a class be sufficiently numerous to make joinder of all class members impractical.  Although the Tenth Circuit has eschewed a bright-line rule for satisfying the numerosity test, *Trevizo*, 455 F.3d at 1162, this is not a close case.  Here, there are hundreds of thousands of members of the defined Class, representing 1.2 million transactions, and the membership spans the entire country.  That more than suffices to satisfy the numerosity element. *See Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 550 (D. Colo. 1998) (where proposed class included hundreds, if not thousands, of persons, joinder was clearly impractical, and numerosity requirement was satisfied).  Thus, the numerosity requirement is easily satisfied here.

#### 2.   The Commonality Requirement Is Satisfied.

In addition, Rule 23(a) requires that questions of fact or law must exist that are common to the class as a whole.  The commonality requirement does not demand that all questions of law or fact at issue be common, but instead requires only that significant common issues of law or fact exist. *Queen Uno Ltd. Pshp. v. Coeur D'Alene Mines Corp.*, 183 F.R.D. 687, 691 (D. Colo. 1998); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 385 (D. Colo. 1993).

Although a single common question may satisfy this element,[15] the Supreme Court has more recently clarified that the common question must rise to the level of being a contention that "the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

---

[15] *Valdez*, 186 F.3d at 1288; *Kerner v. City & Cnty. of Denver*, No. 11-CV-00256-MSK-KMT, 2012 WL 7802744, at *4 (D. Colo. Nov. 30, 2012), *report and recommendation adopted*, 2013 WL 1222394 (Mar. 25, 2013).

In addition, the Supreme Court explained that a key consideration in assessing commonality is whether class treatment can "generate common *answers* apt to drive the resolution of the litigation[.]" *Id.* (citation and internal quotation marks omitted; emphasis in original).

In this litigation, there is an overriding issue: the lawfulness of Western Union not notifying customers of unclaimed money transfer until the interdiction of the States' unclaimed property laws, all the while earning and retaining interest on those funds. If a money transfer is not claimed by the intended recipient for whatever reason, Western Union does not immediately notify the sender. Instead, Western Union has held the funds for years, until the escheatment/unclaimed property laws of the state of residence of the sender require Western Union to notify the sender. Western Union has maintained that it need not provide notice to the sender of an unclaimed money transfer until such time and that it is entitled to earn and keep the interest on the unclaimed funds. By contrast, Plaintiffs contend that Western Union should provide prompt notice to the sender that a money transfer is unclaimed. In the absence of such notice, Plaintiffs have alleged that it is inequitable for Western Union to retain the funds, to put those funds at risk of escheatment when the proper owner is unaware that Western Union has retained possession, earn and keep the interest on those funds, and to charge an administrative fee during the period in which the funds are inequitably retained. Thus, whether prompt notice is required and whether Western Union is entitled to keep the interest earned on unredeemed funds, or to charge an administrative fee, are issues common to all Class members. To these common questions "a classwide proceeding [would] generate common answers apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551 (emphasis omitted). Because these issues of law and fact can be resolved through generalized proof, the commonality requirement is plainly satisfied within the meaning of *Dukes*.

### 3.      The Typicality Requirement Is Satisfied.

Rule 23(a) further requires that the proposed class representatives' claims be typical of the claims of absent members of the class.  Typicality is "not normally a difficult hurdle" and is established if the proposed representatives' and class members' claims arise from the same course of conduct and are based on the same legal or remedial theory.  *Clark v. State Farm Mut. Auto. Ins. Co.*, 245 F.R.D. 478, 484 (D. Colo. 2007), *aff'd*, 590 F.3d 1134 (10th Cir. 2009); *Schwartz*, 178 F.R.D. at 551; *Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635, 640 (D. Colo. 1986). Assuming that they are so based, factual variations among individual class members' situations do not defeat the typicality test.  *Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181, 1189 (10th Cir. 1975) (citing authorities); *Steiner v. Ideal Basic Indus., Inc.*, 127 F.R.D. 192, 196 (D. Colo. 1987).  Put another way, if there is a nexus between the named plaintiffs' claims and the common questions of fact or law that bind the class together, the typicality requirement is satisfied.  *Cook*, 151 F.R.D. at 385 (citing cases).

Here, Plaintiffs and Class members all placed funds to be transferred with Western Union, those transfers were not redeemed and therefore not transferred, Class members were not informed of the failed transfers and Western Union's retention of the funds, and the funds were returned, if at all, only years later.  Plaintiffs and absent members have allegedly been damaged by the same course of conduct—namely, Western Union's common practice of not providing prompt notice that a money transfer is unclaimed, retaining those funds without the owner's knowledge or consent, keeping the interest earned on those unclaimed funds, charging administrative fees for the period of the unauthorized retention, and providing inadequate notice of escheatment.   Plaintiffs' claims are based on the same factual elements and theories of liability as those of the rest of the Class because Western Union's policies and practices were uniformly applied to all money transfers irrespective of the identity of the sender.  Therefore, the

typicality requirement is also plainly satisfied.

### 4.     The Adequate Representation Requirement Is Satisfied.

The final requirement set forth in Rule 23(a), adequacy of representation, focuses on two issues:  (1) whether class counsel are sufficiently qualified and experienced to represent the class; and (2) whether the proposed representatives have any conflicts of interest which create a disincentive to fully prosecute the claims of the class.  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002); *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1112 (10th Cir. 2001); *Neiberger v. Hawkins*, 208 F.R.D. 301, 316 (D. Colo. 2002).  "'[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.'"  *City P'ship Co.*, 213 F.R.D. at 588 (quoting treatise); *Joseph*, 109 F.R.D. at 640 (same).  Absent evidence to the contrary, courts should presume that the adequacy of representation requirement is satisfied.  *Schwartz*, 178 F.R.D. at 552.

Plaintiffs in these consolidated cases are adequate representatives of the Class.  They satisfy the adequacy requirement first and foremost because their claims are identical to those of absent Class members, giving them every incentive to vigorously pursue the claims on behalf of the absent members.  *E.g.*, *Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 387 (D. Kan. 1998) (noting that "[a]n overlap exists in the typicality and adequacy of representation requirements because if typicality is not present, the class representatives do not have an incentive to vigorously prosecute class claims") (citing treatise); *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008) ("The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class.").

Nor do Plaintiffs have any conflict of interest with any other absent members of the Class.  They contributed their time and attention to the litigation by answering discovery,

including being deposed by Western Union, and vigorously prosecuting this litigation in the face of Western Union's well-financed and spirited defense. *E.g.*, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 219 (D. Me. 2003) (proposed representatives adequate where they "followed the proceedings, submitted to depositions, and responded to extensive written discovery requests"); *In re Ins. Mgmt. Solutions Group, Inc. Sec. Litig.*, 206 F.R.D. 514, 517 (M.D. Fla. 2002) (adequacy shown where, *inter alia*, proposed representative "attended his deposition and answered interrogatories"); *Sebo v. Rubenstein*, 188 F.R.D. 310, 316 (N.D. Ill. 1999) ("For a plaintiff who wishes to be a class representative, general knowledge [of the case] and a participation in discovery are enough.") (citation and internal quotation marks omitted); *Garcia v. Gordon Trucking, Inc.*, No. 1:10-CV-0324 AWI SKO, 2012 WL 5364575, at *4 (E.D. Cal. Oct. 31, 2012) (proposed representatives "acted vigorously to prosecute this action on behalf of the class members by providing information and documentation, responding to written discovery requests from Defendants, and by providing deposition testimony"); *Willix v. Healthfirst, Inc.*, No. 07CV1143ENVRER, 2009 WL 6490087, at *3 (E.D.N.Y. Dec. 3, 2009) ("The Named Plaintiffs have demonstrated their commitment to the class by having their depositions taken, responding to Defendants' discovery requests, and providing Plaintiffs' counsel with factual information relevant to the case."); *cf. In re Storage Tech. Corp. Sec. Litig.*, 113 F.R.D. 113, 118 (D. Colo. 1986) (finding 5 proposed representatives not adequate where they "fail[ed] to comply with proper discovery").

Moreover, Class Counsel submit that they have extensive experience handling complex class action litigation throughout the country, including the successful handling of claims asserting consumer fraud and unjust enrichment challenging the deceptive and inequitable practices of large corporations. The Court previously found Plaintiffs' attorneys adequate when

it granted the motion for appointment of Interim Class Counsel.  (D.E. #34.)  Class Counsel are well qualified to represent the Class in this litigation.

In short, Plaintiffs have diligently pursued the claims on behalf of themselves and absent Class members and acted in the best interests of all members throughout this litigation, and they will continue to do so.  The adequacy of representation requirement is therefore satisfied.

### B.    The Class Satisfies the Requirements of Rule 23(b)(3).

### 1.    Common Questions of Law and Fact Predominate.

In order to certify a class under Rule 23(b)(3), the questions of law or fact that are common to the members of a class must predominate over any questions affecting only individual members.  The so-called "predominance" test, however, does not require "a complete identity relating to all class members, as long as a common nucleus of operative facts is present." *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 388 (D. Colo. 1993) (citing cases; internal quotation marks omitted).

Furthermore, "[t]he predominance test is not a numerical test and does not require the court to add up the common issues and the individual issues and determine which is greater." *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 655 (W.D. Okla. 2012) (citing cases; internal quotation marks omitted).  Rather, certification under Rule 23(b)(3) is appropriate "when common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Joseph*, 109 F.R.D. at 641 (citing treatise; internal quotation marks omitted).  Also, "'[t]he common questions need not be dispositive of the entire action.  In other words, 'predominate' should not be automatically equated with 'determinative' or 'significant.'" *Cook*, 151 F.R.D. at 388 (quoting treatise).  "Therefore, when one or more of the central issues in the action are

common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." *Id.* (quoting treatise).  Notably, the Supreme Court has recognized that the predominance test is one that is "readily met" in consumer fraud litigation such as this. *Amchem Prods.*, 521 U.S. at 625.

Here, the common *and* predominant issue is whether prompt notice to the sender of an unclaimed money transfer is required and whether Western Union is entitled to keep the interest earned on those funds absent such notice.  Western Union has employed a uniform policy and practice regarding the treatment of unredeemed money transfers and the issue of whether such policy and practice of Western Union is inequitable and actionable, both in law and equity, towers over any other issue in this litigation.  These common questions of fact and law therefore predominate over any issues that may exist respecting individual Class members.

### 2.    A Class Action Is the Superior Method of Resolving This Dispute.

Rule 23(b)(3)(A)-(D) sets forth four factors that this Court should consider in determining whether a class action is superior to individual lawsuits for the resolution of the claims at issue.  Pursuant to Rule 23(b)(3)(A), the Court should consider the interest of Class members in individually controlling the prosecution of separate actions.  Although there are thousands of Class members, none has expressed any interest in prosecuting a separate lawsuit against Western Union for the lack of prompt notice and the failure to remit principal and pay interest.  Moreover, many Class members have claims for interest in relatively small amounts.  It is therefore beneficial to aggregate the claims of all Class members in order to permit an economical resolution of the claims at issue.  "Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually . . . most of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985); *accord Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661

(7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis in original).

Indeed, this Court and others have recognized that the existence of so-called "negative value" claims—"meaning it costs more to litigate than you would get if you won," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 130 S. Ct. 1758, 1769 n.7 (2010) (citation and internal quotation marks omitted)—is "one of the most compelling rationales" for finding the superiority prong of Rule 23(b)(3) satisfied. *Kerner*, 2012 WL 7802744, at *12; *accord Reap v. Cont'l Cas. Co.*, 199 F.R.D. 536, 550 (D.N.J. 2001) (negative value factor is typically "*the* most compelling rationale for finding superiority" of class treatment) (citation and internal quotation marks omitted; emphasis added); *see Clark*, 245 F.R.D. at 489 ("'While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'") (quoting *Amchem Prods.*, 521 U.S. at 617).

The second factor to consider, pursuant to Rule 23(b)(3)(B), is the extent and nature of any litigation concerning the controversy already commenced by members of the Class. There are no members of the Class who are pursuing separate litigation against Western Union; nor have any members of the Class indicated that any other suits related to the claims in the consolidated cases are contemplated. The absence of other litigation weighs in favor of the superiority of class treatment. *E.g.*, *Brotherson v. Prof'l Basketball Club, L.L.C.*, 262 F.R.D. 564, 573-74 (W.D. Wash. 2009); *In re Revco Sec. Litig.*, 142 F.R.D. 659, 669 (N.D. Ohio 1992); *Hochschuler v. G.D. Searles & Co.*, 82 F.R.D. 339, 350 (N.D. Ill. 1978).

Pursuant to Rule 23(b)(3)(C), this Court should also consider the desirability of concentrating the litigation of these claims in this forum. The creation of Western Union's policies and practices related to unredeemed money transfers occurred in this judicial district. In addition, TWUC's principal place of business is in Colorado while WUFSI is a Colorado corporation with its principal place of business also in Colorado. Furthermore, as this Court has already held (D.E. #37), all of the claims at issue are governed by Colorado substantive law. Concentrating the litigation of these claims in this Court is therefore the most efficient and economical method of resolving this dispute.

The final factor that should normally be considered in evaluating the issue of superiority, as set forth in Rule 23(b)(3)(D), is the difficulty likely to be encountered in the management of this class action. The Supreme Court, however, has held that a district court, confronted with a request for a settlement-only class certification, need not inquire whether the case, if tried, would represent intractable management problems because the proposal inherent in the settlement is that there will be no trial. *Amchem Prods.*, 521 U.S. at 620. Thus, as to settlement-only classes such as this, the manageability component of the Rule 23(b)(3) superiority analysis is simply irrelevant.

In sum, the superiority prong for certification of a Rule 23(b)(3) settlement class is also easily satisfied here. Accordingly, the Court should convert its provisional certification of the Class to a final settlement class certification.

## VI.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND THEREFORE WARRANTS FINAL APPROVAL.

### A.    There Is an Overriding Federal Policy Favoring Settlements of Class Actions.

It is long settled that "compromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank of Pauls Valley*, 216 U.S. 582, 585 (1910). The Tenth Circuit and

this Court have repeatedly acknowledged this strong public policy. *E.g.*, *GET, LLC v. City of Blackwell*, 407 F. App'x 307, 318 (10th Cir. 2011) (unpublished); *City P'ship Co. v. IR-TCI Partners V, L.P.*, 252 F. Supp. 2d 1114, 1121 (D. Colo. 2003) (citing cases); *Am. Family Mut. Ins. Co. v. Orlowski*, No. 08-CV-00763DMEKMT, 2009 WL 1698504, at *5 (D. Colo. June 15, 2009) ("There is a strong public policy favoring dispute resolution rather than continued litigation."); *Giles v. The Inflatable Store, Inc.*, No. 07CV00401PABKLM, 2009 WL 801729, at *5 (D. Colo. Mar. 24, 2009). The weighty considerations justifying this policy include the need to conserve judicial resources, *Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir. 1994), and to reduce litigation and related expenses, *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (citing authorities).

This policy is particularly strong where class action litigation is concerned. *E.g.*, *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation.") (citing cases); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("[T]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.") (citing authorities); *In re U.S. Oil and Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *Airline Stewards & Stewardesses Ass'n v. Trans World Airlines, Inc.*, 630 F.2d 1164, 1166-67 (7th Cir. 1980) ("Federal Courts look with great favor upon the voluntary resolution of litigation through settlement. This rule has particular force regarding class action lawsuits.") (citing cases; internal citation omitted), *aff'd sub nom. Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 (1982); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("[L]itigants should be encouraged to determine their respective rights between themselves. Particularly in class action

suits, there is an overriding public interest in favor of settlement.") (citation omitted); *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976) ("overriding public interest in settling and quieting litigation . . . is particularly true in class action suits . . . which frequently present serious problems of management and expense") (footnotes omitted).

As one court has put, "[m]ost class actions are inherently complex and settlement avoids the costs, delays and multitude of other problems associated with them.  Thus, [i]n most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."  *Brent v. Midland Funding, LLC*, No. 3:11 CV 1332, 2011 WL 3862363, at *16 (N.D. Ohio Sept. 1, 2011) (citations and internal quotation marks omitted).

Therefore, while a district court has discretion concerning the approval of a proposed settlement, "[t]he strong judicial policy in favor of class action settlement contemplates a circumscribed role for the district courts in settlement review and approval proceedings." *Hershey v. ExxonMobil Oil Corp.*, No. 07-1300-JTM, 2012 WL 5306260, at *1-2 (D. Kan. Oct. 26, 2012) (citing cases); *see Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (noting "proper deference" owed to "the private consensual decision of the parties" in settling class action).  In this respect, this Court has noted that "a settlement hearing is not a substitute for a trial; the Court's role is much more limited."  *Diaz v. Romer*, 801 F. Supp. 405, 407 (D. Colo. 1992), *aff'd*, 9 F.3d 116 (table), 1993 WL 425143 (10th Cir. Oct. 21, 1993) (unpublished).

## B.    Criteria Governing Consideration of Final Settlement Approval

Rule 23(e) governs approval of class action settlements.  The "primary concern addressed by Rule 23(e) is the protection of class members whose rights may not be given adequate consideration during the settlement negotiations." *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 283 (D. Colo. 1997) (citation and internal quotation marks omitted).

In determining whether a class action settlement is "fair, reasonable, and adequate," courts consider the following four factors:  (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable.  *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984); *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002); *Gottlieb v. Wiles*, 11 F.3d 1004, 1014 (10th Cir. 1993), *abrogated in part on other grounds by Devlin v. Scardelletti*, 536 U.S. 1 (2002); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1133, 1137 (D. Colo. 2009).

Additional factors that may be relevant include (1) the risk of establishing damages at trial; (2) the extent of discovery and the current posture of the case; (3) the range of possible settlement; and (4) the reaction of class members to the proposed settlement.  *Wilkerson*, 171 F.R.D. at 284.

"In making the determination whether to approve a class action settlement, the court should not decide the merits of the case or resolve unsettled legal questions. . . .  The object of settlement is to avoid, not confront, the determination of contested issues:  therefore, the approval process should not be converted into an abbreviated trial on the merits.  *Ashley v. Reg'l Transp. Dist. & Amalgamated Transit Union Div. 1001 Pension Fund Trust*, No. 05-CV-01567-WYD-BNB, 2008 WL 384579, at *4 (D. Colo. Feb. 11, 2008) (citations and internal quotation marks omitted); *accord Wilkerson*, 171 F.R.D. at 283 (court is not to decide the merits or resolve unsettled legal questions because essence of settlement is compromise).

Consideration of the applicable factors confirms that the Settlement is fair, reasonable, and adequate, and merits this Court's final approval.[16]

### C. The Settlement Was Fairly and Honestly Negotiated.

Where a settlement has been negotiated at arm's length by experienced counsel, a court should draw a strong inference that it is fair and reasonable. *E.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.") (citation and internal quotation marks omitted); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation."); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1392 (D. Ariz. 1989) ("Counsels' opinions warrant great weight both because of their considerable familiarity with this litigation and because of their extensive experience in similar actions."), *aff'd sub nom. Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992); *see also Marcus v. State of Kan., Dep't of Revenue*, 209 F. Supp. 2d 1179, 1182 (D. Kan. 2002) (noting that settlement "was negotiated by experienced counsel for the class").

Here, as the Court is aware from the interim appointment application and its Order granting same (D.E.#30-31, 34), Class Counsel are among the leading law firms handling

---

[16] In *Alvarado Partners v. Mehta*, 723 F. Supp. 540 (D. Colo. 1989), *appeal dismissed*, 936 F.2d 582 (table), 1991 WL 109139 (10th Cir. June 17, 1991) (unpublished), the Court opined that, where a settlement class has been conditionally (*i.e.*, provisionally) certified, "the duty of the Court is heightened to meet concerns of collusion and undue pressure by the settling defendants on a would be class representative. In such a situation, there must be a 'clearer showing of a settlement's fairness, reasonableness and adequacy and the propriety of negotiations leading to the settlement.'" *Id.* at 546-47 (citations omitted.) The instant Settlement, particularly given Western Union's strenuous opposition to Class Counsel's fee request, satisfies the "clearer showing" that Judge Babcock discussed in *Alvarado Partners*.

plaintiffs' consumer fraud class action litigation.   These experienced Class Counsel negotiated the Settlement only after extensive litigation, including after they briefed motions to dismiss filed by Western Union, reviewed discovery produced by Western Union, took numerous depositions of Defendants' witnesses, and defeated the Arbitration Motion filed by WUFSI (which was pending on appeal to the Tenth Circuit).   Based on the extensive review and analysis of the facts, issues, and procedural posture of the case, Class Counsel was able to fully assess the strengths and difficulties of Class members' claims against Western Union.   Class Counsel ultimately negotiated what they believe is a robust and superior monetary settlement for the Class, as well as significant changes in Western Union's business practices going forward.

A settlement negotiated with the assistance of an experienced mediator is further proof that the settlement was reached fairly and provides adequate relief.   *Thieriot v. Celtic Ins. Co.*, No. C-10-04462-LB, 2011 WL 1522385, at *5 (N.D. Cal. Apr. 21, 2011) (approving settlement as "fair, adequate, and reasonable" after noting that it was "the product of serious, non-collusive, arms' length negotiations by experienced counsel with the assistance of an experienced mediator at JAMS."); *accord In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, 631 F. Supp. 2d 1151, 1156 (D. Minn. 2009) (court may consider "whether a settlement resulted from arm's length negotiations, and whether a skilled mediator was involved"); *Erickson v. Credit Bureau Servs., Inc.*, No. 8:11CV215, 2013 WL 672313, at *2 (D. Neb. Feb. 22, 2013) (involvement of skilled mediator in arm's length negotiations is factor to be considered); *Int'l Bhd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*, No. 3:09-CV-00419-MMD, 2012 WL 5199742, at *2 (D. Nev. Oct. 19, 2012) (granting final approval after noting that settlement was reached following arm's length negotiations between experienced counsel that involved assistance of "experienced and reputable" mediator).

As discussed above in Section IV, the Parties participated in mediation sessions with the Tenth Circuit's chief mediator, Mr. Aemmer, which demonstrates the integrity of the settlement negotiation process.   Without Mr. Aemmer's tireless and uniquely capable efforts and contributions (for which Plaintiffs and Class Counsel again wish to commend him), this Settlement would not have been achieved. The Settlement was the result of arm's length negotiations between experienced counsel, assisted by a neutral, experienced mediator, and it was reached after more than three and one-half years of spirited litigation, including extensive motion practice and meaningful discovery.

Indeed, as the Court's file will attest, the litigation was hard fought and frequently contentious, including discovery disputes, motions to compel discovery (D.E. #89), and hearing thereon (D.E. #102).   The Court's file reflects almost 100 docket entries alone related to the Arbitration Motion (D.E. # 56) and the Order denying it (D.E. #139).   There can be no genuine dispute that the parties had "'vigorously advocated their respective positions throughout the pendency of the case.'"   *Lane v. Page*, 862 F. Supp. 2d 1182, 1245 (D.N.M. 2012) (quoting *Wilkerson*, 171 F.R.D. at 284).   The Settlement obtains almost every facet of relief that Plaintiffs could have achieved through litigation.

Throughout the course of the negotiations that ultimately resulted in the Settlement, Plaintiffs and Class Counsel consistently acted in the best interest of all Class members, and ultimately agreed to a settlement that provides substantial compensation and future benefits to the entire Class.   Thus, the fair and honest negotiation of this Settlement supports this Court's approval of the Settlement.

### D.    The Settlement Came Out Only After Spirited Litigation.

Another important indicium that a settlement is fair, reasonable, and adequate is whether it was reached after "the parties to th[e] litigation ha[d] 'vigorously advocated their respective

positions throughout the pendency of the case.'" *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006) (quoting *Wilkerson*, 171 F.R.D. at 284); *accord Henderson v. Volvo Cars of N. Am., LLC*, No. 09-4146 CCC, 2013 WL 1192479, at *10 (D.N.J. Mar. 22, 2013) (noting that settlement was reached after case had been "vigorously litigated for more than three years"). Significantly, as the Court is well aware, this is not some sort of "sweetheart" settlement. Rather, as discussed above, the Settlement came about after nearly three years of spirited litigation, including discovery and multiple rounds of motion practice; and an appeal from this Court's denial of the Arbitration Motion had been initiated at the time that mediation commenced. *Cf. In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1338 (N.D. Ga. 2000) (approving settlement after finding that could not be characterized as "quick settlement"; parties "were well-informed of the strengths and weaknesses of each side's case," having conducted ample discovery and filed numerous motions, which showed that settlement was "entered into when both parties were fully appri[s]ed of the facts, risks and obstacles involved with the possibility of continued litigation"). Indeed, the truculence of Western Union's opposition to Class Counsel's attorney's fees motion (D.E.#207-08) should alone dispel any suggestion that the Settlement might be a collusive "sweetheart" deal.

Given the procedural posture of the litigation at the time that the Settlement was signed and the potential legal difficulties and inevitable delays of the litigation and appeals process (*see* Sections VI.E-F, *infra*), the Settlement represents an excellent, if not outstanding, resolution for the Class. It provides immediate monetary and injunctive relief to the Class, which is composed of a significant number of immigrant and low-income individuals who will greatly benefit from the Settlement. In short, the Settlement is more than fair, adequate, and reasonable given the obstacles and delays that Plaintiffs and the Class faced had this litigation moved ahead without a

negotiated resolution.

>    **E.   Serious Questions of Law and Fact Existed That Put the Ultimate Outcome of a Trial in Doubt.**

In determining the adequacy of the Settlement, the strength of Class members' claims must be considered.  *E.g.*, *Williams v. Sprint/United Mgmt. Co.*, No. 03-2200-JWL, 2007 WL 2694029, at *7 (D. Kan. Sept. 11, 2007) (granting final approval after weighing "relative strength of the claims, and the cost and uncertainty of further litigation").

All through the course of this litigation, the Parties have advocated sharply contrasting positions regarding Western Union's duties and obligations to Plaintiffs with respect to providing prompt notice of unclaimed funds, paying interest on those funds, and charging administrative fees.   Western Union has also asserted that it is immune from liability or has complete affirmative defenses to Plaintiffs' claims based on regulatory oversight by the states, explicit contractual provisions, and compliance with state unclaimed property laws.   It vigorously defended itself in this litigation through the filing of several motions to dismiss (including successfully dismissing the consumer fraud claim [*see* D.E. #37]), contesting discovery, filing the Arbitration Motion, and then filing the appeal to the Tenth Circuit of the denial of the Arbitration Motion (D.E. #141).

Although Plaintiffs believe that the Tenth Circuit would have affirmed this Court's denial of the Arbitration Motion, that appeal alone raised serious uncertainty about the viability of this class action.   Had the Court of Appeals reversed this Court's ruling and directed it to compel arbitration of Plaintiffs' claims, the purported arbitration agreements contain a class action waiver.   Had that waiver been enforced, Plaintiffs and Class members would have had to proceed in individual arbitration.

Even had the Tenth Circuit affirmed the denial of the Arbitration Motion, this Court had

pending before it Western Union's April 25 Rule 12 Motion (*see* D.E. #52).   And even if

Plaintiffs had successfully defended against that motion, that offered "no guarantee that

[Plaintiffs] w[ould] ultimately prevail on the merits."   *McNeely v. Nat'l Mobile Health Care,*

*LLC*, No. 07-933-M, 2008 WL 4816510, *13 (W.D. Okla. Oct. 27, 2008).   Whatever claims

survived that motion would then still have to be certified by this Court for class-wide

adjudication, and class certification was by no means a certainty.   The parties would also have

had to brief and resolve pending merits discovery disputes.   Had a litigation class been certified,

Western Union would likely have pursued an appeal of that decision pursuant to Rule 23(f)—

thus, further prolonging any possibility of relief.   Finally, assuming all class certification hurdles

were surmounted, Plaintiffs' claims would likely have had to be decided on the merits at a trial

and have survive Defendants' almost-certain appeal of a favorable verdict.

Although Class Counsel believe they had a strong case, and would have had a good

chance of securing certification of a litigation class and then prevailing on the merits, a verdict in

favor of the Class (assuming a class was certified and upheld on appeal) was by no means

certain.   "As all experienced litigators and jurists know, that a jury will be the ultimate fact-

finder at trial presents further risks and uncertainties."   *In re Processed Egg Prods. Antitrust*

*Litig.*, 284 F.R.D. 278, 300 (E.D. Pa. 2012); *see In re Metro. Life Derivative Litig.*, 935 F. Supp.

286, 293 (S.D.N.Y. 1996) (approving settlement after noting "the usual risks and uncertainties

attendant to a jury trial").

## F.   The Value of the Settlement Far Outweighs the Possibilities of Future Relief After Protracted and Expensive Litigation.

The goals for the litigation as set out in Section II.A above have very nearly been

completely achieved. The Settlement provides compensation to the Class respecting members'

claims for recovery of principal and interest, and for additional relief in the form of prompt

notice of the right to refund of the unclaimed money transfers.  In fact, there is little more a victory at trial would have achieved.  Consequently, nearly any degree of litigation risk, no matter how small—and, as noted above, experience teaches that there is always litigation risk— weighs in favor of approval of the Settlement.  The amount that Western Union has agreed to transfer into a common fund to settle the claims of the Class is estimated at approximately $133 million (*see* D.E.#219, 219-1); the Settlement represents 100% of the interest earned by Western Union on the unclaimed money transfers,[17] and 100% of the principal amount, less administrative fees.  Moreover, Western Union will pay interest, separate from the Settlement Fund, directly to certain Class members.  In addition, the Settlement will provide Class members whose money has escheated to the states with significant and valuable assistance in obtaining a refund of their money from the states.  Finally, there is the injunctive relief component of providing prompt notice (after 60 days if a money transfer is unclaimed), which creates four economic benefits to the Class:  (1) notice of a right to refund of the principal (*i.e.*, the original amount of money intended to be sent); (2) interest (to compensate for lost time value of money); (3) the ability to avoid administrative fees by claiming the refund prior to one year; and (4) avoidance of the risk of escheatment.

Given the considerable litigation risks inherent in a trial on the merits, not to mention Western Union's appeal of the Arbitration Motion's denial, the pendency of a motion to dismiss at the time of the Court's preliminary approval, the fact that a litigation class had not been certified, and the delay and expense of obtaining an adjudication after trial of Plaintiffs' claims on behalf of the Class, the Settlement represents a resoundingly favorable resolution of this

---

[17] As reasonably calculated, given that the exact amount of interest earned by Western Union during the class period is almost impossible to determine.

litigation.  As stated above, it is highly likely that the Settlement is similar to what could have been obtained for the Class even after a full victory at trial on the merits.  *See Wess v. Storey*, No. 2:08-CV-623, 2011 WL 1463609, at *4 (S.D. Ohio Apr. 14, 2011) ("Furthermore, if the Class were to recover a judgment larger than the Settlement offer, the additional delay due to post-trial motions and the appellate process could deny Class Members a recovery for years.  Given the time value of money, a future recovery, even one greater than the Settlement, may be less valuable to the Class than receiving the benefits of the Settlement now.  To delay this matter further would not substantially benefit the Class.") (citations omitted).

The total economic value of this Settlement, including the payment of compensation to Class members, far outweighs the uncertain possibility of a more favorable recovery after resolution of the pending appeal and a potential trial on the merits. In the absence of this Settlement, Plaintiffs would be required to engage in and complete protracted litigation, including appellate practice.  Even if Plaintiffs were successful on appeal, and the likely Petition for Writ of Certiorari to follow, they would face—at substantial expense—extensive additional discovery, resolution of the motion to dismiss, other contested motions (including class certification and summary judgment), and a lengthy trial proceeding with an uncertain outcome. If this case were to be fully litigated to a conclusion, it would be two or three more years before it would be finally resolved (including any appeals).  Furthermore, if Plaintiffs were unsuccessful on the appeal of the Arbitration Motion's denial—which, by order of the Tenth Circuit, had resulted in a stay of all proceedings in this Court—the individual plaintiffs would have needed to undertake arbitration, and the Class would likely recover nothing.  The totality of circumstances

thus overwhelmingly favors approval of the Settlement.[18]

### G.   Class Counsel Believe the Settlement Is Fair, Reasonable, and Adequate.

Plaintiffs and Class Counsel agreed to the terms of the Settlement only after engaging in extensive analysis and contested litigation.  It was only during the pendency of the Tenth Circuit appeal that the substantive settlement discussions that resulted in the Settlement were initiated. This Court and numerous others have held that Class Counsel's judgment as to the fairness of a class settlement is entitled to considerable weight.  *Lucas*, 234 F.R.D. at 695; *accord Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("[T]he trial court is entitled to rely upon the judgment of experienced counsel for the parties.  Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.") (citations omitted); *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class.") (citation and internal quotation marks omitted); *Int'l Union of Elec. Workers v. Unisys Corp.*, 858 F. Supp. 1243, 1265 (E.D.N.Y. 1994) (opinion of "experienced and competent class counsel is "accorded great weight") (citing cases); *Williams v. Costco Wholesale Corp.*, No.02CV2003 IEG(AJB), 2010 WL 2721452, at *3, *5 (S.D. Cal. July 7, 2010) ("experience and views of counsel" are among considerations in evaluating class settlement for final approval; because counsel believed settlement was "both fair and adequate, th[at] also weigh[ed] in favor of granting final approval").

Here, Class Counsel, who have extensive experience in successfully resolving other class

---

[18] This settlement would have resulted in a complete victory for Plaintiffs had Western Union agreed to the return of the administrative fees it charged Class Members.  That claim, though, stood on weaker footing than the other forms of relief that Plaintiffs were pursuing because such administrative fees were explicitly provided for in the money transfer forms and are expressly permitted under the applicable states' statutes.

action cases nationwide and who are among the leading practitioners in consumer fraud class action litigation, believe that this Settlement constitutes a very favorable resolution of Class members' claims, as to both retrospective and prospective forms of relief.  Because the terms of the Settlement provide a fair, reasonable, and adequate resolution of this litigation for all Class members, Class Counsel strongly recommend that the Court grant final approval to the Settlement.

### H.    Positive Response of Class Members

Another factor that this and other courts have long looked to is the reaction of the very members of a proposed settlement class to a class settlement.    *E.g.*, *In re N.M. Natural Gas Antitrust Litig.*, 607 F. Supp. 1491, 1504 (D. Colo. 1984); *Wilkerson*, 171 F.R.D. at 284; *U S W., Inc. v. MacAllister*, No. 92-B-1254, 1992 WL 427772, at *10 (D. Colo. Dec. 18, 1992); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575-76 (9th Cir. 2004); *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982); *Shlensky v. Dorsey*, 574 F.2d 131, 148 (3d Cir. 1978).

### 1.    The Paucity of Objections in General

Out of a huge Class—numbering in the hundreds of thousands and potentially over one million members, *see* Section V.A.1, *supra* (discussing how Rule 23(a) numerosity element is met here), a mere 12 objections to the Settlement were lodged, which represents .000011% of the Class (using the 1.1 million mailed notices).    That is strong evidence of the fairness, reasonableness, and adequacy of the Settlement, as recognized by a legion of precedents in this District and in many other courts.  *E.g.*, *Ryskamp v. Looney*, No. 10-CV-00842-WJM-KLM, 2012 WL 3397362, at *4 (D. Colo. Aug. 14, 2012) (that only two objections to settlement were received and no objectors appeared at fairness hearing, despite fact that notice of settlement was sent to at least 805 shareholders, "weigh[ed] heavily in favor of approval" of settlement") (citing cases); *Wal-Mart Stores*, 396 F.3d at 118 ("'a small number of objections . . . can be viewed as

indicative of the adequacy of the settlement'") (quoting treatise); *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 795 (N.D. Ohio 2010) (paucity of objections "suggest[ed] that the Settlement Class Members believe[d] the Settlement Agreement [wa]s beneficial"); *In re Lucent Techs., Inc., Secs. Litig.*, 307 F. Supp. 2d 633, 644 (D.N.J. 2004) ("The absence of objections from the overwhelming majority . . . [of] Class Members should be considered in approving the Settlement."); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) ("It has repeatedly been held that one indication of the fairness of a settlement is the lack of or small number of objections.") (citing authorities; internal quotation marks omitted); *State of N.Y. ex rel. Vacco v. Reebok Int'l Ltd.*, 903 F. Supp. 532, 538 (S.D.N.Y. 1995) ("minuscule" number of objections to settlement "also support[ed] its approval"), *appeal dismissed*, 96 F.3d 44 (2d Cir. 1996); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.") (citing cases), *appeal dismissed*, 391 F.3d 812 (6th Cir. 2004); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 378 (D.D.C. 2002) ("the paucity of objections . . . militates in favor of the settlement[]") (citation and internal quotation marks omitted); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) ("the absence of substantial objections and relative absence of opt-outs strongly favors approval") (citing cases); *In re AOL Time Warner, Inc. Sec.*, No. 02 Civ. 5575 (SWK), 2006 WL 3057232, at *16 (S.D.N.Y. Oct. 25, 2006) (absent class members' "satisfaction . . . [wa]s reflected in the paucity of objections to the final settlement"); *Snapp v. Topps Co.*, No. 93-CV-0347 JG, 1997 WL 1068687, at *2 (E.D.N.Y. Feb. 12, 1997) (dearth of objections "carries considerable weight" in evaluation of settlement's fairness) (citing cases); *cf. Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1217 (5th Cir. 1978) (district court should have withheld

approval of settlement that was opposed by 70% of subclass members).[19]

Notably, this minuscule percentage of objections is even smaller than those that courts have found to reflect a class's satisfaction with a settlement. *See Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118 (3d Cir. 1990) (noting that "out of 281 class members, only twenty-nine[] filed objections to the proposed settlement"); *Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (unpublished) (where out of class of nearly 11,000 members, only 79 objected to settlement and only 54 appealed settlement's approval, such small numbers "permit[ted] the inference that most of the class members had no qualms" with the settlement).

### 2.    The Few Objections Lodged Are Meritless

Nor is there any merit to the few objections to the Settlement that were lodged.   Plaintiffs address individual Class members' objections in alphabetical order.

### a.    Bacharach Objection

N. Albert Bacharach, Jr. ("Bacharach") submitted an objection dated May 15, 2013 (D.E.#216).   Bacharach submitted it on his own behalf as a putative class member.   That said, Bacharach is a professional filer of meritless (and even tardy) objections to class action settlements. *E.g.*, *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 115 (D.N.J. 2012), *appeal dismissed*, No. 12-2247 (3d Cir. Aug. 13, 2012); *In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04 Civ. 8141 (DAB), 2010 WL 5060697, at *3 (S.D.N.Y. Dec. 2, 2010), *aff'd*, 452 F. App'x 75 (2d Cir. 2012); *Meyenburg v. Exxon Mobil Corp.*, 3:05-CV-15-DGW, 2006 WL 5062697, at *6 (S.D. Ill.

---

[19] Indeed, some courts have expressed the view that class members' reaction to a settlement "may be *the most* significant factor" in the final approval inquiry. *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003) (emphasis added), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005); *accord Shuford v. Ala. State Bd. of Ed.*, 897 F. Supp. 1535, 1548 (M.D. Ala. 1995) ("In determining whether a settlement is fair, adequate, and reasonable, the obvious *first* place a court should look is to the views of the class itself.") (citing cases; emphasis added).

June 5, 2006); *see also In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, No. MDL 1203, 2002 WL 32154197, at *14-15 (E.D. Pa. Oct. 3, 2002) (denying Bacharach's request for award of fees for objection, filed one day before fairness hearing, after finding that objection did not enhance settlement). That fact warrants this Court's skeptical examination of his objection. *See In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247 ADM/JJK, 2012 WL 3984542, at *5 (D. Minn. Sept. 11, 2012) ("Courts treat with particular disapproval the objections and appeals of 'professional objectors,' whose objections amount to a 'tax that has no benefit to anyone other than to the objectors' but serves to 'tie up the execution of [a] Settlement and further delay payment to the members of the Settlement Class[.]") (quoting *In re Checking Account Overdraft Litig.*, No. MDL 2036, 2012 WL 456691, at *2 (S.D. Fla. Feb. 14, 2012), *appeal dismissed*, No. 12-11168 (11th Cir. June 19, 2012)).

At any rate, Bacharach does not offer any critique of the Settlement itself.  Rather, his sole protest is to the amount of the requested fee award.  Specifically, he contends that the requested award "fails to take into account the economies of scale inherent in mega-fund cases" (which he defines as any settlement yielding more than $100 million), and he asserts that Class Counsel's award should be not more than "15.1%" of the Class Settlement Fund.  The argument that a smaller percentage of a common fund should be awarded in the case of "mega-fund" settlements is one that a number of courts—most emphatically the Seventh Circuit—have rejected, noting that "[p]rivate parties would never contract for such an arrangement, because it would eliminate [class] counsel's incentive to press for more . . . from the defendants." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001).

Thus, in *Synthroid*, the Seventh Circuit reversed the district court's 10% cap on fees that

it had imposed on the reasoning that the $88 million consumer claims settlement fund was a "mega-fund," and it reaffirmed its holding from several previous cases that "when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Id.* (citing cases); *accord In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 754 (S.D. Tex. 2008) ("[T]he megafund rule is contrary to the Fifth Circuit's approach that the district court scrutinize each case for the particular facts that will determine what constitutes a reasonable fee award."); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1203 (S.D. Fla. 2006) (benchmark for class counsel fee awards should be "by reference to the market rate for a contingent fee in private commercial cases tried to judgment and reviewed on appeal"); *In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-0085 FSH, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) ("The percentage-of-the-fund method of awarding attorneys' fees in class actions should approximate the fee which would be negotiated if the lawyer were offering his or her services in the private marketplace. The object . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation.") (citation and internal quotation marks omitted); *Millsap v. McDonnell Douglas Corp.*, No. 94-CV-633-H(M), 2003 WL 21277124, at *7 (N.D. Okla. May 28, 2003) (besides Tenth Circuit's range of fee awards, "[t]he market rate for Class Counsel's legal services . . . informs the determination of a reasonable percentage to be awarded from the common fund as attorney fees").

In short, the Court should reject Bacharach's invitation to penalize Class Counsel for their having achieved a high dollar-value settlement for Class members.

### b.    Dorsey Objection

Paul Dorsey ("Dorsey"), appearing pro se, submitted a 24-page brief—docketed on May

20, 2013 and transmitted to Class Counsel by ECF on May 21st, six days after the expiration for the filing of objections.   In it, Mr. Dorsey recites various conclusory or boilerplate propositions of law and specifically (i) attacks the Class Notice plan, (ii) disputes the valuation of the Settlement, and (iii) remarkably contends that the low number of objectors should not be deemed to reflect Class members' satisfaction with the Settlement because the Parties "artificially reduced the number of objectors."   (D.E.#211.)

As a threshold matter, the Court should disregard Dorsey's brief because it appears to have been filed out of time.   That aside, the Court previously rejected Dorsey's attack (D.E.# 176) on the sufficiency of the Class Notice.   Dorsey's latest challenge to the Class Notice and notice plan similarly falter.

To be sure, one of the considerations in the final approval of a settlement is the adequacy of notice to members of a proposed settlement class, with some courts (including at least one decision in this District) considering it a threshold issue.   *E.g.*, *Ashley*, 2008 WL 384579, at *4 ("first issue to be addressed" was adequacy of notice to settlement class); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1170 (S.D. Cal. 2007); *Riker v. Gibbons*, No. 3:08-CV-00115-LRH, 2010 WL 4366012, at *1 (D. Nev. Oct. 28, 2010).   As the Tenth Circuit has summarized the notice requirement,

> [u]nder [Rule] 23(e)(1)(B), a district court approving a class action settlement must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise. . . . particularly when, as here, individual class members are required to file claims to collect from [a] settlement fund.   For any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.   In addition to the requirements of Rule 23, the constitution's Due Process Clause also guarantees unnamed class members the right to notice of certification or settlement.

*DeJulius v. New Eng. Health Care Employees Pension Fund*, 429 F.3d 935, 943-44 (10th Cir. 2005) (citations and internal quotation marks).

"'The standard for the settlement notice under Rule 23(e) is that it must "fairly apprise" the class members of the terms of the proposed settlement and of their options.'" *In re Integra Realty Res.*, 262 F.3d at 1111 (quoting *Gottlieb*, 11 F.3d at 1013 (citing treatise).  The substance of the notice to a settlement class must describe the nature of the action, the definition of the class to be certified, the class claims and defenses at issue, as well as explain that settlement class members may enter an appearance through counsel if so desired, request to be excluded from the settlement class, and that the effect of a class judgment shall be binding on all class members.  *See* Fed. R. Civ. P. 23(c)(2)(B).  Notice is adequate "if it may be understood by the average class member."  *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 130 (2d Cir. 2011) (citation and internal quotation marks omitted); *accord In re Corrugated Container Antitrust Litig.*, 611 F.2d 86, 88 (5th Cir. 1980).

Measured against these standards, Dorsey's objection teeters on the frivolous.  Here, the Settlement provided for a multifaceted Notice Plan (*see* Secs. 3.D.-E), which satisfies both the substance and manner of distribution requirements of Rule 23 and Due Process.  The Administrator mailed to the members of the provisionally-certified Class—in accordance with the procedures described above at length in Section IV.D—a "Long Form Notice" (*see* Exhibit 2 to the Settlement Agreement).  Secs. 3.D.2-3.  In addition, the Administrator e-mailed the Long Form Notice to Class members for whom the Administrator had an e-mail address on record.  Sec. 3.D.4.  Although he complains that he did not receive the notice by e-mail (D.E. #211 at 13-14), Dorsey concedes that he received the Class Notice by mail, at which time he first contacted Class Counsel.

Also, on April 25, 2013, in accordance with Secs. 2.A.3 and 2.C.4 and this Court's April 11, 2013 Order (D.E.#183), the Administrator mailed a supplemental notice to those Class members who faced interim escheatment during the time period between the Court's provisional and final approvals, explaining their rights under state law and the opportunity to secure a return of their funds, and pursuant to the Court's May 15, 2013 Order (D.E.#206), the Administrator issued corrected supplemental notice to that category of Class members once it was discovered that the April 25th supplemental notices contained incorrect transaction amounts.

Separately, the Administrator oversaw wide-ranging publication notice, which required the placement of half-page versions of the notice, attached as Exhibit C to the Settlement Agreement, in the national publications *People en Español*, *Ebony*, and *People* (the "Publication Notice") (Exhibit 3 to the Settlement Agreement). *See* Sec. 3.D.7. Finally, the Administrator established a website, contained downloadable copies of the Claim Forms and Long Form Notice (in both English and Spanish), as well as the Publication Notice, and the Escheat Recovery Form and Instructions. Both the Long Form Notice and the Publication Notice provided all of the information that Rules 23(c)(2)(B) and 23(e) require, and the Long Form Notice and the Publication Notice complied with the recommendations of the Federal Judicial Center

Dorsey's attacks on the adequacy of the Class Notice based on recommendations contained in the *Manual for Complex Litigation* ("Manual") are unavailing. "The Manual is not mandatory authority, and itself stresses that its 'suggestions' need not be strictly adhered to in every application." *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983) (quoting *Manual*); *accord Pan Am. World Airways, Inc. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 523 F.2d 1073, 1078 (9th Cir. 1975) ("[T]he Manual cannot serve as a source of judicial power because the committee that drafted it possessed authority only to issue

*recommendations*.") (emphasis added).

Also unavailing is Dorsey's assertion that he "has[s] been unable to obtain the actual Notice Plan." (D.E.#211, at 14.) Dissemination of Class Notice was governed by Section 3.D of the Settlement Agreement, which was docketed as part of the preliminary approval motion papers. (D.E.#172-2.) There is no requirement that absent Class members be furnished the precise details of a notification plan in order to make an informed decision if a settlement is fair, reasonable, and adequate to them.

As for his attack on the Settlement's valuation (D.E.#211, at 19-22), Dorsey complains that by disgorging $180 million in cash, while also removing $180 million in liabilities the "net number to Western Union's balance sheet is zero." (*Id.* at 21). Dorsey, though, does not dispute, nor could he, that the Settlement requires Western Union to disgorge *all* unredeemed funds that it is currently holding. It is unclear what more could be required of Western Union, and Dorsey makes no suggestions in that respect. Dorsey also takes issue with the values assigned to the escheated fund and to the interest calculations, arguing that these numbers should be "discounted accordingly." (*Id.* at 22.) But even if these damage tranches are discounted, as Dorsey suggests, this does not materially impact the settlement's robust valuation. Finally, Dorsey argues that the Class Settlement Fund should not be valued by the amount of money deposited in the non-reverting common fund but rather should be valued only by the "amount of the settlement fund that will actually flow thru to the class members." (*Id.* at 21.) This position—valuing a common fund by looking at the claims made by class members as opposed to the amount of money deposited into it—has long been rejected by courts, including the Supreme Court in its landmark decision in *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479 (1980) ("[T]his Court has recognized consistently that a litigant or a lawyer who recovers a common

fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."). As discussed at length in the contemporaneously-filed reply memorandum and Supplemental Declaration of Professor Brian Fitzpatrick, the claim that valuation of a common fund—in which there will be no reverter to the defendant but, rather, a *cy pres* distribution of any residual funds—should be determined by the amount that Class members actually claim has  no support in the law of the Tenth nor any other circuit, or in the scholarly literature on the subject, and any such suggestion flies in the face of all policy considerations involving class action fee determinations.

Besides, Congress has directly confronted the issue of when valuation based upon claims made is appropriate, and it has directed courts to apply such a rule only in the case of coupon settlements. *See* 28 U.S.C. § 1712(a).   That provision was enacted as part of the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, § 3(a), 119 Stat. 4 (Feb. 18, 2005).  Had Congress desired such a rule to apply also in the case of non-reverter cash settlements, it could easily have done so as part of its package of sundry statutory enactments in CAFA governing class action litigation.  Given that Congress is presumed to be aware of existing legal precedents when it legislates, *e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 792 (1998), the only inference that can be drawn from the enactment of section 1712 is that Congress did not intend to disturb the longstanding rule of *Van Gemert* and the multitude of cases adhering to it.

Finally, Dorsey tries to put a favorable spin on the lack of support among Class members for his attack on the Settlement by claiming that the dearth of objections is not indicative of Class member support for the Settlement because the Parties "artificially depressed" the number of objectors.  (D.E.#211, at 22.)  That contention is both factually baseless (given the robust Class Notice plan discussed above) and legally unsupportable (given the ample caselaw

precedent discussed in Section VI.H above).  In short, Dorsey's objections are as specious as his earlier attack on the Class Notice, and this Court should, as before, overrule them.

c.      <strong>Giancaterino Objection</strong>

Terry Giancaterino ("Giancaterino") filed a pro se objection on April 15, 2013 (D.E.#189), which is limited to potential size of Class Counsel's fee award.  She maintains that the amount is excessive because there are "too many" attorneys representing Plaintiffs and that $10.8 million would be an appropriate fee award, and she also objects to Western Union being allowed to deduct administrative fees.  She compares this case to the *Dalkon Shield* litigation and says that the final settlement there "didn't reach nearly this high"; however, Dalkon Shield had a $615 million reserve and involved over 8,000 individual personal injury claims.  Her assertion that the requested award in the case *sub judicie* is excessive and suggestion that Plaintiffs' attorneys have overstaffed this litigation do not hold water.  As the Court is aware, Western Union vigorously defended this litigation.  Its fervor has not lessened even in the wake of the Settlement, as reflected by its vociferous opposition to Class Counsel's fee motion.  Plaintiffs had to bring to bear the resources of a number of firms against such a large, well-financed, and aggressive corporate defendant.

With respect to Giancaterino's latter point, as noted in Section VI.F above, while Plaintiff surely would have preferred a perfect settlement that also included reimbursement of administrative fees, this was not to be; Plaintiffs' claim for a return of the administrative fees charged by Western Union stood on weaker footing than the other forms of relief that Plaintiffs pursued because such fees were explicitly provided for in the money transfer forms—*i.e.*, they are a matter of contract between Class members and Western Union—and are expressly permitted under applicable states' statutes.

### d.      Jeremiah Nelson Objection

Jeremiah Nelson ("Mr. Nelson") submitted a pro se objection, dated April 22, 2013, in which he (1) "object[s] to the lack of criminal charges against Western Union" and (2) objects to having any administrative fees deducted from his settlement proceeds.  With respect to his first point, (i) that is a matter entirely outside Plaintiffs' and Class Counsel's purview, (ii) Plaintiffs are unaware of any precedent calling into question the fairness of a class settlement on the ground that criminal charges were not pursued against a defendant, and (iii) Mr. Nelson does not identify what criminal laws Western Union violated.   As to his latter point, the response respecting Giancaterino's similar objection applies equally:   the fact that administrative fees were not recouped in the settlement does not make the settlement unfair or unreasonable.  Put another way, it is not unreasonable that the Settlement allowed Western Union to retain such fees because the claim for a return of administrative fees charged by Western Union stood on weaker footing than the other forms of relief that they pursued.

### e.      Sikora Nelson Objection

Ms. Sikora Nelson ("Ms. Nelson"), represented by the law firm of Drew, Cooper & Anding, submitted an objection, dated May 14, 2013 and raising two complaints.  (D.E.#212.) She maintains that (i) the Settlement is unfair to Michigan resident Class members because it foregoes the possibility of treble damages under that state's laws (and that therefore a subclass of Michigan residents was warranted); and (ii) the notice of the Settlement did not fairly apprise Class members of the terms of "the nature of the case," the Settlement's terms, and the nature of the release being given to Defendants.

Ms. Nelson's assertion concerning treble damages under Michigan law misses the point. Unless Plaintiffs first established Western Union's *liability*, no Class member stood to receive a single penny in damages or restitution—and, as discussed above in Sections VI.E-F., prevailing

on the threshold liability questions was far from certain if the litigation continued. Hence, any speculation as to the quantum of particular Class members' damages is misplaced. In any event, in evaluating class settlements, courts do not factor the foregoing of possible treble damages into the calculus. *E.g.*, *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 325 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1876 (2012); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 458-59 (2d Cir. 1974), *overruled in part on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). Furthermore, acceptance of Ms. Nelson's premise—that the members of a nationwide consumer settlement class should be treated differently depending on the state law applicable to their claims—would in many (if not most) cases unnecessarily complicate settlement administration, if not render it altogether unworkable. Finally, for the reasons explained above with respect to Dorsey's objection, there is even less merit to Ms. Nelson's grievance as to the sufficiency of the Class Notice.[20]

### f.     Severini Objection

Steven Severini ("Severini"), represented by the law firm of Lombardi & Lombardi, and apparently joined by his wife Luanne, submitted an objection, dated May 13, 2013 (D.E.#217), in which he complains that the Settlement does not compensate him for the injuries that he suffered on account of Western Union's failures to effectuate his money transfers. Specifically, Severini contends that failed money transfers to Harley Davidson Financial eventually led to the repossession of his motorcycle that he had purchased in 2006, with the result that his credit

---

[20] Ms. Nelson also states that "it is worth noting that the proposed common settlement fund in this case of $180 million is *less than* 6% of the total settlement funds held by Western Union." (D.E.# 212, at 5 (emphasis added).) That statement, however, is incorrect because the Class Settlement Fund represents 100% of all unredeemed transfer funds currently held by Western Union.

rating was "severely blemished," and that Harley Davidson Financial is continuing to dun him for almost $10,800.   The suggestion that Plaintiffs failed to obtain compensation for consequential damages suffered by Class members is unavailing.  This litigation was never about Class members' consequential damages but, rather, about Class members' money that Western Union had been wrongfully holding interest-free and without timely notice to them.  Putting that to one side, Class members' money transfer forms specifically preclude consequential damages. Besides, consequential damages must be reasonably within the contemplation of, or reasonably foreseeable by, the parties to a contract.  *E.g.*, *Duffield v. First Interstate Bank of Denver, N.A.*, 13 F.3d 1403, 1406 (10th Cir. 1993) (applying Colorado law); *Halstead Hosp., Inc. v. N. Bank Note Co.*, 680 F.2d 1307, 1311 (10th Cir. 1982) (Kansas law); *Skier's Edge Co. v. Ladapa Die & Tool, Inc.*, 99 F. App'x 848, 851-52 (10th Cir. 2004) (unpublished) (Utah law).   Any contention that Class members' consequential damages were reasonably within the Parties' contemplation or reasonably foreseeable by them at the time that Class members sought to make their respective transfers would have been tenuous.  Because Plaintiffs never pursued consequential damages from the outset of this litigation and had no basis to do so, the absence of such relief to Class members cannot call into question the Settlement's fairness, reasonableness, and adequacy.

g.      **Other Responses**

In addition to these few objections, James Hinga ("Hinga") filed a pro se response on May 14, 2013 (D.E.#205) in which he states that he has "the pleasure of thanking you for undertaking this daunting and commendable action on behalf of those adversely affected by Western Union questionable business practices."   Hinga states that his "participation" in the settlement is "condition[ed]" on the understanding that he will receive what Western Union owes him, plus interest and "damages," absent which he would be "compelled to file [his] own legal claim against Western Union."   Taken together, Hinga's statements appear to endorse the

Settlement.  Similarly, C. Edward Wolfe's pro se filing (D.E.#191)—in which he stated only that he "object[s] to the incidents listed in this case with Western Union Co."— seems to attack only Western Union's misconduct.  Another pro se submission was filed by Ana Ortiz, who stated only that she wishes to be "include[d]" in the Settlement.  (D.E.#214.)  Marlene Benedict wrote to Lead Class Counsel on March 30, 2013 to "[t]hank you so much for your letter concerning Western Union.  I want to express to you . . .  that Western Union is a terrible company to do business with. . . . [Its] actions and contractual abuses should not be allowed to continue."  Arnelle Lee Gabor submitted a pro se letter to Lead Class Counsel, stating that she was "thankful for the professionalism of this lawfirm seeking justifiable justice for my current circumstances with complete honorary respect and appreciation with patience in this process."  (D.E.#187(1).)  Finally, Elizabeth Scott submitted a pro se response (D.E.#210) that mentioned nothing about the Settlement but, rather, pertained to an unrelated New York State Freedom of Information Law dispute.

### h.    Objections of State Attorneys General

As the Court is aware, the Attorneys General of 13 states and the District of Columbia improvidently filed a motion for leave to file a brief as amici curiae (D.E. #223), which this Court denied (D.E. #224) subject to consideration of a Reply which will come, if at all, after the deadline for this brief.  The foregoing notwithstanding, the Attorneys General have made a number of claims attacking the fairness of this Settlement which, although inaccurate, may find traction if not rebutted.  The proponents of the Settlement have the obligation to establish its fairness irrespective of arguments made by objectors or putative objectors.  Because the bell cannot be un-rung, and without waiving the objections to their filing, Class Counsel feels compel to provide a brief response to these baseless attacks.

In every class action case, a court has ample authority to extinguish the claims of class members who do not claim their funds from the class settlement fund. Every class action ultimately results in a resolution of class claims through a binding judgment. That is the function of the requirements of Rule 23(e) and Due Process. Here, each Class member received a notice by first-class mail that complies with Due Process. Having received this first-class mail notice, Class members have had an opportunity to opt out of the Settlement, and only a negligible number have. The law regarding the effect of failure to opt out after receipt of Due Process-compliant notice is not in controversy. It has long been recognized that "a fully descriptive notice [] sent first-class mail to each class member, with an explanation of the right to 'opt out,' satisfies due process. Requiring a Class member to affirmatively request inclusion would probably impede the prosecution of those class actions involving an aggregation of small individual claims, where a large number of claims are required to make it economical to bring suit." *Shutts*, 472 U.S. at 813. *Shutts* makes clear that Due Process is satisfied by such a notice in "those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments." *Id*. at 881 n.3. The Class claim here is one that is unequivocally for money. Therefore, by failing to opt out, a Class member has agreed to be bound, and can be constitutionally bound, by this Settlement. Class members can claim their funds through the Settlement and have ample opportunity to do so. Indeed, the Settlement provided by this notice greatly increases the probability that a claim will be made compared to the pre-Settlement world, where Western Union sent a simple letter years after the fact to an address that very likely did not reach the Class member.

Further, the money covered by this Settlement is not ripe to be escheated and is expressly excluded from the Class Settlement Fund. See Settlement Agreement, Sec. 2.A.3 ("shall not

include any funds deemed abandoned or unclaimed under the abandoned or unclaimed property laws of any state, district, territory, or U.S. jurisdiction"). All unclaimed money transfer funds deemed abandoned have already been escheated. As such, no abandoned or unclaimed property laws are implicated by the Class Settlement Fund, comprised as it is only with unclaimed money transfers about which the rightful owners—the Class—are unaware.

The real substance of the litigation is the alleged inequitable and unconscionable practice of Western Union secretly holding consumers' money for five years (or more), all the while earning interest and charging administrative fees (approximately $50 million worth). Plaintiffs do not allege that Western Union violated state unclaimed property law or state escheatment law, and the Parties do not dispute that Class members are the rightful owners of their unclaimed money transfers. The case is not about who owns the money, it is about depriving the owners of that property for five or more years, all the while profiting from that deprivation: "Plaintiffs' allegations center on Western Union's practice of failing to notify customers when their attempted wire transfers fail or go unclaimed, and holding those funds in interest-bearing accounts, sometimes for years, until individual state unclaimed property laws trigger a notification obligation." (Dkt. # 28). The is also no dispute that the Class Settlement Fund is an approximate $133 million fund to be deposited in an escrow account for distribution to the Class under Court supervision. This is money to which the Class had no access before the Settlement, primarily because Western Union never disclosed that the money transfers had failed. Finally, the resolution of all money disputes result in a release because that is what a resolution means. This case is no different from any other case: consideration is paid by a defendant in exchange for a binding release of claims against it. The Release does not extend beyond the matters in dispute and is not overbroad. It is carefully tailored to the claims of the litigation, and prudently

defines the "Released Claims," "Released Parties," and the "Releasors" in full compliance with all legal norms.

## CONCLUSION

For the foregoing reasons, the Class satisfies the requisite criteria for certification under Rule 23 (a) and (b)(3), and the Settlement between the Class and Western Union is fair, reasonable, and adequate.  Accordingly, the Court should enter an Order:

1)    Certifying the Class for settlement purposes only;

2)    Appointing the named Plaintiffs in the consolidated actions as the Class Representatives;

3)    Appointing Complex Litigation Group LLC; Seeger Weiss LLP; Burg, Simpson, Eldredge, Hersh & Jardine, P.C.; Calton Legal Services; Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C.; and Mitchell Baker as Class Counsel for the Class;

4)    Appointing Complex Litigation Group LLC as Lead Class Counsel; and

5)    Granting final approval of the Settlement.[21]

**Dated:** June 3, 2013

Respectfully submitted,

**COMPLEX LITIGATION GROUP LLC**

By:____/s/ Richard J. Burke_____

Richard J. Burke
**COMPLEX LITIGATION GROUP LLC**
1010 Market Street, Suite 1340
St. Louis, Missouri  63101

---

[21]  Plaintiffs and Class Counsel have also requested an award of attorney's fees, reimbursement of expenses, and $7,500 incentive awards for each of the four Plaintiffs, but those requests are the subject of a separate motion filed on April 30, 2013 (D.E.#195-98), to which Western Union filed opposition papers on May 16, 2013 (D.E.#207-08), and in further support of which Plaintiffs and Class Counsel are contemporaneously filing reply papers.

Jeffrey A. Leon
Jamie E. Weiss
Grant Y. Lee
**COMPLEX LITIGATION GROUP LLC**
513 Central Avenue, Suite 300
Highland Park, IL 60035
(847) 433-4500

***Interim Lead Class Counsel***


Seth A. Katz
Daniel McKenzie
**BURG SIMPSON EDDREDGE HERSH
& JARDINE P.C.**
40 Inverness Drive East
Englewood, Colorado 80112

Jonathan Shub
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, Pennsylvania 19102


Jim S. Calton, Jr.
**Calton Legal Services, SP**
322 South Eufaula Avenue
Eufaula, AL 36027

James E. Cecchi
**CARELLA, BYRNE, CECCHI, OLSTEIN,
 BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068

Mitchell Baker
1543 Champa Street, Suite 400
Denver, Colorado 80202

***Attorneys for Plaintiffs and the Class***